IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL MULTIFAMILY HOUSING COUNCIL )
and NATIONAL APARTMENT ASSOCIATION, )
)
                Plaintiffs, )
)
       v. )
)
)
ALPHONSO JACKSON, in his official capacity as )   Civil Action No. 07-815 (JR)
Secretary of Housing and Urban Development, and )   Judge James Robertson
UNITED STATES DEPARTMENT OF HOUSING )
& URBAN DEVELOPMENT, )
451 Seventh St., S.W. )
Washington, DC 20410, )
)
                Defendants. )
_____)

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ON THE PLEADINGS**

**INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants Alphonso Jackson, Secretary of Housing and Urban Development, and the United States Department of Housing and Urban Development ("HUD"), respectfully move to dismiss the complaint in this case for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted. Plaintiffs' claims are not ripe, and plaintiffs lack standing to assert them. Accordingly, plaintiffs' claims should be dismissed.

Plaintiff National Multifamily Housing Council ("NMHC") describes itself as the representative of "over 1000 multi family housing developers, owners, managers and financiers." Complaint, ¶ 2. Plaintiff National Apartment Association ("NAA") describes itself as "an

industry trade group with 188 state and local affiliates representing over 51,000 multi family housing companies." Comp. ¶ 3.

On May 3, 2007, Plaintiffs filed this action, challenging guidance that HUD issued to help ensure that persons with limited English proficiency receive fair and meaningful access to federally funded services, programs, and activities. See Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 72 Fed. Reg. 2732 (Jan. 8, 2007) ("Policy Guidance").[1] This Policy Guidance clarifies the federal government's long-standing view that, under Title VI and its implementing regulations, in certain circumstances, recipients of federal financial assistance must provide access to linguistic assistance to persons with limited English proficiency to avoid providing services in a manner that results in discrimination based on national origin.[2] See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; 24 C.F.R. § 1. The challenged Policy Guidance also reflects the unfortunate reality that, absent specific efforts to eliminate linguistic barriers, persons with limited English proficiency frequently are denied the benefits of federally funded programs.

Defendants now move to dismiss plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted.

---

[1.] A copy of the Policy Guidance is Attachment A to this Memorandum.

[2.] See also Lau v. Nichols, 414 U.S. 563, 570 (1974) (Stewart, J. concurring) (describing guidance issued by Department of Health, Education, and Welfare in 1970); Department of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 F.R. 41455 (noting that "the Department's commitment to implement Title VI through regulations reaching language barriers is long-standing") (June 18, 2002).

## STATEMENT OF FACTS

Section 601 of Title VI prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Section 602 of Title VI, 42 U.S.C. § 2000d-1, authorizes and directs each federal grant agency to implement this principle of non-discrimination by issuing rules, regulations or orders. In 1996, HUD promulgated regulations pursuant to Section 602. These regulations state that recipients may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(2)(i).

On August 11, 2000, President Clinton issued Executive Order 13,166. That order directs federal agencies to develop, after consultation with appropriate program and activity stakeholders, guidance ensuring that persons with limited English proficiency ("LEP") receive meaningful access to federally funded services. Exec. Order No. 13,166, 65 Fed. Reg. 50,121 (August 16, 2000). To assist federal agencies in developing LEP guidance, the Executive Order incorporated by reference contemporaneously issued Department of Justice ("DOJ") General Policy Guidance and instructed each agency to issue LEP guidance consistent with that policy directive. 65 Fed. Reg. 50,123 (August 16, 2000).

The DOJ General Policy Guidance stated that it was intended to clarify pre-existing Title VI responsibilities, not to create new obligations beyond those already established by the statute or prior implementing regulations. 65 Fed. Reg. 50,123. It also stated that, while the guidance might help agencies shape overall standards, the specific application of Title VI regulations

would vary on a case-by-case basis:

> Title VI and its regulations require recipients to take reasonable steps to ensure "meaningful" access to the information and services they provide. What constitutes reasonable steps to ensure meaningful access will be contingent on a number of factors * * * [including] the number or proportion of LEP persons in the eligible service population, the frequency with which LEP individuals come in contact with the program, the importance of the service provided by the program, and the resources available to the recipient.

Id. at 50,124. Further guidance was issued by DOJ in 2002. See Department of Justice, <u>Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons</u>, 67 Fed. Reg. 41,455 (June 18, 2002).

To fulfill its obligations under Executive Order 13,166, HUD issued its own guidance to recipients of HUD financial assistance. The Policy Guidance was originally published on December 19, 2003. See 68 Fed. Reg. 70,968 (Dec. 19, 2003). The initial public comment period closed on January 20, 2004, but on that date the comment period was extended to February 5, 2004. The final Policy Guidance with which plaintiffs take issue was published on January 22, 2007, at 72 Fed. Reg. 2731-2754.[3]

The Introduction to the HUD Policy Guidance describes the purpose of the document as follows:

> This policy guidance clarifies existing legal requirements for LEP persons by describing the factors recipients should consider in fulfilling their responsibilities to LEP persons. The policy guidance is not a regulation, but rather a guide. Title VI and its implementing regulations require that recipients take responsible steps to ensure meaningful access by LEP persons. This guidance provides an analytical framework that recipients may use to determine how best to comply with statutory

---

[3] The first section of the Federal Register publication summarizes the comments received and HUD's responses. The actual Policy Guidance begins at 72 Fed. Reg. 2738.

and regulatory obligations to provide meaningful access to the benefits, services, information, and other important portions of their programs and activities for individuals who are limited English proficient.

72 Fed Reg. at 2738.

Similar to the DOJ General Policy Guidance, the HUD Policy Guidance includes factors that help recipients of federal financial assistance understand their existing obligation under Title VI and its implementing regulations to take reasonable steps to provide meaningful access to federally funded programs to LEP persons. These factors include: (1) the number or proportion of LEP persons eligible to be served or likely to be encountered by the program, activity, or service provided by the recipient; (2) the frequency with which LEP individuals come into contact with the recipient's program, activity, or service; (3) the nature and importance of the recipient's program, activity, or service; and (4) the resources available to the recipient and costs. See 72 Fed. Reg. 2734.

Under HUD's regulations, if HUD believes that a fund recipient is not in compliance with Title VI, HUD must first attempt to resolve any dispute by informal means. 24 C.F.R. § 1.7(d). If such efforts are unsuccessful, it may refer the matter to the Department of Justice with a recommendation that DOJ initiate enforcement action. Alternatively, HUD may institute proceedings to suspend or terminate the recipient's federal financial assistance. 24 C.F.R. § 1.8(a).

Before HUD may suspend or terminate the financial assistance, the responsible official must notify the recipient of the alleged noncompliance, and must determine that the matter cannot be resolved by voluntary means. 24 C.F.R. § 1.8(c)(1). The recipient must then be afforded an opportunity for a hearing, 24 C.F.R. § 1.8(c)(2), in accordance with procedures set

forth in 24 C.F.R. § 1.9. If the hearing results in a finding of discrimination, the finding must be approved by the Secretary, 24 C.F.R. § 1.8(c)(3), and may not take effect until the expiration of 30 days after the Secretary has filed with the appropriate committees of the House and Senate "a full written report of the circumstances and the grounds for such action." 24 C.F.R. § 1.8(c)(4). Pursuant to 42 U.S.C.A. § 2000d-2, the recipient is entitled to judicial review of HUD's action.

Plaintiffs have not brought suit on their own behalf, but solely on behalf of "certain of their members," whom the complaint does not identify. Plaintiffs have not alleged that HUD or any other federal agency has initiated any enforcement proceedings against any of their members.

## ARGUMENT

Before plaintiffs may have their allegations adjudicated on the merits, they must demonstrate that this court has subject matter jurisdiction over their claims, and that they have stated claims for which relief can be granted. Plaintiffs fail to meet this burden as they have not presented justiciable claims. To the contrary, they are asking this court to adjudicate a disagreement over policy.

Specifically, plaintiffs take issue with the way in which HUD has interpreted the obligation, imposed on recipients of federal financial assistance by Title VI and its implementing regulations, to provide their programs and services in a manner that does not result in discrimination based on national origin. In the agency's view, the obligation to avoid discrimination based on national origin includes taking reasonable steps to provide meaningful access to federally funded programs and activities to LEP persons. But the Policy Guidance, which plaintiffs seek to challenge, does not create this obligation. It arises from the regulation prohibiting fund recipients to "utilize criteria or methods of administration which have the effect

of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(2)(i). Plaintiffs do not challenge HUD's regulations in this case.[4] See Complaint at 17-18.

Plaintiffs do not allege that any of their members is the subject of any investigation, compliance review, or other enforcement proceeding based in whole or in part on alleged failure to follow the Policy Guidance. In the absence of such a concrete enforcement proceeding, courts lack the power to entertain an abstract challenge to agency policy because (1) the party bringing the action lacks standing to do so, and (2) the dispute is not ripe for judicial review. These related doctrines of standing and ripeness require dismissal of this action.

## I.  PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

The Supreme Court has enunciated several requirements for standing, all of which must be met in order for a federal court to adjudicate a case. Three of these standing requirements derive from the Supreme Court's interpretation of Article III of the Constitution. First, the plaintiff must allege that he or she has suffered or immediately will suffer an injury. Second, the plaintiff must allege that the injury is fairly traceable to the defendant's conduct. Third, the plaintiff must allege

---

[4] The Supreme Court, in Lau v. Nichols, 414 U.S. 563 (1974), interpreted regulations promulgated by the former Department of Health, Education, and Welfare (HHS's predecessor) as requiring a federal financial assistance recipient to take steps to ensure that language barriers did not exclude LEP persons from effective participation in its benefits and services. More recently, in Alexander v. Sandoval, 532 U.S. 275 (2001), the Supreme Court held that private individuals may not sue to enforce such regulations, promulgated by a federal agency under Title VI. That ruling does not affect the regulations themselves or agency guidance, such as the Policy Guidance at issue here, which explains recipients' obligation to ensure meaningful access to federally funded programs and services for LEP persons. See Alexander v. Sandoval, 532 U.S. at 282-83.

that a favorable decision is likely to redress the injury. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); accord City of Dania Beach v. Federal Aviation Admin., 485 F.3d 1181, 1185 (D.C. Cir. 2007).

An associational plaintiff seeking to assert standing on behalf of its members must show that: (1) at least one of its members possesses standing to sue in his or her own right; (2) the interests the suit seeks to vindicate are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Renal Physicians Ass'n v. U.S. Dept. Of Health & Human Services, — F.3d —, 2007 WL 1671676 at *8 (D.C. Cir. June 12, 2007) (quoting Hunt v. Wash. State Apple Adver. Comm'n., 432 U.S. 333, 343 (1977)).

The party invoking federal jurisdiction bears the burden of establishing all of these elements. See American Federation of Government Employees, AFL-CIO v. Rumsfeld, 321 F.3d 329, (D.C. Cir. 2003); Lujan, 504 U.S. at 561. To meet this burden, the litigant must clearly and specifically set forth claims sufficient to satisfy Article III standing requirements. See id. The plaintiffs' "factual allegations [of the necessary elements] must be enough to raise a right to relief above the speculative level." Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1959 (2007). The plaintiff must put forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic, 127 S. Ct. at 1959. As explained below, plaintiffs' complaint is devoid of allegations that show anything beyond speculation that one or more of its members can establish each of the three elements necessary for Article III standing.

A.    **Plaintiffs Have Failed to Allege Actual or Imminent Injury**

Central to Article III's requirement of cases and controversies is the rule that standing is

limited to those who have personally suffered or imminently will suffer an injury. At an "irreducible minimum," Article III of the Constitution requires the party who invokes the court's authority to show that "he has personally suffered some actual or threatened injury." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982); National Recycling Coalition v. Browner, 984 F.2d 1243, 1248 (D.C. Cir. 1993). The Supreme Court has stated that "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983) (citing Golden v. Zwickler, 394 U.S. 103, 109-110 (1969)); see also Lujan, 504 U.S. at 560 (an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'"). Plaintiffs who seek declaratory and injunctive relief face an additional burden in order to establish standing. In such cases, it is not sufficient to present a claim of past injury; a party seeking such relief must also show that it is likely to suffer future injury as well. See Lyons, 461 U.S. at 106.

Plaintiffs have not pled facts sufficient to establish injury in fact. Plaintiffs have not alleged that HUD has initiated any type of Title VI LEP enforcement proceeding against any of their members, nor that any such proceeding is imminent. Likewise, plaintiffs have not alleged that any of their members has lost any federal funding, or that such a loss is imminent. Thus, plaintiffs have not suffered any actual or threatened injury. See Rizzo v. Goode, 423 U.S. 362, 372 (1976) (prospect that plaintiffs might be arrested and subjected to allegedly unconstitutional police procedures insufficient to confer standing).

Plaintiffs' complaint includes only generalized allegations of the costs of compliance with the alleged requirements of the Policy Guidance. However, to satisfy the injury requirement for standing, plaintiffs' alleged injury must be concrete and particularized, and actual or imminent, not conjectural or hypothetical. See Lujan, 504 U.S. at 560. The plaintiffs do not allege with particularity what any member has done in response to the Policy Guidance. Rather, plaintiffs merely assert that certain "[m]embers" – whom they do not identify – have spent "a substantial amount of money" assessing their tenant populations and taking unspecified steps to comply with the Policy Guidance. See Comp. ¶ 39. Such vague assertions are insufficient to establish injury in fact. Similarly, plaintiffs have failed to allege with any particularity that substantial future expenses are imminent for any member.

Moreover, any housing provider which receives federal financial assistance will inevitably have to spend time familiarizing itself with the requirements of federal law it has promised to obey when accepting federal money. If merely spending money to determine one's obligations under a law were sufficient to confer standing, Article III's requirement of concrete injury would have little meaning. As the D.C. Circuit has held,

> just as an individual lacks standing to assert "generalized grievances" about the conduct of Government," see Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974), so an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)

Spann v. Colonial Village, 899 F.2d 24, 27 (D.C. Cir. 1990).

Plaintiffs have thus failed to allege that any member has suffered any concrete or particularized injury, nor have they alleged that any such injury is imminent. Plaintiffs have only

presented generalized allegations of conjectural and hypothetical injuries that do not satisfy the injury in fact requirement for standing under Article III of the Constitution. Their claims should, accordingly, be dismissed.[5]

### B. Plaintiffs' Alleged Injury is Not Caused By the Policy Guidance, Nor is it Likely to Be Redressed by a Favorable Decision

Plaintiffs also fail to satisfy the causation and redressability elements of standing. Plaintiffs fail to plead facts sufficient to establish a causal connection between the injury and the conduct complained of or to show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-561.

Plaintiffs claim that the alleged injury to their members is the result of the measures required by the Policy Guidance. However, any obligation to which any of plaintiffs' members, as recipients of federal financial assistance, may be subject regarding the provision of services to LEP persons comes, not from the Guidance, but from Title VI and its implementing regulations. Therefore, to the extent that there is an injury, it is caused, not by the Guidance, but by the underlying statute and regulations, which are not challenged in this case.

Similarly, the relief that Plaintiffs seek will not redress the alleged injuries to their

---

[5.] The Supreme Court's recent decision in <u>Parents Involved In Community Schools v. Seattle School District</u>, --- S.Ct. ---. 2007 WL 1836531 (June 28, 2007), rejecting the school district's argument that the plaintiffs' alleged injury was not "imminent" because it was speculative whether a school at which they would seek enrollment for their children would be oversubscribed is not to the contrary. There, although the nature and extent of the harm that might result from the challenged assignment system was speculative, the injury was not. As the Court noted, the injury was being forced to compete on an unequal basis in a race-based system, in violation of the equal protection clause. See <u>id.</u> at p. *10, citing <u>Adarand Constuctors, Inc. v. Pena</u>, 515 U.S. 200, 211 (1995). Here, however, plaintiffs do not allege a violation of equal protection and cannot show injury from being potentially subject to guidance that merely provides an analytical framework recipients may use to determine how to comply with Title VI and its implementing regulations.

members. Courts lack jurisdiction "over cases where the likelihood that the requested relief would redress the plaintiff's alleged injury is 'only speculative.'" In re Thornburgh, 869 F.3d 1503, 1512 (D.C. Cir. 1989) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973). Striking down the Policy Guidance will not redress the injuries that it is alleged to be causing to plaintiffs' members, because those members who are recipients of federal financial assistance will remain subject to Title VI and its implementing regulations regardless of whether the Policy Guidance is enjoined. Accordingly, their obligation to make their programs and services available in a manner that does not result in discrimination based on national origin will remain as well.[6] This includes, when necessary to avoid discrimination based on national origin, the obligation to take reasonable steps to ensure meaningful access to their programs and services by LEP persons. An injunction would simply prevent HUD from utilizing the Policy Guidance, which is consistent with that used by all federal agencies that provide federal financial assistance.

Plaintiffs' claims, therefore, do not meet the constitutional standing requirements that their alleged injury is fairly traceable to defendants' Policy Guidance, and that a decision in their favor is likely to redress the alleged injury.

## II.    PLAINTIFFS' CLAIMS ARE NOT RIPE

Plaintiffs have failed to meet their burden of establishing the ripeness of their claims. Like standing, the question of ripeness also goes to whether the court has subject matter jurisdiction. See DKT Mem'l Fund, Inc. v. Agency for Int'l Dev., 887 F.2d 275, 281 D.C. Cir. 1989) (lack of ripeness arising from the fact that no concrete injury has yet occurred is jurisdictional); see also

---

[6.] Indeed, plaintiffs note that even prior to the issuance of the Final Guidance, "many [m]embers made significant efforts prior to the issuance of the Final Guidelines to provide translation services to speakers of the most prominent foreign languages." See Complaint, ¶ 39.

Ayuda, Inc. v. Thornburgh, 880 F.2d 1325, 1341 (D.C. Cir. 1989). The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2000) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003).

To determine whether a claim is ripe, courts examine the "fitness of the issue for judicial decision" and the "hardship to the parties of withholding court consideration." Id.; Nat'l Park Hospitality Ass'n, 538 U.S. at 808. Also, in cases challenging agency action under the general review provision of the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, the plaintiff must identify the final agency action causing his alleged injury. See Lujan, 497 U.S. 871, 882 (1990) ("When, as here, review is sought . . . under the general review provisions of the APA, the agency action in question must be final agency action."). The plaintiff must also show that "he has 'suffered legal wrong' because of the challenged agency action or is 'adversely affect or aggrieved' by that action within the meaning of the statute." Id. at 883. This requires a showing that the injury complained of falls within the zone of interests sought to be protected. See ibid. The fact that plaintiffs assert a facial challenge rather than an as-applied challenge does not alter the determination that their claims are not ripe. In National Park Hospitality Association, the Supreme Court held that a facial challenge to an agency's general statement of policy was not ripe for review. 538 U.S. at 805. The Court explained that the uncertainty as to the validity of the rule did not constitute a hardship sufficient to merit immediate judicial review, id. at 811-12, and that

even though plaintiff's claim presented a purely legal question, "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" Id. at 812 (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 82 (1978)). Both criteria – the fitness for judicial review and the hardship to the parties of withholding court consideration – instruct that plaintiffs' claims are not ripe and should be dismissed.

A.   **Plaintiffs' Claims are Not Fit for Judicial Review**

The critical question concerning the fitness of an issue for review is whether the claim involves uncertain or contingent events that may not occur as anticipated, or may not occur at all. This is not a case involving a purely legal issue, such as that found to be amenable to judicial review in National Assn. of Home Builders v. U.S. Army Corps of Engineers, 440 F.3d 459, 464 (D.C. Cir. 2006). Rather, as in Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2000), plaintiffs seek to involve this Court in an abstract dispute concerning policy guidance that has not been applied, nor threatened to be applied, to any of plaintiffs' members.

Plaintiffs' claim that HUD has exceeded its delegated authority under Title VI and its implementing regulations in issuing the Policy Guidance. Absent a statutory provision providing for immediate judicial review, such an agency issuance generally is not ripe for judicial review under the APA "until the scope of the controversy has been reduced to more manageable proportions," and the "factual components fleshed out, by some concrete action" applying it to the "claimant's situation in a fashion that harms or threatens to harm him." See Nat'l Park Hospitality Ass'n, 538 U.S. at 808 (citing Lujan, 497 U.S. at 891); see also 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

Plaintiffs' claim rests upon a speculative and unsupported assumption that the challenged policy may some day have an effect on their members if HUD determines that their future acts or omissions deny meaningful access to federally assisted programs on the basis of national origin. Neither plaintiff has alleged that HUD has taken any enforcement action against any one of its members. Plaintiffs are therefore asking the court to make a determination based purely on speculation without any factual development. Under such circumstances, the court would be issuing an advisory opinion as there is no certainty or even likelihood that the facts will develop as plaintiffs hypothesize at this time.

Even if plaintiffs had alleged that HUD had initiated an investigation into compliance with Title VI and its implementing regulations by any of their members – which they have not – this pre-enforcement status would fail to satisfy the requirement of a final agency action. The D.C. Circuit has said that "[a]n investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commn., 324 F.3d 726, 731-32 (D.C. Cir. 2003). If a claim alleging that an agency investigation has been undertaken is premature for review, plaintiffs' claims, which fail to allege even that, are clearly not fit for review.

Moreover, the Policy Guidance itself does not constitute final agency action. As discussed above, a recipient's obligation to provide language assistance to LEP persons derives, not from the Guidance, but from Title VI and its implementing regulations. The Policy Guidance merely "clarifies existing legal requirements," 72 Fed. Reg. 2738. As the Guidance itself emphasizes, "[t]he policy guidance is not a regulation, but rather a guide [that] * * * provides an analytical framework that recipients may use to determine how best to comply with statutory and regulatory

obligations." *Id.* Because the Policy Guidance is only a guide and does not impose an obligation or the fixing of a legal relationship, it does not constitute a final agency action.

Accordingly, plaintiffs' claim is not fit for judicial review.

### B. Plaintiffs' Claims Do Not Demonstrate That They Will be Significantly Harmed if Judicial Determination is Withheld at This Time

In determining whether a claim is ripe, the court also examines whether withholding judicial consideration will result in significant hardship to the parties. In <u>National Park Hospitality Ass'n</u>, the Supreme Court reaffirmed its holding in <u>Toilet Goods Ass'n, Inc. v. Gardner</u>, 387 U.S. 158 (1967), that challenges to an FDA regulation requiring producers of color additives to provide FDA employees with access to all manufacturing facilities, processes, and formulae were not ripe for lack of a showing of hardship. 538 U.S. at 810 (citing <u>Toilet Goods Ass'n</u>, 387 U.S. at 161-62, 164). In <u>Toilet Goods Ass'n</u>, failure to comply with the FDA regulation would have resulted in the suspension of the producer's certification. Nevertheless, the Court concluded that the case was not ripe for judicial review because the impact of the regulation could not "be said to be felt immediately by those subject to it in conducting their day-to-day affairs," and "no irremediable adverse consequences flow[ed] from requiring a later challenge.'" <u>Toilet Goods Ass'n</u>, 387 U.S. at 164).

Similarly, there is no indication that plaintiffs will experience any hardship should the court withhold determination until plaintiffs present a properly justiciable claim. As described above, plaintiffs have not claimed that they have suffered any injury even though the Policy Guidance has been in effect for almost six months and the draft guidance, which set forth how

HUD would assess complaints in the interim, was issued over three and a half years ago. Plaintiffs, therefore, fail to present a claim that they will incur any hardship should the court wait to adjudicate this claim until it is sufficiently ripe. At this point, plaintiffs merely hypothesize about what may or may not happen. The court should, therefore, reject plaintiffs' claims and withhold judicial determination until the facts are sufficiently developed so that the court can make a proper decision with full information.

Even if plaintiffs had alleged with sufficient specificity that publication of the Policy Guidance had caused one or more of their members to spend money to provide assistance to LEP persons, it is not the Guidance that requires such expenditures. Any obligation to provide services comes from the statute and regulations, not the Guidance itself. The hardship prong of the ripeness doctrine is not satisfied unless the challenged agency action "create[s] adverse effects of a strictly legal kind." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). "Here, the Policy Guidance documents "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; [and] they create no legal rights or obligations." Ibid.

Moreover, the Policy Guidance does not force any of plaintiffs' members "to modify [their] behavior in order to avoid future adverse consequences, as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions." Ohio Forestry Ass'n, 523 U.S. at 734. This case is thus distinct from those in which "challenged regulations [or other agency action] presented plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for

violation." Reno v. Catholic Soc. Servs., 509 U.S. 43, 57 (1993). Here, there is no automatic penalty for a recipient's failure to follow the Policy Guidance. The Guidance does not impose any obligations. It describes one way to assess and determine a recipient's obligation under Title VI. There is no suggestion that failure to follow the Policy Guidance is necessarily a Title VI violation.

Even if HUD were to initiate enforcement action against any of plaintiffs' members, this would not create a hardship, as the regulations promulgated under Title VI delineate specific procedures and protections, thus ensuring plaintiffs an adequate remedy that includes judicial review. See 42 U.S.C.A. § 2000d-2; 24 C.F.R. §§ 1.7-1.9. There are many steps between the initial assessment of a recipient's obligation under Title VI and the statute's implementing regulations, and an agency's determination that a recipient has violated the statute and its implementing regulations by discriminating on the basis of national origin. Even then, there are no immediate sanctions. As set forth at pp. 4-5 above, the HUD regulations state that its Office of Fair Housing and Equal Opportunity must seek to achieve Title VI compliance through informal means, and may not initiate enforcement proceedings against a recipient unless attempts at voluntary compliance fail. 24 C.F.R. §1.7(d)(1).

In sum, Plaintiffs do not allege sufficient imminent, practical harm to demonstrate that delayed review will cause them significant hardship.

## CONCLUSION

Plaintiffs have failed to demonstrate that this court has subject matter jurisdiction over their claims. Plaintiffs' claims are not ripe, and plaintiffs lack standing to assert them. Plaintiffs fail to allege that they have suffered or imminently will suffer a concrete and particularized injury,

and that such alleged injury is both traceable to the defendants' conduct and will likely be redressed by a favorable decision. Plaintiffs have also failed to demonstrate that their claims are fit for review or that they will experience hardship should the court withhold judicial consideration at this time. Accordingly, plaintiffs' complaint should be dismissed.

This 6th day of July, 2007

Respectfully submitted,

WAN J. KIM
Assistant Attorney General
Civil Rights Division

BEVERLY RUSSELL
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530

STEVEN H. ROSENBAUM
Chief
TIMOTHY J. MORAN
Deputy Chief

_____/s_____
HARVEY L. HANDLEY
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - G St.
Washington, D.C. 20530
Phone: (202) 514-4756
Fax: (202) 514-1116

Attorneys for Defendants