**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL MULTIFAMILY HOUSING COUNCIL and NATIONAL APARTMENT ASSOCIATION,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALPHONSO JACKSON, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT,<br>451 Seventh St., S.W.<br>Washington, DC 20410,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 07-815 (JR)<br>)  Judge James Robertson<br>)<br>) |

**MOTION TO DISMISS ON THE PLEADINGS**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants Alphonso Jackson, Secretary of Housing and Urban Development, and the United States Department of Housing and Urban Development ("HUD"), respectfully move this Court to dismiss the complaint in this case for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted. Plaintiffs' claims are not ripe, and plaintiffs lack standing to assert them.

The reasons why this Motion should be granted are more fully set out in the accompanying

Memorandum.

This ___6th___ day of July, 2007

                                        Respectfully submitted,


                                        WAN J. KIM
                                        Assistant Attorney General
                                        Civil Rights Division


BEVERLY RUSSELL                         STEVEN H. ROSENBAUM
Assistant United States Attorney        Chief
555 4th Street, NW                      TIMOTHY J. MORAN
Washington, DC 20530                    Deputy Chief


                                        _____/s_____
                                        HARVEY L. HANDLEY
                                        Trial Attorney
                                        Housing and Civil Enforcement Section
                                        Civil Rights Division
                                        U.S. Department of Justice
                                        950 Pennsylvania Avenue, N.W. - G St.
                                        Washington, D.C. 20530
                                        Phone: (202) 514-4756
                                        Fax: (202) 514-1116


                                        Attorneys for Defendants

**Certificate of Service**

I hereby certify that on July 6, 2007, I electronically filed the foregoing Motion to Dismiss using the CM/ECF system which sent notification of such filing to Andrew L, Sandler.

                /s Harvey L. Handley
                HARVEY L. HANDLEY
                Trial Attorney
                Housing and Civil Enforcement Section
                Civil Rights Division
                U.S. Department of Justice
                950 Pennsylvania Avenue, N.W.
                Washington, D.C. 20530

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL MULTIFAMILY HOUSING COUNCIL )
and NATIONAL APARTMENT ASSOCIATION, )
                                          )
                  Plaintiffs, )
                                          )
             v.                              )
                                          )
ALPHONSO JACKSON, in his official capacity as )     Civil Action No. 07-815 (JR)
Secretary of Housing and Urban Development, and )   Judge James Robertson
UNITED STATES DEPARTMENT OF HOUSING )
& URBAN DEVELOPMENT, )
451 Seventh St., S.W. )
Washington, DC 20410, )
                                          )
                Defendants. )
_____)

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ON THE PLEADINGS

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants Alphonso

Jackson, Secretary of Housing and Urban Development, and the United States Department of

Housing and Urban Development ("HUD"), respectfully move to dismiss the complaint in this

case for lack of subject matter jurisdiction and failure to state a claim for which relief can be

granted. Plaintiffs' claims are not ripe, and plaintiffs lack standing to assert them. Accordingly,

plaintiffs' claims should be dismissed.

Plaintiff National Multifamily Housing Council ("NMHC") describes itself as the

representative of "over 1000 multi family housing developers, owners, managers and financiers."

Complaint, ¶ 2. Plaintiff National Apartment Association ("NAA") describes itself as "an

industry trade group with 188 state and local affiliates representing over 51,000 multi family housing companies." Comp. ¶ 3.

On May 3, 2007, Plaintiffs filed this action, challenging guidance that HUD issued to help ensure that persons with limited English proficiency receive fair and meaningful access to federally funded services, programs, and activities. See Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 72 Fed. Reg. 2732 (Jan. 8, 2007) ("Policy Guidance").[1] This Policy Guidance clarifies the federal government's long-standing view that, under Title VI and its implementing regulations, in certain circumstances, recipients of federal financial assistance must provide access to linguistic assistance to persons with limited English proficiency to avoid providing services in a manner that results in discrimination based on national origin.[2] See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; 24 C.F.R. § 1. The challenged Policy Guidance also reflects the unfortunate reality that, absent specific efforts to eliminate linguistic barriers, persons with limited English proficiency frequently are denied the benefits of federally funded programs.

Defendants now move to dismiss plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted.

---

[1.] A copy of the Policy Guidance is Attachment A to this Memorandum.

[2.] See also Lau v. Nichols, 414 U.S. 563, 570 (1974) (Stewart, J. concurring) (describing guidance issued by Department of Health, Education, and Welfare in 1970); Department of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 F.R. 41455 (noting that "the Department's commitment to implement Title VI through regulations reaching language barriers is long-standing") (June 18, 2002).

## STATEMENT OF FACTS

Section 601 of Title VI prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Section 602 of Title VI, 42 U.S.C. § 2000d-1, authorizes and directs each federal grant agency to implement this principle of non-discrimination by issuing rules, regulations or orders. In 1996, HUD promulgated regulations pursuant to Section 602. These regulations state that recipients may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(2)(i).

On August 11, 2000, President Clinton issued Executive Order 13,166. That order directs federal agencies to develop, after consultation with appropriate program and activity stakeholders, guidance ensuring that persons with limited English proficiency ("LEP") receive meaningful access to federally funded services. Exec. Order No. 13,166, 65 Fed. Reg. 50,121 (August 16, 2000). To assist federal agencies in developing LEP guidance, the Executive Order incorporated by reference contemporaneously issued Department of Justice ("DOJ") General Policy Guidance and instructed each agency to issue LEP guidance consistent with that policy directive. 65 Fed. Reg. 50,123 (August 16, 2000).

The DOJ General Policy Guidance stated that it was intended to clarify pre-existing Title VI responsibilities, not to create new obligations beyond those already established by the statute or prior implementing regulations. 65 Fed. Reg. 50,123. It also stated that, while the guidance might help agencies shape overall standards, the specific application of Title VI regulations

would vary on a case-by-case basis:

> Title VI and its regulations require recipients to take reasonable steps to ensure "meaningful" access to the information and services they provide. What constitutes reasonable steps to ensure meaningful access will be contingent on a number of factors * * * [including] the number or proportion of LEP persons in the eligible service population, the frequency with which LEP individuals come in contact with the program, the importance of the service provided by the program, and the resources available to the recipient.

*Id.* at 50,124. Further guidance was issued by DOJ in 2002. See Department of Justice,

Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against

National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg.

41,455 (June 18, 2002).

To fulfill its obligations under Executive Order 13,166, HUD issued its own guidance to

recipients of HUD financial assistance. The Policy Guidance was originally published on

December 19, 2003. See 68 Fed. Reg. 70,968 (Dec. 19, 2003). The initial public comment

period closed on January 20, 2004, but on that date the comment period was extended to

February 5, 2004. The final Policy Guidance with which plaintiffs take issue was published on

January 22, 2007, at 72 Fed. Reg. 2731-2754.[3]

The Introduction to the HUD Policy Guidance describes the purpose of the document as

follows:

> This policy guidance clarifies existing legal requirements for LEP persons by describing the factors recipients should consider in fulfilling their responsibilities to LEP persons. The policy guidance is not a regulation, but rather a guide. Title VI and its implementing regulations require that recipients take responsible steps to ensure meaningful access by LEP persons. This guidance provides an analytical framework that recipients may use to determine how best to comply with statutory

---

[3] The first section of the Federal Register publication summarizes the comments received and HUD's responses. The actual Policy Guidance begins at 72 Fed. Reg. 2738.

and regulatory obligations to provide meaningful access to the benefits, services, information, and other important portions of their programs and activities for individuals who are limited English proficient.

72 Fed Reg. at 2738.

Similar to the DOJ General Policy Guidance, the HUD Policy Guidance includes factors that help recipients of federal financial assistance understand their existing obligation under Title VI and its implementing regulations to take reasonable steps to provide meaningful access to federally funded programs to LEP persons. These factors include: (1) the number or proportion of LEP persons eligible to be served or likely to be encountered by the program, activity, or service provided by the recipient; (2) the frequency with which LEP individuals come into contact with the recipient's program, activity, or service; (3) the nature and importance of the recipient's program, activity, or service; and (4) the resources available to the recipient and costs. See 72 Fed. Reg. 2734.

Under HUD's regulations, if HUD believes that a fund recipient is not in compliance with Title VI, HUD must first attempt to resolve any dispute by informal means. 24 C.F.R. § 1.7(d). If such efforts are unsuccessful, it may refer the matter to the Department of Justice with a recommendation that DOJ initiate enforcement action. Alternatively, HUD may institute proceedings to suspend or terminate the recipient's federal financial assistance. 24 C.F.R. § 1.8(a).

Before HUD may suspend or terminate the financial assistance, the responsible official must notify the recipient of the alleged noncompliance, and must determine that the matter cannot be resolved by voluntary means. 24 C.F.R. § 1.8(c)(1). The recipient must then be afforded an opportunity for a hearing, 24 C.F.R. § 1.8(c)(2), in accordance with procedures set

forth in 24 C.F.R. § 1.9. If the hearing results in a finding of discrimination, the finding must be approved by the Secretary, 24 C.F.R. § 1.8(c)(3), and may not take effect until the expiration of 30 days after the Secretary has filed with the appropriate committees of the House and Senate "a full written report of the circumstances and the grounds for such action." 24 C.F.R. § 1.8(c)(4). Pursuant to 42 U.S.C.A. § 2000d-2, the recipient is entitled to judicial review of HUD's action.

Plaintiffs have not brought suit on their own behalf, but solely on behalf of "certain of their members," whom the complaint does not identify. Plaintiffs have not alleged that HUD or any other federal agency has initiated any enforcement proceedings against any of their members.

## ARGUMENT

Before plaintiffs may have their allegations adjudicated on the merits, they must demonstrate that this court has subject matter jurisdiction over their claims, and that they have stated claims for which relief can be granted. Plaintiffs fail to meet this burden as they have not presented justiciable claims. To the contrary, they are asking this court to adjudicate a disagreement over policy.

Specifically, plaintiffs take issue with the way in which HUD has interpreted the obligation, imposed on recipients of federal financial assistance by Title VI and its implementing regulations, to provide their programs and services in a manner that does not result in discrimination based on national origin. In the agency's view, the obligation to avoid discrimination based on national origin includes taking reasonable steps to provide meaningful access to federally funded programs and activities to LEP persons. But the Policy Guidance, which plaintiffs seek to challenge, does not create this obligation. It arises from the regulation prohibiting fund recipients to "utilize criteria or methods of administration which have the effect

of subjecting individuals to discrimination because of their race, color, or national origin, or have

the effect of defeating or substantially impairing accomplishment of the objectives of the program

with respect to individuals of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(2)(i).

Plaintiffs do not challenge HUD's regulations in this case.[4] See Complaint at 17-18.

Plaintiffs do not allege that any of their members is the subject of any investigation,

compliance review, or other enforcement proceeding based in whole or in part on alleged failure

to follow the Policy Guidance. In the absence of such a concrete enforcement proceeding, courts

lack the power to entertain an abstract challenge to agency policy because (1) the party bringing

the action lacks standing to do so, and (2) the dispute is not ripe for judicial review. These related

doctrines of standing and ripeness require dismissal of this action.

## I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

The Supreme Court has enunciated several requirements for standing, all of which must be

met in order for a federal court to adjudicate a case. Three of these standing requirements derive

from the Supreme Court's interpretation of Article III of the Constitution. First, the plaintiff must

allege that he or she has suffered or immediately will suffer an injury. Second, the plaintiff must

allege that the injury is fairly traceable to the defendant's conduct. Third, the plaintiff must allege

---

[4] The Supreme Court, in Lau v. Nichols, 414 U.S. 563 (1974), interpreted regulations
promulgated by the former Department of Health, Education, and Welfare (HHS's predecessor)
as requiring a federal financial assistance recipient to take steps to ensure that language barriers
did not exclude LEP persons from effective participation in its benefits and services. More
recently, in Alexander v. Sandoval, 532 U.S. 275 (2001), the Supreme Court held that private
individuals may not sue to enforce such regulations, promulgated by a federal agency under Title
VI. That ruling does not affect the regulations themselves or agency guidance, such as the Policy
Guidance at issue here, which explains recipients' obligation to ensure meaningful access to
federally funded programs and services for LEP persons. See Alexander v. Sandoval, 532 U.S. at
282-83.

that a favorable decision is likely to redress the injury. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); accord City of Dania Beach v. Federal Aviation Admin., 485 F.3d 1181, 1185 (D.C. Cir. 2007).

An associational plaintiff seeking to assert standing on behalf of its members must show that: (1) at least one of its members possesses standing to sue in his or her own right; (2) the interests the suit seeks to vindicate are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Renal Physicians Ass'n v. U.S. Dept. Of Health & Human Services, — F.3d —, 2007 WL 1671676 at *8 (D.C. Cir. June 12, 2007) (quoting Hunt v. Wash. State Apple Adver. Comm'n., 432 U.S. 333, 343 (1977)).

The party invoking federal jurisdiction bears the burden of establishing all of these elements. See American Federation of Government Employees, AFL-CIO v. Rumsfeld, 321 F.3d 329, (D.C. Cir. 2003); Lujan, 504 U.S. at 561. To meet this burden, the litigant must clearly and specifically set forth claims sufficient to satisfy Article III standing requirements. See id. The plaintiffs' "factual allegations [of the necessary elements] must be enough to raise a right to relief above the speculative level." Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1959 (2007). The plaintiff must put forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic, 127 S. Ct. at 1959. As explained below, plaintiffs' complaint is devoid of allegations that show anything beyond speculation that one or more of its members can establish each of the three elements necessary for Article III standing.

## A.    Plaintiffs Have Failed to Allege Actual or Imminent Injury

Central to Article III's requirement of cases and controversies is the rule that standing is

-8-

limited to those who have personally suffered or imminently will suffer an injury. At an "irreducible minimum," Article III of the Constitution requires the party who invokes the court's authority to show that "he has personally suffered some actual or threatened injury." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982); National Recycling Coalition v. Browner, 984 F.2d 1243, 1248 (D.C. Cir. 1993). The Supreme Court has stated that "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983) (citing Golden v. Zwickler, 394 U.S. 103, 109-110 (1969)); see also Lujan, 504 U.S. at 560 (an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'"). Plaintiffs who seek declaratory and injunctive relief face an additional burden in order to establish standing. In such cases, it is not sufficient to present a claim of past injury; a party seeking such relief must also show that it is likely to suffer future injury as well. See Lyons, 461 U.S. at 106.

Plaintiffs have not pled facts sufficient to establish injury in fact. Plaintiffs have not alleged that HUD has initiated any type of Title VI LEP enforcement proceeding against any of their members, nor that any such proceeding is imminent. Likewise, plaintiffs have not alleged that any of their members has lost any federal funding, or that such a loss is imminent. Thus, plaintiffs have not suffered any actual or threatened injury. See Rizzo v. Goode, 423 U.S. 362, 372 (1976) (prospect that plaintiffs might be arrested and subjected to allegedly unconstitutional police procedures insufficient to confer standing).

-9-

Plaintiffs' complaint includes only generalized allegations of the costs of compliance with the alleged requirements of the Policy Guidance. However, to satisfy the injury requirement for standing, plaintiffs' alleged injury must be concrete and particularized, and actual or imminent, not conjectural or hypothetical. See Lujan, 504 U.S. at 560. The plaintiffs do not allege with particularity what any member has done in response to the Policy Guidance. Rather, plaintiffs merely assert that certain "[m]embers" – whom they do not identify – have spent "a substantial amount of money" assessing their tenant populations and taking unspecified steps to comply with the Policy Guidance. See Comp. ¶ 39. Such vague assertions are insufficient to establish injury in fact. Similarly, plaintiffs have failed to allege with any particularity that substantial future expenses are imminent for any member.

Moreover, any housing provider which receives federal financial assistance will inevitably have to spend time familiarizing itself with the requirements of federal law it has promised to obey when accepting federal money. If merely spending money to determine one's obligations under a law were sufficient to confer standing, Article III's requirement of concrete injury would have little meaning. As the D.C. Circuit has held,

> just as an individual lacks standing to assert "generalized grievances" about the conduct of Government," see Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974), so an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)

Spann v. Colonial Village, 899 F.2d 24, 27 (D.C. Cir. 1990).

Plaintiffs have thus failed to allege that any member has suffered any concrete or particularized injury, nor have they alleged that any such injury is imminent. Plaintiffs have only

-10-

presented generalized allegations of conjectural and hypothetical injuries that do not satisfy the

injury in fact requirement for standing under Article III of the Constitution.  Their claims should,

accordingly, be dismissed.[5]

### B.    Plaintiffs' Alleged Injury is Not Caused By the Policy Guidance, Nor is it Likely to Be Redressed by a Favorable Decision

Plaintiffs also fail to satisfy the causation and redressability elements of standing.

Plaintiffs fail to plead facts sufficient to establish a causal connection between the injury and the

conduct complained of or to show that it is "'likely,' as opposed to merely 'speculative,' that the

injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560-561.

Plaintiffs claim that the alleged injury to their members is the result of the measures

required by the Policy Guidance.  However, any obligation to which any of plaintiffs' members, as

recipients of federal financial assistance, may be subject regarding the provision of services to

LEP persons comes, not from the Guidance, but from Title VI and its implementing regulations.

Therefore, to the extent that there is an injury, it is caused, not by the Guidance, but by the

underlying statute and regulations, which are not challenged in this case.

Similarly, the relief that Plaintiffs seek will not redress the alleged injuries to their

---

[5] The Supreme Court's recent decision in <u>Parents Involved In Community Schools v. Seattle School District</u>, --- S.Ct. ---. 2007 WL 1836531 (June 28, 2007), rejecting the school district's argument that the plaintiffs' alleged injury was not "imminent" because it was speculative whether a school at which they would seek enrollment for their children would be oversubscribed is not to the contrary.  There, although the nature and extent of the harm that might result from the challenged assignment system was speculative, the injury was not.  As the Court noted, the injury was being forced to compete on an unequal basis in a race-based system, in violation of the equal protection clause.  See <u>id.</u> at p. *10, citing <u>Adarand Constuctors, Inc. v. Pena</u>, 515 U.S. 200, 211 (1995).  Here, however, plaintiffs do not allege a violation of equal protection and cannot show injury from being potentially subject to guidance that merely provides an analytical framework recipients may use to determine how to comply with Title VI and its implementing regulations.

members.  Courts lack jurisdiction "over cases where the likelihood that the requested relief would redress the plaintiff's alleged injury is 'only speculative.'"  In re Thornburgh, 869 F.3d 1503, 1512 (D.C. Cir. 1989) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973).  Striking down the Policy Guidance will not redress the injuries that it is alleged to be causing to plaintiffs' members, because those members who are recipients of federal financial assistance will remain subject to Title VI and its implementing regulations regardless of whether the Policy Guidance is enjoined.  Accordingly, their obligation to make their programs and services available in a manner that does not result in discrimination based on national origin will remain as well.[6] This includes, when necessary to avoid discrimination based on national origin, the obligation to take reasonable steps to ensure meaningful access to their programs and services by LEP persons. An injunction would simply prevent HUD from utilizing the Policy Guidance, which is consistent with that used by all federal agencies that provide federal financial assistance.

Plaintiffs' claims, therefore, do not meet the constitutional standing requirements that their alleged injury is fairly traceable to defendants' Policy Guidance, and that a decision in their favor is likely to redress the alleged injury.

## II.    PLAINTIFFS' CLAIMS ARE NOT RIPE

Plaintiffs have failed to meet their burden of establishing the ripeness of their claims.  Like standing, the question of ripeness also goes to whether the court has subject matter jurisdiction. See DKT Mem'l Fund, Inc. v. Agency for Int'l Dev., 887 F.2d 275, 281 D.C. Cir. 1989) (lack of ripeness arising from the fact that no concrete injury has yet occurred is jurisdictional); see also

---

[6.]  Indeed, plaintiffs note that even prior to the issuance of the Final Guidance, "many [m]embers made significant efforts prior to the issuance of the Final Guidelines to provide translation services to speakers of the most prominent foreign languages."  See Complaint, ¶ 39.

-12-

Ayuda, Inc. v. Thornburgh, 880 F.2d 1325, 1341 (D.C. Cir. 1989). The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2000) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003).

To determine whether a claim is ripe, courts examine the "fitness of the issue for judicial decision" and the "hardship to the parties of withholding court consideration." Id.; Nat'l Park Hospitality Ass'n, 538 U.S. at 808. Also, in cases challenging agency action under the general review provision of the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, the plaintiff must identify the final agency action causing his alleged injury. See Lujan, 497 U.S. 871, 882 (1990) ("When, as here, review is sought . . . under the general review provisions of the APA, the agency action in question must be final agency action."). The plaintiff must also show that "he has 'suffered legal wrong' because of the challenged agency action or is 'adversely affect or aggrieved' by that action within the meaning of the statute." Id. at 883. This requires a showing that the injury complained of falls within the zone of interests sought to be protected. See ibid. The fact that plaintiffs assert a facial challenge rather than an as-applied challenge does not alter the determination that their claims are not ripe. In National Park Hospitality Association, the Supreme Court held that a facial challenge to an agency's general statement of policy was not ripe for review. 538 U.S. at 805. The Court explained that the uncertainty as to the validity of the rule did not constitute a hardship sufficient to merit immediate judicial review, id. at 811-12, and that

-13-

even though plaintiff's claim presented a purely legal question, "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" Id. at 812 (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 82 (1978)). Both criteria – the fitness for judicial review and the hardship to the parties of withholding court consideration – instruct that plaintiffs' claims are not ripe and should be dismissed.

### A.    Plaintiffs' Claims are Not Fit for Judicial Review

The critical question concerning the fitness of an issue for review is whether the claim involves uncertain or contingent events that may not occur as anticipated, or may not occur at all. This is not a case involving a purely legal issue, such as that found to be amenable to judicial review in National Assn. of Home Builders v. U.S. Army Corps of Engineers, 440 F.3d 459, 464 (D.C. Cir. 2006). Rather, as in Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2000), plaintiffs seek to involve this Court in an abstract dispute concerning policy guidance that has not been applied, nor threatened to be applied, to any of plaintiffs' members.

Plaintiffs' claim that HUD has exceeded its delegated authority under Title VI and its implementing regulations in issuing the Policy Guidance. Absent a statutory provision providing for immediate judicial review, such an agency issuance generally is not ripe for judicial review under the APA "until the scope of the controversy has been reduced to more manageable proportions," and the "factual components fleshed out, by some concrete action" applying it to the "claimant's situation in a fashion that harms or threatens to harm him." See Nat'l Park Hospitality Ass'n, 538 U.S. at 808 (citing Lujan, 497 U.S. at 891); see also 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

-14-

Plaintiffs' claim rests upon a speculative and unsupported assumption that the challenged policy may some day have an effect on their members if HUD determines that their future acts or omissions deny meaningful access to federally assisted programs on the basis of national origin. Neither plaintiff has alleged that HUD has taken any enforcement action against any one of its members. Plaintiffs are therefore asking the court to make a determination based purely on speculation without any factual development. Under such circumstances, the court would be issuing an advisory opinion as there is no certainty or even likelihood that the facts will develop as plaintiffs hypothesize at this time.

Even if plaintiffs had alleged that HUD had initiated an investigation into compliance with Title VI and its implementing regulations by any of their members – which they have not – this pre-enforcement status would fail to satisfy the requirement of a final agency action. The D.C. Circuit has said that "[a]n investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commn., 324 F.3d 726, 731-32 (D.C. Cir. 2003). If a claim alleging that an agency investigation has been undertaken is premature for review, plaintiffs' claims, which fail to allege even that, are clearly not fit for review.

Moreover, the Policy Guidance itself does not constitute final agency action. As discussed above, a recipient's obligation to provide language assistance to LEP persons derives, not from the Guidance, but from Title VI and its implementing regulations. The Policy Guidance merely "clarifies existing legal requirements," 72 Fed. Reg. 2738. As the Guidance itself emphasizes, "[t]he policy guidance is not a regulation, but rather a guide [that] * * * provides an analytical framework that recipients may use to determine how best to comply with statutory and regulatory

-15-

obligations." *Id.* Because the Policy Guidance is only a guide and does not impose an obligation or the fixing of a legal relationship, it does not constitute a final agency action.

Accordingly, plaintiffs' claim is not fit for judicial review.

### B.    Plaintiffs' Claims Do Not Demonstrate That They Will be Significantly Harmed if Judicial Determination is Withheld at This Time

In determining whether a claim is ripe, the court also examines whether withholding judicial consideration will result in significant hardship to the parties. In National Park Hospitality Ass'n, the Supreme Court reaffirmed its holding in Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158 (1967), that challenges to an FDA regulation requiring producers of color additives to provide FDA employees with access to all manufacturing facilities, processes, and formulae were not ripe for lack of a showing of hardship. 538 U.S. at 810 (citing Toilet Goods Ass'n, 387 U.S. at 161-62, 164). In Toilet Goods Ass'n, failure to comply with the FDA regulation would have resulted in the suspension of the producer's certification. Nevertheless, the Court concluded that the case was not ripe for judicial review because the impact of the regulation could not "be said to be felt immediately by those subject to it in conducting their day-to-day affairs," and "no irremediable adverse consequences flow[ed] from requiring a later challenge.'" Toilet Goods Ass'n, 387 U.S. at 164).

Similarly, there is no indication that plaintiffs will experience any hardship should the court withhold determination until plaintiffs present a properly justiciable claim. As described above, plaintiffs have not claimed that they have suffered any injury even though the Policy Guidance has been in effect for almost six months and the draft guidance, which set forth how

-16-

HUD would assess complaints in the interim, was issued over three and a half years ago. Plaintiffs, therefore, fail to present a claim that they will incur any hardship should the court wait to adjudicate this claim until it is sufficiently ripe. At this point, plaintiffs merely hypothesize about what may or may not happen. The court should, therefore, reject plaintiffs' claims and withhold judicial determination until the facts are sufficiently developed so that the court can make a proper decision with full information.

Even if plaintiffs had alleged with sufficient specificity that publication of the Policy Guidance had caused one or more of their members to spend money to provide assistance to LEP persons, it is not the Guidance that requires such expenditures. Any obligation to provide services comes from the statute and regulations, not the Guidance itself. The hardship prong of the ripeness doctrine is not satisfied unless the challenged agency action "create[s] adverse effects of a strictly legal kind." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). "Here, the Policy Guidance documents "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; [and] they create no legal rights or obligations." Ibid.

Moreover, the Policy Guidance does not force any of plaintiffs' members "to modify [their] behavior in order to avoid future adverse consequences, as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions." Ohio Forestry Ass'n, 523 U.S. at 734. This case is thus distinct from those in which "challenged regulations [or other agency action] presented plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for

-17-

violation." <u>Reno v. Catholic Soc. Servs.</u>, 509 U.S. 43, 57 (1993). Here, there is no automatic

penalty for a recipient's failure to follow the Policy Guidance. The Guidance does not impose any

obligations. It describes one way to assess and determine a recipient's obligation under Title VI.

There is no suggestion that failure to follow the Policy Guidance is necessarily a Title VI

violation.

Even if HUD were to initiate enforcement action against any of plaintiffs' members, this

would not create a hardship, as the regulations promulgated under Title VI delineate specific

procedures and protections, thus ensuring plaintiffs an adequate remedy that includes judicial

review. See 42 U.S.C.A. § 2000d-2; 24 C.F.R. §§ 1.7-1.9. There are many steps between the

initial assessment of a recipient's obligation under Title VI and the statute's implementing

regulations, and an agency's determination that a recipient has violated the statute and its

implementing regulations by discriminating on the basis of national origin. Even then, there are

no immediate sanctions. As set forth at pp. 4-5 above, the HUD regulations state that its Office of

Fair Housing and Equal Opportunity must seek to achieve Title VI compliance through informal

means, and may not initiate enforcement proceedings against a recipient unless attempts at

voluntary compliance fail. 24 C.F.R. §1.7(d)(1).

In sum, Plaintiffs do not allege sufficient imminent, practical harm to demonstrate that

delayed review will cause them significant hardship.

## CONCLUSION

Plaintiffs have failed to demonstrate that this court has subject matter jurisdiction over

their claims. Plaintiffs' claims are not ripe, and plaintiffs lack standing to assert them. Plaintiffs

fail to allege that they have suffered or imminently will suffer a concrete and particularized injury,

and that such alleged injury is both traceable to the defendants' conduct and will likely be redressed by a favorable decision. Plaintiffs have also failed to demonstrate that their claims are fit for review or that they will experience hardship should the court withhold judicial consideration at this time. Accordingly, plaintiffs' complaint should be dismissed.


This 6th day of July, 2007

                              Respectfully submitted,


                              WAN J. KIM
                              Assistant Attorney General
                              Civil Rights Division

BEVERLY RUSSELL               STEVEN H. ROSENBAUM
Assistant United States Attorney    Chief
555 4th Street, NW            TIMOTHY J. MORAN
Washington, DC 20530          Deputy Chief

                              _____/s_____
                              HARVEY L. HANDLEY
                              Trial Attorney
                              Housing and Civil Enforcement Section
                              Civil Rights Division
                              U.S. Department of Justice
                              950 Pennsylvania Avenue, N.W. - G St.
                              Washington, D.C. 20530
                              Phone: (202) 514-4756
                              Fax: (202) 514-1116

                              Attorneys for Defendants

72 FR 2732-01                                                                    Page 1
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

NOTICES

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-4878-N-02]

Final Guidance to Federal Financial Assistance Recipients Regarding Title VI
Prohibition Against National Origin Discrimination Affecting Limited English
Proficient Persons

Monday, January 22, 2007

AGENCY: Office of the Assistant Secretary for Fair Housing and Equal Opportunity,
HUD.

*2732 ACTION: Final notice.

SUMMARY: The Department of **Housing** and Urban Development (HUD) is publishing the
final "Guidance to Federal Financial Assistance Recipients Regarding Title VI
Prohibition Against National Origin Discrimination Affecting **Limited English**
**Proficient** (LEP) Persons" (Guidance) as required by Executive Order (EO) 13166. EO
13166 directs federal agencies that extend assistance, subject to the requirements
of Title VI, to publish Guidance to clarify recipients' obligations to LEP persons.
This final Guidance follows publication of the proposed Guidance on December 19,
2003.

DATES: Effective Date: February 21, 2007.

FOR FURTHER INFORMATION CONTACT: Pamela D. Walsh, Director, Program Standards and
Compliance Division, Office of Fair Housing and Equal Opportunity, Department of
Housing and Urban Development, 451 Seventh Street SW., Room 5226, Washington, DC
20410, telephone: (202) 708-2904 (this is not a toll-free number). Persons with
hearing or speech impairments may access this number via TTY by calling the
toll-free Federal Information Relay Service at (800) 877- 8339.

SUPPLEMENTARY INFORMATION:

I. Background--December 19, 2003, Proposed Guidance

 On December 19, 2003 (68 FR 70968), HUD published proposed Guidance to help
recipients of federal financial assistance take reasonable steps to meet their
regulatory and statutory obligations to ensure that LEP persons have meaningful
access to HUD programs and activities. Under Title VI of the Civil Rights Act of
1964 (Title VI) and its implementing regulations, recipients of federal financial
assistance have a responsibility to ensure meaningful access to programs and
activities by LEP persons. Specifically, EO 13166, issued on August 11, 2000, and
reprinted at 65 FR 50121 (August 16, 2000), directs each federal agency that extends
assistance subject to the requirements of Title VI to publish guidance for its
respective recipients clarifying this obligation.

 This Guidance must adhere to the federal-wide compliance standards and framework
detailed in the Department of Justice (DOJ) model LEP Guidance, published at 67 FR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41455 (June 18, 2002). HUD's proposed Guidance followed the established format used
in the DOJ model, and solicited comments on the Guidance's nature, scope, and
appropriateness. Specific examples set out in HUD's Guidance explain and/or
highlight how federal-wide compliance standards are applicable to recipients of
HUD's federal financial assistance.

II. Significant Differences Between the December 19, 2003, Proposed Guidance and
This Final Guidance

  This final Guidance takes into consideration the public comments received on the
December 19, 2003, proposed Guidance. There are no significant changes between the
proposed Guidance and this final Guidance. However, for purposes of clarification,
several minor changes were made in Appendix A, and a new Appendix B has been added
to the Guidance. Appendix B, "Questions and Answers (Q&A)," responds to frequently
asked questions (FAQs) related to providing meaningful access to LEP persons.

III. Discussion of Public Comments Received on the December 19, 2003, Proposed
Guidance

  The public comment period on the December 19, 2003, proposed Guidance closed on
January 20, 2004. On January 20, 2004, the comment period was extended to February
5, 2004. HUD received 21 comments. Comments were received from public housing
agencies, state housing agencies, private sector housing providers, organizations
serving LEP populations, organizations advocating that English be the official U.S.
language, and trade associations representing public housing agencies. HUD also
received more than 7,000 postcards from concerned citizens who opposed the Guidance
as an "onerous burden" on small and underfunded organizations and groups that
advocated adoption of English as the official language of the United States.

  The comments expressed a wide range of viewpoints. Many of the comments identified
areas of the Guidance for improvement and/or revision. Other comments objected to
sections of the Guidance or to the Guidance in its entirety. The most frequent
dissenting comments involved: (1) Opposition to the Alexander v. Sandoval Supreme
Court decision [53 U.S. 275 (2001)]; (2) enforcement and compliance efforts
(including legal enforceability, validity of housing-related legal documents, and
vulnerability of recipients); (3) applicability of the Guidance (including HUD's
provision of clearer standards regarding when the provision of language services are
needed); (4) cost considerations; (5) competency of interpreters (including use of
informal interpreters) and translators; (6) vulnerability of recipients as a result
of this Guidance (including "safe harbors"); and (7) consistency of translations
(including standardized translations of documents).

  In addition, four commenters stated that HUD did not solicit the input of
stakeholders for the proposed Guidance, despite the mandate of EO 13166. These and
other comments are discussed in greater depth below. This preamble presents a more
detailed review of the most significant concerns raised by the public in response to
the December 19, 2003, proposed Guidance and HUD's response to each concern. The
preamble's sections are:

• Section IV, which discusses comments regarding the Sandoval Supreme Court
decision (including enforcement under Title VI);

• Section V, which discusses comments regarding enforcement and compliance efforts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 3
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

(including legal enforceability, validity of housing-related legal documents, and
vulnerability of recipients);

• Section VI, which discusses comments regarding applicability of the Guidance
(i.e., clearer standards regarding when language services can reasonably be expected
to be provided);

• Section VII, which discusses comments regarding cost considerations;

• Section VIII, which discusses comments regarding competency of interpreters
(including use of informal interpreters) and translators;

• Section IX, which discusses comments regarding vulnerability of recipients as a
result of this Guidance (including "safe harbors");

• Section X, which discusses comments regarding consistency of translations
(including standardized translations of documents); and

• Section XI, which discusses other comments.

IV. Comments Regarding the Sandoval Supreme Court Decision (Including Enforcement
Under Title VI)

Comment: Several commenters wrote that the proposed Guidance was *2733 unsupported
by law and, therefore, urged its withdrawal. The commenters expressed disagreement
with the HUD and DOJ positions on the holding in Alexander v. Sandoval. Sandoval
precludes individuals from bringing judicial actions to enforce those agency
regulations based on Title VI. The commenters wrote that federal agencies have no
power to enforce such regulations through this Guidance because it would violate the
Sandoval decision to use the Guidance to determine compliance with Title VI and
Title VI's regulations.

HUD Response. HUD reiterates here, as it did in the proposed Guidance published on
December 19, 2003, that its commitment to implement Title VI through regulations
reaching language barriers is longstanding and is unaffected by the Sandoval
decision. In its proposed Guidance, HUD stated that DOJ had disagreed with the
interpretation voiced by the commenters, and in its final Guidance, HUD continues to
take this position. The Guidance and the response to Appendix B, Q&As XV, XXIV, and
XXV, state that the Supreme Court, in the Sandoval decision, did not strike down
Title VI itself or Title VI's disparate impact regulations (at HUD, that would be
its civil rights-related program requirements or "CRRPRs"), but only ruled that
individuals could not enforce these Title VI regulations through the courts and
could only bring such court action under the statute itself. The Guidance further
states that because the Supreme Court did not address the validity of the
regulations or EO 13166, that both remain in effect. Individuals may still file
administrative complaints with HUD alleging Title VI and Title VI regulatory
violations for failing to take reasonable steps to provide meaningful access to LEP
persons.

Appendix B, Q&As II, III, and IV further clarify the requirements of both the EO
and Title VI of the Civil Rights Act of 1964. These responses describe the
obligations of federal agencies under the EO and how Title VI applies to situations
involving discrimination against LEP persons. These Q&As explain that Title VI of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 4
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

the Civil Rights Act of 1964 is the federal law that protects individuals from
discrimination on the basis of their race, color, or national origin in programs
that receive federal financial assistance. Federally conducted programs and
activities are required to meet the standards for taking reasonable steps to provide
meaningful access to LEP persons under EO 13166. In addition, all programs and
operations of entities that receive financial assistance from the federal
government, including, but not limited to, state agencies, local agencies, and
for-profit and nonprofit entities, and all sub-recipients (those that receive
funding passed through a recipient) must comply with the Title VI obligations
(including those in the regulations). Programs that do not receive federal funding,
such as those that receive Federal Housing Administration (FHA) insurance, are not
required to comply with Title VI's obligations. (If the recipient received FHA
insurance along with Rental Assistance, construction subsidy, or other federal
assistance, it would be required to comply with Title VI requirements.) In certain
situations, failure to ensure that LEP persons can effectively participate in, or
benefit from, federally assisted programs may violate Title VI's prohibition against
national origin discrimination. EO 13166, signed on August 11, 2000, directs all
federal agencies, including HUD, to work to ensure that programs receiving federal
financial assistance provide meaningful access to LEP persons. Section 3 of the EO
requires all federal agencies to issue LEP guidance to help federally assisted
recipients in providing such meaningful access to their programs. This guidance must
be consistent with DOJ Guidance, but tailored to the specific federal agency's
federally assisted recipients. HUD has written its general Guidance and Appendices
to meet these requirements.

V. Comments Regarding Enforcement and Compliance Efforts (Including Legal
Enforceability and Validity of Housing-Related Legal Documents and Vulnerability of
Recipients)

Comment: Two commenters who supported adoption of the proposed Guidance recommended
that HUD provide more detailed Guidance to its staff on enforcement and compliance
and encouraged collaboration with nonprofit organizations, such as fair housing
groups funded by the Fair Housing Initiatives Program (FHIP). A number of
commenters, while supportive of the Guidance and HUD's leadership in this area,
suggested modifications that would, in their view, provide a more definitive
statement of the minimal compliance standards or better describe how HUD would
evaluate activities under a more flexible compliance standard. There were also
comments that claimed the Guidance was actually a set of regulatory requirements
masquerading as "Guidance"; one commenter stated that the Guidance would be used to
determine compliance with Title VI and its regulations, rather than as discretionary
advice.

HUD Response. HUD's rule at 24 CFR 1.7(c) requires HUD to undertake "a prompt
investigation whenever a compliance review, report, complaint, or any other
information indicates a possible failure to comply with this part 1." As explained
further in Appendix B, Q&As XVI, XVIII, and XIX, FHEO will investigate or review
complaints or other information that suggests a recipient is not in compliance with
its Title VI obligations. HUD will determine whether the recipient has made
reasonable efforts to ensure participation of LEP persons in programs or activities
receiving federal financial assistance from HUD. Review of the evidence will
include, but may not be limited to, application of the four-factor analysis
identified in the LEP Guidance, which provides a framework for reviewing the
totality of the circumstances and objectively balances the need to ensure meaningful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                Page 5
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

access by LEP persons and without imposing undue burdens on recipients. HUD will
also collect and evaluate evidence about whether the recipient has adopted a
Language Access Plan (LAP) that reflects LEP needs (or addressed LEP needs in
another official plan, such as the PHA or Consolidated Plan), implemented the Plan,
and maintained Title VI compliance records that demonstrate services provided to LEP
persons. HUD will inform the recipient of any findings of compliance or
non-compliance in writing. If the investigation or review results in findings that
the recipient has failed to comply with HUD's rules at 24 CFR part 1, HUD will
inform the recipient and attempt to resolve the findings by informal means [24 CFR
1.7(d)]. HUD may use other means of voluntary cooperation, such as negotiation and
execution of a voluntary compliance agreement. If HUD determines that compliance
cannot be secured by voluntary means, HUD may use other means to enforce its rules
under Title VI, such as the suspension or termination of approved funding or refusal
to grant future funding [24 CFR 1.8(a), (c), and (d)]. HUD also may refer the matter
to DOJ for enforcement action.

  Appendix B, Q&A VII, provides additional guidance on the four-factor analysis by
explaining that recipients are required to take reasonable steps to ensure
meaningful access to LEP persons. This standard is intended to be both flexible and
fact-dependent and also to balance the need to ensure meaningful access by LEP
persons to critical services while not imposing *2734 undue financial burdens on
small businesses, small local governments, or small nonprofit organizations. The
recipient may conduct an individualized assessment that balances the following four
factors: (1) Number or proportion of LEP persons served or encountered in the
eligible service population ("served or encountered" includes those persons who
would be served or encountered by the recipient if the persons were afforded
adequate education and outreach); (2) frequency with which LEP persons come into
contact with the program; (3) nature and importance of the program, activity, or
service provided by the program; and (4) resources available to the recipient and
costs to the recipient. It further refers recipients to examples of applying the
four-factor analysis to HUD-specific programs in Appendix A of HUD LEP Guidance.

  Appendix B, Q&A IX, explains that after completing the four-factor analysis and
deciding what language assistance services are appropriate, a recipient may develop
a LAP or Implementation Plan to address identified needs of the LEP populations it
serves. Some elements that may be helpful in designing an LAP include: (1)
Identifying LEP persons who need language assistance and the specific language
assistance that is needed; (2) identifying ways in which language assistance will be
provided; (3) providing effective outreach to the LEP community; (4) training staff;
(5) translating informational materials in identified language(s) that detail
services and activities provided to beneficiaries (e.g., model leases, tenants'
rights and responsibilities brochures, fair housing materials, first-time homebuyer
guide); (6) providing appropriately translated notices to LEP persons (e.g.,
eviction notices, security information, emergency plans); (7) providing interpreters
for large, medium, small, and one-on-one meetings; (8) developing community
resources, partnerships, and other relationships to help with the provision of LEP
services; and (9) making provisions for monitoring and updating the LAP.

  However, HUD did not make changes to the Guidance itself. At this time, HUD does
not feel that a specific separate statement of compliance standards is needed. HUD
will continue to apply current Title VI investigative standards when conducting LEP
investigations or compliance reviews. (See Appendix B, Q&A VI, for further
discussion.)

          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                 Page 6
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

Comment: Several commenters stated that housing documents of a legal nature, such as leases, sales contracts, etc., that are translated into foreign languages might not be upheld in court as legally enforceable.

HUD Response. HUD appreciates this concern that the documents required by the Guidance would complicate possible eviction actions. State and local law govern contractual agreements between residents and landlords.

Comment: Commenters stated that questions could be raised about the accuracy of the translation and whether, for example, a tenant's signature on both English language and foreign language versions of a housing-related legal document would be upheld as valid in a judicial proceeding.

HUD Response. HUD recommends that when leases are translated into other languages than English, the recipient only ask the tenant to sign the English lease. The translated document would be provided to the tenant but marked "For information only." However, this recommendation in no way minimizes the need to ensure meaningful access, and therefore to take reasonable measures, such as second checks by professional translators, to ensure that the translation is accurate.

VI. Comments Regarding Applicability of the Guidance (i.e., HUD Should Provide Clearer Standards Regarding the Provision of Language Services)

Comment: Several commenters wrote that the statement "coverage extends to a recipient's entire program or activity * * * even if only one part of the recipient receives the federal assistance," places an unwarranted burden on an entire program. One commenter gave the example of a PHA that contracts with a Residents' Council that provides some level of LEP services. The commenter recommended that the PHA should not be required to enforce LEP requirements against the Residents' Council unless there is clear evidence of discriminatory intent.

HUD Response. With regard to the specific example of a Residents' Council that provides some level of LEP services, given the context, we assume that this comment intended to characterize the Council as a subrecipient of federal financial assistance. The proposed Guidance issued on December 19, 2003, states that "subrecipients likewise are covered when federal funds are passed through from one recipient to a subrecipient." Recipients such as Community Development Block Grant (CDBG) Entitlement jurisdictions, CDBG state programs, and PHAs are required to monitor their subrecipients who receive federal financial assistance for a variety of purposes. Among these purposes are that such entities are also subject to the requirements of Title VI of the Civil Rights Act of 1964, as amended by the Civil Rights Restoration Act of 1987. This final Guidance does not change the position taken on this issue as cited in the proposed Guidance. Therefore, the Resident Counsel in the above comment would be subject to Title VI if it received any funding from the PHA, although its analysis may indicate that it must provide little, if any, LEP services. The Guidance and Appendix B, Q&A IV, restate that Title VI's LEP obligations apply to (1) all programs and activities of entities that receive federal financial assistance, and (2) all subrecipients that receive federal funds that are passed through a recipient. Entities that are not recipients or subrecipients of federal financial assistance are not, themselves, subject to Title VI requirements (see 24 CFR 1.2), although recipients using contractors to carry out recipient activities remain obligated to ensure civil rights compliance in those activities. With regard to the comment that LEP requirements should only apply to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 7
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

subrecipients in the case of clear evidence of discriminatory intent, refer to
Appendix B, Q&A IV, for a more in-depth response. Finally, this Guidance in no way
expands the scope of coverage mandated by Title VI, as amended by the Civil Rights
Restoration Act of 1987, which defined the terms "program" and "program or
activity."

VII. Comments Regarding Cost Considerations

  Comments: A number of comments focused on the cost considerations as an element of
HUD's flexible four-factor analysis for identifying and addressing the language
assistance needs of LEP persons. For example, several commenters said that
implementing this Guidance would constitute an unfunded mandate and that the total
costs nationally would exceed the $100 million limit stipulated in the Unfunded
Mandates Control Act. Commenters also stated that document translation is not a
"one-time" cost, since laws, regulations, and Guidance all change over time. In
addition, several commenters noted that private housing providers and PHAs would not
be able to recover the costs of implementing LEP services through rent increases,
since LEP services are not included in HUD formulae used to calculate and approve
rent increases. A few comments suggested that the flexible fact-dependent compliance
standard incorporated by the Guidance, when combined with the desire of most
recipients to avoid the risk of noncompliance, could lead some large, *2735
statewide recipients to incur unnecessary or inappropriate financial burdens in
conjunction with already strained program budgets.

  While no comments urged that costs be excluded from the analysis, some commenters
wrote that a recipient could use cost as an inappropriate justification for avoiding
otherwise reasonable and necessary language assistance to LEP persons.

  HUD Response. HUD believes that costs are a material consideration in identifying
the reasonableness of particular language assistance measures, and that the Guidance
identifies an appropriate framework by which costs are to be considered. The
Department recognizes that some projects' budgets and resources are constrained by
contracts and agreements with the Department. These constraints may impose a
material burden upon the projects. Where a recipient of HUD funds can demonstrate
such a material burden, HUD views this as a critical item in the consideration of
costs in the four-factor analysis. However, where documents share common text, costs
can be significantly decreased through pooling resources. For instance, many HUD
recipients of HUD funds belong to national organizations that represent their
interests. HUD recommends that these national groups set aside some funds from
membership fees to offset the written translations. In addition, the same national
groups may contract with a telephone interpreter service to provide oral
interpretation on an as-needed basis. Appendix A discusses this issue in greater
depth. Appendix B, Q&A VII, integrates the issue of cost as part of the discussion
of the four-factor analysis described in the Guidance by advising the recipient to
take into account both the costs and resources available to the recipient.

  In addition, Appendix B, Q&A XII, explains how a recipient may supplement its
limited resources to provide necessary language services without sacrificing quality
and accuracy. The federal government's LEP Web site, http:// www.lep.gov/recip.html
(scroll to translator and interpreter organizations), lists some examples of
associations and organizations whose members may provide translation and
interpretation services. In addition, the General Services Administration maintains
a language services database for both written translations and oral interpretation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                    Page 8
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

that can be accessed at: http://
www.gsaelibrary.gsa.gov/&fxsp0;ElibMain/SinDetails?executeQuery=YES&&fxsp0;
scheduleNumber=738+II&flag &&fxsp0;filter=&specialItemNumber=382+1. Site visitors
may choose an interpreter or translator from among a list of language service
providers. Language service providers are available through other means, as well,
and the above list is in no way meant to be an exclusive list or recommendations,
but rather is shared for information purposes only.

VIII. Comments Regarding Competency of Interpreters (Including Use of Informal
Interpreters) and Translators

   Comment: Several commenters wrote that written LAPs should include language
strongly discouraging or severely limiting the use of informal interpreters, such as
family members, guardians, or friends. Some recommended that the Guidance prohibit
the use of informal interpreters except in limited or emergency situations.
Commenters expressed concern that the technical and ethical competency of
interpreters could jeopardize meaningful and appropriate access at the level and
type contemplated under the Guidance.

   HUD Response. HUD believes that the Guidance is sufficient to allow recipients to
achieve the proper balance between the many situations where the use of informal
interpreters is inappropriate, and the few where the transitory and/or limited use
of informal interpreters is necessary and appropriate in light of the nature of the
service or benefit being provided and the factual context in which that service or
benefit is being provided. Appendix B, Q&A XIII, states that a recipient should
generally discourage the use of family members or other informal interpreters, but
should permit the use of interpreters of the LEP person's choosing when that LEP
person rejects the recipient's free language assistance services. This Guidance
further explains and clarifies all aspects of how a recipient can provide different
types of interpretation services, including informal interpreters for different
situations. To ensure the quality of written translations and oral interpretations,
HUD encourages recipients to use professional interpreters and translators.

   Comment: A number of commenters objected to requiring recipients to determine the
competency of interpreters or translators, and strongly stated that such a
requirement was too burdensome for the small- to medium-sized housing providers. A
few commenters urged HUD to provide details on particular interpretation standards
or approaches that would apply on a national basis.

   HUD Response. HUD declines to set such professional or technical standards. General
guidelines for translator and interpreter competency are set forth in the Guidance.
Recipients, beneficiaries, and associations of professional interpreters and
translators could collaborate in identifying the applicable professional and
technical interpretation standards that are appropriate for particular situations.
For example, local, state, or national chapters of businesses or housing trade
organizations can set up and enforce a set of rules and standards that will qualify
interpreters and translators to participate in housing-related legal and other
program-related transactions. Alternatively, PHAs may be able to find qualified
interpreters and translators through associations representing that industry (e.g.,
American Translators Association, National Association of Judicial Interpreters and
Translators, Translators and Interpreters Guild, and others) or even from for-profit
organizations. Housing provider groups and/or individual housing providers can, as
part of their LAPs, communicate with the state Attorney General's Office or the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 9
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

State Administrative Offices of the Courts regarding the regulations that govern the use of interpreters in most legal proceedings in state courts. Sections VI.A.1 and VI.B.4 of the general Guidance provide information on how to determine the competency of interpreters and translators. In addition, Appendix B, Q&A XII, re-emphasizes that the recipient should try to ensure the quality and accuracy of any interpretation or translation services provided.

IX. Comments Regarding Vulnerability of Recipients as a Result of This Guidance (Including "Safe Harbors")

Comments: Some comments focused on providing "safe harbors" for oral translations and provision of written translation for vital documents. The commenters stated that there should be a level below which there would be no need to provide language services where the numbers and proportions of the population that are LEP are insignificant. Another commenter recommended that the "safe harbor" standards be less stringent and that compliance be determined based on the total circumstances.

Comment: While not clearly stated in any of the comments, there appeared to be a misunderstanding about how the safe harbor requirements applied to the eligible population of the market area as opposed to current beneficiaries of the recipient.

HUD Response. This final Guidance makes no changes to the "safe harbor" *2736 provisions found at Paragraph VI.B.3 or the Guidance in Appendix A.

Oral Interpretation v. Written Translation: The "safe harbor" provided in this Guidance is for written translations only. There is no "safe harbor" for oral interpretation. In fact, Q&As XXII and XXIII clarify that no matter how few LEP persons the recipient is serving, oral interpretation services should be made available in some form. Recipients should apply the four-factor analysis to determine whether they should provide reasonable and timely, oral interpretation assistance, free of charge, in all cases, to any beneficiary that is LEP. Depending on the circumstances, reasonable oral interpretation assistance might be an in-person or telephone service line interpreter.

Safe Harbor for Written Translations: Q&A XX explains how the four-factor analysis and the recipient's subsequent actions may be used to provide a "safe harbor" for written translations. HUD LEP Guidelines in Paragraph VI(B)(3) explains how certain recipient activities would constitute a "safe harbor" against a HUD finding that the recipient had not made reasonable efforts to provide written language assistance. As has already been noted, this Guidance is not intended to provide a definitive answer governing the translation of written documents for all recipients, nor one that is applicable in all cases and for all situations. Rather, in drafting the "safe harbor" and vital documents provisions of the Guidance, HUD sought to provide one, but not necessarily the only point of reference for when a recipient should consider translations of documents (or the implementation of alternatives to translating such documents). The recipient should consider its particular program or activity, the document or information in question, and the potential LEP populations served.

Specific Safe Harbor Guidance: Appendix B, Q&A XXI, provides a helpful table that further clarifies the "safe harbors" for written translations based on the number and percentages of the market area-eligible population or current beneficiaries and applicants that speak a specific language. According to the table, HUD would expect translations of vital documents to be provided when the eligible LEP population in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 10
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

the market area or the current beneficiaries exceeds 1,000 persons or if it exceeds 5 percent of the eligible population or beneficiaries along with more than 50 persons. In cases where more than 5 percent of the eligible population speaks a specific language, but fewer than 50 persons are affected, there should be a translated written notice of the person's right to an oral interpretation. An oral interpretation should be made available in all cases.

Vital Documents: Q&A XX defines a "safe harbor" for written translations for purposes of this Guidance as one where the recipient has undertaken efforts to prevent a finding of non-compliance with respect to the needed translation of vital written materials. HUD's Guidance follows DOJ's Guidance that define a "safe harbor" only for the translation of vital documents. Q&A X describes how to determine if a document is a "vital document." Vital documents are those that are critical for ensuring meaningful access by beneficiaries or potential beneficiaries generally and LEP persons specifically. If a recipient (1) undertakes the four-factor analysis, (2) determines a need for translated materials, and (3) translates vital documents to accommodate the primary languages of its LEP applicants, beneficiaries, and potential beneficiaries, then HUD will consider this strong evidence of compliance with respect to translation of vital documents.

The decision as to what program-related documents should be translated into languages other than English is a complex one. While documents generated by a recipient may be helpful in understanding a program or activity, not all are critical or vital to ensuring meaningful access by beneficiaries generally and LEP persons specifically. Some documents may create or define legally enforceable rights or responsibilities on the part of individual beneficiaries (e.g., leases, rules of conduct, notices of benefit denials, etc.). Others, such as applications or certification forms, solicit important information required to establish or maintain eligibility to participate in a federally assisted program or activity. For some programs or activities, written documents may be the core benefit or service provided. Moreover, some programs or activities may be specifically focused on providing benefits or services to significant LEP populations. Finally, a recipient may elect to solicit vital information orally as a substitute for written documents. Certain languages are oral rather than written, and thus a high percentage of such LEP speakers will likely be unable to read translated documents or written instructions. Each of these factors should play a role in deciding: (1) What documents should be translated; (2) what target languages other than English are appropriate; and (3) whether more effective alternatives exist, rather than continued reliance on written documents to obtain or process vital information.

Eligible population in the housing market area vs. current beneficiaries and applicants: While the final Guidance makes no changes to the safe harbor provisions found in Section VI.B.3. of the Guidance or to that found in Appendix A, the latter has been changed to differentiate between how the results of the "safe harbor" will affect a recipient's outreach efforts to eligible LEP populations as opposed to its LEP services for current beneficiaries and applicants of its programs. We have clarified in the "Housing" portion of Appendix A, as well as in Appendix B, Q&A XXI, that the "safe harbor" evaluation will differ depending on the population the recipient is considering. When conducting outreach to the eligible population in the housing market area, the number and percentage of the eligible LEP population in that housing market area should be evaluated. When working with a recipient's own beneficiaries (e.g., residents of a specific housing development or applicants to the housing development), the number and percentage of LEP persons living in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 11
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

housing and on the waiting list should be evaluated.

Guidance v. Requirements: Regarding written translations, the general HUD Guidance does identify actions that will be considered strong evidence of compliance with Title VI LEP obligations. However, the failure to provide written translations under these cited circumstances does not necessarily mean that the recipient is in non-compliance. Rather, the "safe harbors" provide a starting point for recipients to consider whether the following justify written translations of commonly used forms into frequently encountered languages other than English: (1) The importance of the service, benefit, or activity and the nature of the information sought; (2) the number or proportion of LEP persons served; (3) the frequency with which LEP persons need this particular information and the frequency of encounters with the particular language being considered for translation; and (4) resources available, including costs.

Comment: One comment pointed out that current demographic information based on the 2000 Census or other data was not readily available to assist recipients in identifying the number or proportion of LEP persons and the significant language groups among their otherwise eligible beneficiaries.

HUD Response. This information is now available at: http:// *2737 www.census.gov/main/www/com2000.html.

X. Comments Regarding Consistency of Translations (Including Standardized Translations of Documents)

Comment: One commenter stated that the concept of "safe harbors" should reflect an agreed-upon split of responsibilities between HUD and its private and public sector partners. Several commenters proposed that HUD provide standardized translations of basic programmatic and legal documents associated with HUD housing programs (e.g., public housing lease, housing discrimination complaint form, etc). They also recommended that HUD assume the cost of such translations as a means of reducing the costs of LEP services.

HUD Response. On an ad hoc basis, HUD's individual program offices have translated "as needed" important documents that affect that particular office's programs. This approach has been effective and will be continued.

XI. Other Comments

Comment: Several national organizations representing assisted housing providers said HUD should place a "disclaimer" on its translated documents that stipulates they are: (1) HUD translations, (2) provided as supplementary information, (3) not replacement for the official English document, and (4) not word-for-word translations of the housing providers documents.

HUD Response. After undertaking reasonable quality control measures to ensure the accuracy of the translation, HUD will use the following language as a disclaimer in its translated lease or other documents: "This document is a translation of a HUD-issued legal document. HUD provides this translation to you merely as a convenience to assist in your understanding of your rights and obligations. The English language version of this document is the official, legal, controlling document. This translated document is not an official document."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 12
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

Comment: Recipients of HUD funds have commented on potential complications that may arise during legal proceedings on the eviction of non-compliant residents. Recipients noted that failure on the part of the housing providers to provide all vital documents in the resident's native language would create a defense against eviction.

HUD Response. HUD appreciates this concern that the documents required by the Guidance would complicate possible eviction actions. As stated in Appendix B, Q&A XIV, state and local laws control contractual agreements between residents and landlords. Notwithstanding, HUD is unaware of any state or local case law that would encumber the eviction process.

Comment: National organizations representing assisted housing providers commented that the definition of "Who is LEP?" is misleading. They pointed out that since all members of the family over 18 years of age must sign the lease and related documents, they, therefore, are all legally responsible for the terms and conditions of the lease. If a member of the family who signs the lease is English proficient, then this family should not be counted as LEP, and the standards for providing alternate language services to that family should not apply.

HUD response. HUD and its recipients do not determine who is LEP. The beneficiaries of the services and activities identify themselves as LEP.

Comment: HUD received more than 7,000 postcards from individual citizens who opposed the Guidance as an "onerous burden" on small and underfunded organizations and who advocated adoption of English as the official language of the United States.

HUD Response. As stated in Appendix B, Q&As II and III, the Guidance is based on Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on national origin in programs and activities receiving federal financial assistance, and is, therefore, not a new requirement. The Guidance requires that meaningful access to programs, activities, and services that receive such assistance are expected to be provided to LEP persons. As explained in Appendix B, Q&A XXVI, recipients operating in jurisdictions in which English has been declared the official language continue to be subject to Title VI federal nondiscrimination requirements, including those applicable to the provisions of federally assisted services to LEP persons.

Comment: Four commenters stated that HUD did not solicit the input of housing industry stakeholders in drafting the Guidance, despite the mandate of EO 13166. They recommended that HUD convene a stakeholder meeting to discuss issues relating to the final version of this Guidance.

HUD Response. HUD contends that the process of publishing the December 19, 2003, proposed Guidance, providing the public comment period, reviewing the issues raised by the comments, and issuing this final version of the Guidance (with Appendices A and B) provided adequate opportunity for all housing industry stakeholders to review, discuss, and comment on the Guidance. HUD has determined that no separate housing industry stakeholder meetings are necessary.

Since publication of the proposed Guidance, HUD has provided several training sessions to industry groups. After this final Guidance is published, HUD plans to hold a series of public forums where PHAs, housing and service providers, and other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 13
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

HUD program recipients and beneficiaries may exchange ideas on how to implement this
Guidance and discuss and identify "promising practices" in serving LEP persons.

   In addition, the following clarifying comments have been added in Appendix B:    (1)
Q&A I defines LEP persons as "persons who, as a result of national origin, do not
speak English as their primary language and who have a limited ability to speak,
read, write or understand English;" (2) Q&A V describes the applicability of these
requirements to immigration and citizenship by explaining that U.S. citizenship and
LEP should not be used interchangeably. It is possible for a person to be a citizen
and LEP, or for a person to be fluent in English but not a U.S. citizen. Some, but
not all, HUD programs do require recipients to document the citizenship or eligible
immigrant status of program beneficiaries. Title VI applies equally to citizens,
documented non-citizens and undocumented non-citizens, based on the LEP status of
those who meet program requirements; (3) Q&A VIII specifies the types of language
assistance that may be used. These include, but are not limited to, oral
interpretation services, bilingual staff, telephone service lines interpreters,
written translation services, notices to staff and recipients of the availability of
LEP services, and referrals to community liaisons proficient in the language of LEP
persons; (4) Q&A XI helps to determine the language needs of a beneficiary.
Recipients may ask about language service needs from all prospective beneficiaries
(regardless of the prospective beneficiary's race or national origin) and use
language identification (or "I speak") cards that invite LEP persons to identify
their own language needs. To reduce costs of compliance, the Bureau of the Census
has made a set of these cards available on the Internet at
http://www.usdoj.gov/crt/cor/13166.htm; (5) Q&A XIII tells beneficiaries how to file
a complaint; and (6) Q&A XXVII provides the address for the Web site to obtain
further *2738 information. The Web site also contains a link to another set of "I
speak" cards in a different format. A recipient of DOJ funds and translator and
interpreter organizations jointly created these. They are available at
http://www.lep.gov/ocjs-languagecard.pdf. Other promising practices can also be
found in the General Chapter (Chapter 1) of DOJ's Tips and Tools document, found at
http://www.lep.gov/tips--tools-- 92104.pdf and at
http://www.lep.gov/tips--tools--92104.htm.

   In addition to addressing the concerns noted above, HUD has substituted, where
appropriate, technical or stylistic changes that more clearly articulate, in HUD's
view, the underlying principles, guidelines, or recommendations detailed in the
final Guidance. Language has been added that clarifies the Guidance's application to
activities undertaken by a recipient either voluntarily or under contract in support
of a federal agency's functions. After appropriate revision based on an in-depth
review and analysis of the comments, with particular focus on the common concerns
summarized above, HUD adopts its final "Notice of Guidance to Federal Financial
Assistance Recipients Regarding Title VI Prohibition Against National Origin
Discrimination Affecting Limited English Proficiency Persons." The text of this
final Guidance, along with Appendices A and B, are below. Title VI regulations that
deal with discrimination based on national origin have not changed, and violations
of the prohibition on national origin discrimination will continue to be enforced as
in the past. Therefore, no substantive changes have been made to the general
Guidance, although some editorial changes were made. A few substantive changes were
made to the HUD-specific Guidance in Appendix A, from that which was published as
proposed Guidance at 68 FR 70968 on December 19, 2003. The changes were made to
provide clarity. Some editorial changes were also made.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 14
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

Final Guidance

I. Introduction

 Most individuals living in the United States read, write, speak, and understand
English. There are many individuals, however, for whom English is not their primary
language. For instance, based on the 2000 census, over 26 million individuals speak
Spanish and almost 7 million individuals speak an Asian or Pacific Island language
at home. If these individuals have a limited ability to read, write, speak, or
understand English, they are limited English proficient, or "LEP." In the 2000
census, 28 percent of all Spanish and Chinese speakers and 32 percent of all
Vietnamese-speakers reported that they spoke English "not well" or "not at all."

 Language for LEP persons can be a barrier to accessing important benefits or
services, understanding and exercising important rights, complying with applicable
responsibilities, or understanding other information provided by federally funded
programs and activities. The federal government funds an array of programs,
services, and activities that can be made accessible to otherwise-eligible LEP
persons. The federal government is committed to improving the accessibility of these
programs and activities to eligible LEP persons, a goal that reinforces its equally
important commitment to promoting programs and activities designed to help
individuals learn English. Recipients should not overlook the long-term positive
impacts of incorporating or offering English as a Second Language (ESL) programs in
parallel with language assistance services. ESL courses can serve as an important
adjunct to a proper LEP plan or Language Access Plan (LAP). However, the fact that
ESL classes are made available does not obviate the statutory and regulatory
requirement to provide meaningful access for those who are not yet English
proficient. Recipients of federal financial assistance have an obligation to reduce
language barriers that can preclude meaningful access by LEP persons to important
government programs, services, and activities. HUD recognizes that many recipients
had language assistance programs in place prior to the issuance of Executive Order
13166. This policy guidance provides a uniform framework for a recipient to
integrate, formalize, and assess the continued vitality of these existing and
possibly additional reasonable efforts based on the nature of its program or
activity, the current needs of the LEP populations it encounters, and its prior
experience in providing language services in the community it serves.

 In certain circumstances, failure to ensure that LEP persons can effectively
participate in or benefit from federally assisted programs and activities may
violate the prohibition under Title VI of the Civil Rights Act of 1964, 42 U.S.C.
2000d, and Title VI regulations against national origin discrimination. The purpose
of this policy guidance is to assist recipients in fulfilling their responsibilities
to provide meaningful access to LEP persons under existing law. This policy guidance
clarifies existing legal requirements for LEP persons by describing the factors
recipients should consider in fulfilling their responsibilities to LEP persons. The
policy guidance is not a regulation, but rather a guide. Title VI and its
implementing regulations require that recipients take responsible steps to ensure
meaningful access by LEP persons. This guidance provides an analytical framework
that recipients may use to determine how best to comply with statutory and
regulatory obligations to provide meaningful access to the benefits, services,
information, and other important portions of their programs and activities for
individuals who are limited English proficient. These are the same criteria HUD will
use in evaluating whether recipients are in compliance with Title VI and Title VI

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 15
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

regulations.

As with most government initiatives, guidance on LEP requires balancing several principles. While this Guidance discusses that balance in some detail, it is important to note the basic principles behind that balance. First, HUD must ensure that federally assisted programs aimed at the American public do not leave some behind simply because they face challenges communicating in English. This is of particular importance because, in many cases, LEP individuals form a substantial portion of those encountered in federally assisted programs. Second, HUD must achieve this goal while finding constructive methods to reduce the costs of LEP requirements on small businesses, small local governments, or small non-profit entities that receive federal financial assistance.

There are many productive steps that the federal government, either collectively or as individual grant agencies, can take to help recipients reduce the costs of language services, without sacrificing meaningful access for LEP persons. Without these steps, certain smaller grantees may well choose not to participate in federally assisted programs, threatening the critical functions that the programs strive to provide. To that end, HUD plans to continue to provide assistance and guidance in this important area. In addition, HUD plans to work with representatives of state and local governments, public housing agencies, assisted housing providers, fair housing assistance programs and other HUD recipients, and LEP persons to identify and share model plans, examples of best practices, and cost-saving approaches. Moreover, HUD intends to explore how language assistance measures, resources, and cost-containment approaches developed with respect to its own federally conducted programs and **2739 activities can be effectively shared or otherwise made available to recipients, particularly small businesses, small local governments, and small non-profit entities. An interagency working group on LEP has developed a Web site, http://www.lep.gov, to assist in disseminating this information to recipients, federal agencies, and the communities being served.

Many persons who commented on the Department of Justice's (DOJ) proposed LEP guidance, published January 16, 2001 (66 FR 3834), later published for additional public comment on January 18, 2002 (67 FR 2671), and published as final on June 18, 2002 (67 FR 41455), have noted that some have interpreted the case of Alexander v. Sandoval, 532 U.S. 275 (2001), as implicitly striking down the regulations promulgated under Title VI that form the basis for the part of Executive Order 13166 that applies to federally assisted programs and activities. DOJ and HUD have taken the position that this is not the case, for reasons explained below. Accordingly, HUD will strive to ensure that federally assisted programs and activities work in a way that is effective for all eligible beneficiaries, including those with limited English proficiency.

II. Legal Authority

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." Section 602 authorizes and directs federal agencies that are empowered to extend federal financial assistance to any program or activity "to effectuate the provisions of [section 601] * * * by issuing rules, regulations, or orders of general applicability" (42 U.S.C. 2000d-1).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

HUD regulations promulgated pursuant to section 602 forbid recipients from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin" (24 CFR 1.4).

The Supreme Court, in Lau v. Nichols, 414 U.S. 563 (1974), interpreted regulations promulgated by the former Department of Health, Education, and Welfare, including a regulation similar to that of HUD, 24 CFR 1.4, to hold that Title VI prohibits conduct that has a disproportionate effect on LEP persons because such conduct constitutes national-origin discrimination. In Lau, a San Francisco school district that had a significant number of non-English speaking students of Chinese origin was required to take reasonable steps to provide them with a meaningful opportunity to participate in federally funded educational programs.

On August 11, 2000, Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," was issued and published on August 16, 2000 (65 FR 50121). Under that order, every federal agency that provides financial assistance to non-federal entities must publish guidance on how their recipients can provide meaningful access to LEP persons and thus comply with Title VI regulations forbidding funding recipients from "restrict[ing] an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program" or from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin."

On that same day, DOJ issued a general guidance document addressed to "Executive Agency Civil Rights Officers" setting forth general principles for agencies to apply in developing guidance documents for recipients pursuant to the Executive Order. The DOJ document is titled, "Enforcement of Title VI of the Civil Rights Act of 1964 National Origin Discrimination Against Persons With Limited English Proficiency," published on August 16, 2000 (65 FR 50123) ("DOJ LEP Guidance").

Subsequently, federal agencies raised questions regarding the requirements of the Executive Order, especially in light of the Supreme Court's decision in Alexander v. Sandoval, 532 U.S. 275 (2001). On October 26, 2001, the Assistant Attorney General for the Civil Rights Division issued a memorandum for "Heads of Departments and Agencies, General Counsels and Civil Rights Directors." This memorandum clarified and reaffirmed the DOJ LEP Guidance in light of Sandoval. This Guidance noted that some have interpreted Sandoval as implicitly striking down the disparate-impact regulations promulgated under Title VI that form the basis for the part of Executive Order 13166 that applies to federally assisted programs and activities. See, e.g., Sandoval,, 532 U.S. at 286, 286 n.6 ("[W]e assume for purposes of this decision that section 602 confers the authority to promulgate disparate-impact regulations; we cannot help observing, however, how strange it is to say that disparate-impact regulations are 'inspired by, at the service of, and inseparably intertwined with' Sec. 601 * * * when Sec. 601 permits the very behavior that the regulations forbid."). This guidance, however, makes clear that the DOJ disagreed with this interpretation. Sandoval holds principally that there is no private right of action to enforce Title VI disparate-impact regulations. The case did not address the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 17
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

validity of those regulations or Executive Order 13166, or otherwise limit the
authority and responsibility of federal grant agencies to enforce their own
implementing regulations. The Assistant Attorney General stated that because
Sandoval did not invalidate any Title VI regulations that proscribe conduct that has
a disparate impact on covered groups--the types of regulations that form the legal
basis for the part of Executive Order 13166 that applies to federally assisted
programs and activities--the Executive Order remains in force.

This HUD policy is thus published pursuant to Title VI, Title VI regulations, and
Executive Order 13166. It is consistent with the final DOJ "Guidance to Federal
Financial Recipients Regarding Title VI Prohibition Against National Origin
Discrimination Affecting Limited English Proficient Persons," published on June 18,
2002 (67 FR 41455).

III. Who Is Covered?

HUD's regulation, 24 CFR Part 1, "Nondiscrimination in Federally Assisted Programs
of the Department of Housing and Urban Development--Effectuation of Title VI of the
Civil Rights Act of 1964," requires all recipients of federal financial assistance
from HUD to provide meaningful access to LEP persons. Pursuant to Executive Order
13166, the meaningful access requirement of the Title VI regulations and the
four-factor analysis set forth in this LEP Guidance are to additionally apply to the
programs and activities of federal agencies, including HUD. Federal financial
assistance includes grants, training, use of equipment, donations of surplus
property, and other assistance. Recipients of HUD assistance include, for example:

• State and local governments;

• Public housing agencies;

• Assisted housing providers;

*2740 • The Fair Housing Initiative Program and the Fair Housing Assistance
Program; and

• Other entities receiving funds directly or indirectly from HUD.

Subrecipients and state grant recipients are likewise covered when federal funds
are passed to them through the grantee. For example, Entitlement Community
Development Block Grant, State Community Development Block Grant, and HOME
Investment Partnership Program recipients' subrecipients are covered. Coverage
extends to a recipient's entire program or activity, i.e., to all parts of a
recipient's operations. This is true even if only one part of the recipient receives
federal assistance.

For example, HUD provides assistance to a state government's Department of
Community Development, which provides funds to a local government to improve a
particular public facility. All of the operations of the entire state Department of
Community Development--not just the particular community and/or facility--are
covered. However, if a federal agency were to decide to terminate federal funds
based on noncompliance with Title VI or its regulations, only funds directed to the
particular program or activity that is out of compliance would be terminated (42
U.S.C. 2000d-1). Finally, some recipients operate in jurisdictions in which English

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 18
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

has been declared the official language. Nonetheless, these recipients continue to
be subject to federal nondiscrimination requirements, including those applicable to
the provision of federally assisted services to persons with limited English
proficiency.

IV. Who Is a Limited English Proficient Individual?

 Persons who do not speak English as their primary language and who have a limited
ability to read, write, speak, or understand English can be limited English
proficient, or "LEP," and may be entitled to language assistance with respect to a
particular type of service, benefit, or encounter. Examples of populations likely to
include LEP persons who are encountered and/or served by HUD recipients and should
be considered when planning language services include, but are not limited to:

 • Persons who are seeking housing assistance from a public housing agency or
assisted housing provider or are current tenants in such housing;

 • Persons seeking assistance from a state or local government for home
rehabilitation;

 • Persons who are attempting to file housing discrimination complaints with a local
Fair Housing Assistance Program grantee;

 • Persons who are seeking supportive services to become first-time homebuyers;

 • Persons seeking housing-related social services, training, or any other
assistance from HUD recipients; and

 • Parents and family members of the above.

V. How Does a Recipient Determine the Extent of Its Obligation to Provide LEP
Services?

 Recipients are required to take reasonable steps to ensure meaningful access to
their programs and activities by LEP persons. While designed to be a flexible and
fact-dependent standard, the starting point is an individualized assessment that
balances the following four factors: (1) The number or proportion of LEP persons
eligible to be served or likely to be encountered by the program or grantee; (2) the
frequency with which LEP persons come in contact with the program; (3) the nature
and importance of the program, activity, or service provided by the program to
people's lives; and (4) the resources available to the grantee/recipient and costs.
As indicated above, the intent of this Guidance is to suggest a balance that ensures
meaningful access by LEP persons to critical services while not imposing undue
burdens on small business, small local governments, or small nonprofit entities.

 After applying the four-factor analysis, a recipient may conclude that different
language assistance measures are sufficient for the different types of programs or
activities in which it engages. For instance, some of a recipient's activities will
be more important than others and/or have greater impact on or contact with LEP
persons, and thus may require more in the way of language assistance. The
flexibility that recipients have in addressing the needs of the LEP populations they
serve does not diminish, and should not be used to minimize, the obligation that
those needs be addressed. HUD recipients should apply the following four factors to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 19
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

the various kinds of contacts that they have with the public to assess language
needs and decide what reasonable steps they could take to ensure meaningful access
for LEP persons.

A. *The Number or Proportion of LEP Persons Served or Encountered in the Eligible
Service Area*

One factor in determining what language services recipients should provide is the
number or proportion of LEP persons from a particular language group served or
encountered in the eligible service population. The greater the number or proportion
of these LEP persons, the more likely language services are needed. Ordinarily,
persons "eligible to be served, or likely to be directly affected, by" a recipient's
program or activity are those who are served or encountered in the eligible service
population. This population will be program-specific, and includes persons who are
in the geographic area that have been approved by HUD as the recipient's
jurisdiction or service area. However, where, for instance, a public housing project
serves a large LEP population, the appropriate service area for LEP services is most
likely the public housing project neighborhood, and not the entire population served
by the PHA. Where no service area has previously been approved, the relevant service
area may be that which is approved by state or local authorities or designated by
the recipient itself, provided that these designations do not themselves
discriminatorily exclude certain populations. Appendix A provides examples to assist
in determining the relevant service area. When considering the number or proportion
of LEP persons in a service area, recipients should consider LEP parent(s) when
their English-proficient or LEP minor children and dependents encounter the
recipient.

Recipients should first examine their prior experiences with LEP encounters and
determine the breadth and scope of language services that were needed. In conducting
this analysis, it is important to include language minority populations that are
eligible for their programs or activities but may be underserved because of existing
language barriers. Other data could be consulted to refine or validate a recipient's
prior experience, including the latest census data for the area served, data from
school systems and from community organizations, and data from state and local
governments. The focus of the analysis is on lack of English proficiency, not the
ability to speak more than one language. Note that demographic data may indicate the
most frequently spoken languages other than English and the percentage of people who
speak that language and who speak or understand English less than well. Some of the
most commonly spoken *2741 languages other than English may be spoken by people who
are also overwhelmingly proficient in English. Thus, they may not be the languages
spoken most frequently by limited English proficiency persons. When using
demographic data, it is important to focus in on the languages spoken by those who
are not proficient in English. Community agencies, school systems, grassroots and
faith-based organizations, legal aid entities, and others can often assist in
identifying populations for whom outreach is needed and who would benefit from the
recipients' programs and activities if language services were provided.

B. *The Frequency With Which LEP Individuals Come in Contact With the Program*

Recipients should assess, as accurately as possible, the frequency with which they
have or should have contact with an LEP individual from different language groups
seeking assistance. The more frequent the contact with a particular language group,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 20
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

the more likely the need for enhanced language services in that language. The steps that are reasonable for a recipient that serves an LEP person on a one-time basis will be very different than those expected from a recipient that serves LEP persons daily. It is also advisable to consider the frequency of different types of language contacts. For example, frequent contacts with Spanish-speaking people who are LEP may require extensive assistance in Spanish. Less frequent contact with different language groups may suggest a different and less intensified solution. If an LEP individual accesses a program or service on a daily basis, a recipient has greater duties than if the same individual's program or activity contact is unpredictable or infrequent. But even recipients that serve LEP persons on an unpredictable or infrequent basis should use this balancing analysis to determine what to do if an LEP individual seeks services under the program in question. This plan need not be intricate. It may be as simple as being prepared to use one of the commercially available telephonic interpretation services to obtain immediate interpreter services. In applying this standard, recipients should consider whether appropriate outreach to LEP persons could increase the frequency of contact with LEP language groups.

*C. The Nature and Importance of the Program, Activity, or Service Provided by the Program*

The more important the activity, information, service, or program, or the greater the possible consequences of the contact to the LEP persons, the more likely the need for language services. The obligations to communicate rights to a person who is being evicted differ, for example, from those to provide recreational programming. A recipient needs to determine whether denial or delay of access to services or information could have serious or even life-threatening implications for the LEP individual. Decisions by HUD, another Federal, State, or local entity, or the recipient to make a specific activity compulsory in order to participate in the program, such as filling out particular forms, participating in administrative hearings, or other activities, can serve as strong evidence of the program's importance.

*D. The Resources Available to the Recipient and Costs*

A recipient's level of resources and the costs that would be imposed on it may have an impact on the nature of the steps it should take. Smaller recipients with more limited budgets are not expected to provide the same level of language services as larger recipients with larger budgets. In addition, "reasonable steps" may cease to be reasonable where the costs imposed substantially exceed the benefits.

Resource and cost issues, however, can often be reduced by technological advances; sharing of language assistance materials and services among and between recipients, advocacy groups, and federal grant agencies; and reasonable business practices. Where appropriate, training bilingual staff to act as interpreters and translators, information sharing through industry groups, telephonic and video conferencing interpretation services, pooling resources and standardizing documents to reduce translation needs, using qualified translators and interpreters to ensure that documents need not be "fixed" later and that inaccurate interpretations do not cause delay or other costs, centralizing interpreter and translator services to achieve economies of scale, or the formalized use of qualified community volunteers, for example, may help reduce costs. Recipients should carefully explore the most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cost-effective means of delivering competent and accurate language services before
limiting services due to resource concerns. Small recipients with limited resources
may find that entering into a bulk telephonic interpretation service contract will
prove cost effective. Large entities and those entities serving a significant number
or proportion of LEP persons should ensure that their resource limitations are
well-substantiated before using this factor as a reason to limit language
assistance. Such recipients may find it useful to articulate, through documentation
or in some other reasonable manner, their process for determining that language
services would be limited based on resources or costs.

This four-factor analysis necessarily implicates the "mix" of LEP services the
recipient will provide. Recipients have two main ways to provide language services:
Oral interpretation in person or via telephone interpretation service (hereinafter
"interpretation") and through written translation (hereinafter "translation"). Oral
interpretation can range from on-site interpreters for critical services provided to
a high volume of LEP persons through commercially available telephonic
interpretation services. Written translation, likewise, can range from translation
of an entire document to translation of a short description of the document. In some
cases, language services should be made available on an expedited basis, while in
others the LEP individual may be referred to another office of the recipient for
language assistance.

The correct mix should be based on what is both necessary and reasonable in light
of the four-factor analysis. For instance, a public housing provider in a largely
Hispanic neighborhood may need immediate oral interpreters available and should give
serious consideration to hiring some bilingual staff. (Of course, many have already
made such arrangements.) By contrast, there may be circumstances where the
importance and nature of the activity and number or proportion and frequency of
contact with LEP persons may be low and the costs and resources needed to provide
language services may be high--such as in the case of a voluntary public tour of a
recreational facility--in which pre-arranged language services for the particular
service may not be necessary. Regardless of the type of language service provided,
quality and accuracy of those services can be critical in order to avoid serious
consequences to the LEP person and to the recipient. Recipients have substantial
flexibility in determining the appropriate mix.

VI. Selecting Language Assistance Services

Recipients have two main ways to provide language services: oral and written
language services. Quality and accuracy of the language service is critical in order
to avoid serious *2742 consequences to the LEP person and to the recipient.

A. *Oral Language Services (Interpretation)*

Interpretation is the act of listening to something in one language (source
language) and orally translating it into another (target language). Where
interpretation is needed and is a reasonable service to provide, recipients should
consider some or all of the following options for providing competent interpreters
in a timely manner:

1. Competence of Interpreters

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 22
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

When providing oral assistance, recipients are expected to ensure competency of the language service provider, no matter which of the strategies outlined below are used. Competency requires more than self-identification as bilingual. Some bilingual staff and community volunteers, for instance, may be able to communicate effectively in a different language when communicating information directly in that language, but not be competent to interpret in and out of English. Likewise, they may not be able to do written translations. Formal certification as an interpreter is not necessary, although it would serve as documentation of competency to interpret. When using interpreters, recipients are expected to ensure that they:

• Demonstrate proficiency in and ability to communicate information accurately in both English and in the other language and identify and employ the appropriate mode of interpreting (e.g., consecutive, simultaneous, summarization, or sight translation);

• Have knowledge in both languages of any specialized terms or concepts peculiar to the entity's program or activity and of any particularized vocabulary and phraseology used by the LEP person; and understand and follow confidentiality and impartiality rules to the same extent the recipient employee for whom they are interpreting and/or to the extent their position requires. Many languages have "regionalisms," or differences in usage. For instance, a word that may be understood to mean something in Spanish for someone from Cuba may not be so understood by someone from Mexico. In addition, there may be languages that do not have an appropriate direct interpretation of some courtroom or legal terms. The interpreter should be so aware and be able to provide the most appropriate interpretation. The interpreter should make the recipient aware of the issue when it arises and then work to develop a consistent and appropriate set of descriptions of these terms so that the terms can be used again, when appropriate; and

• Understand and adhere to their role as interpreters without deviating into a role as counselor, legal advisor, or other roles (particularly in court, administrative hearings, or law enforcement contexts).

Some recipients may have additional self-imposed requirements for interpreters. Where individual rights depend on precise, complete, and accurate interpretation or translations, the use of certified interpreters is strongly encouraged. For the many languages in which no formal certification assessments currently exist, other qualifications should be considered, such as whether the person has been deemed otherwise qualified by a state or federal court, level of experience and participation in professional trainings and activities, demonstrated knowledge of interpreter ethics, etc. Where such proceedings are lengthy, the interpreter will likely need breaks. Therefore, team interpreting may be appropriate to ensure accuracy and to prevent errors caused by mental fatigue of interpreters and to allow for breaks.

While quality and accuracy of language services is critical, it should be evaluated as part of the appropriate mix of LEP services. The quality and accuracy of language services in an abused woman's shelter, for example, should be extraordinarily high, while the quality and accuracy of language services in a recreational program generally need not meet such exacting standards.

Finally, when interpretation is needed and is reasonable, it should be provided in a timely manner. To be meaningfully effective, language assistance should be timely.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 23
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

While there is no single definition for "timely" applicable to all types of
interactions at all times by all types of recipients, one clear guide is that the
language assistance should be provided at a time and place that avoids the effective
denial of the service, benefit, or right at issue or the imposition of an undue
burden on or delay in important rights, benefits, or services to the LEP person. For
example, when the timeliness of services is important, such as certain activities of
HUD recipients in providing housing, health, and safety services, and when important
legal rights are at issue, a recipient would likely not be providing meaningful
access if it had one bilingual staff person available one day a week to provide the
service. Such conduct would likely result in delays for LEP persons that would be
significantly greater than those for English-proficient persons. Conversely, where
access to or exercise of a service, benefit, or right is not effectively precluded
by a reasonable delay, language assistance can be delayed for a reasonable period.

## 2. Hiring Bilingual Staff

When particular languages are encountered often, hiring bilingual staff offers one
of the best, and often most economical, options. Recipients can, for example, fill
public contact positions, such as persons who take public housing or Section 8
applications, with staff who are bilingual and competent to communicate directly
with LEP persons in the LEP persons' own language. If bilingual staff is also used
to interpret between English speakers and LEP persons, or to orally interpret
written documents from English into another language, they should be competent in
the skill of interpreting. Being bilingual does not necessarily mean that a person
has the ability to interpret. In addition, there may be times when the role of the
bilingual employee may conflict with the role of an interpreter (for instance, a
bilingual intake specialist would probably not be able to perform effectively the
role of an administrative hearing interpreter and intake specialist at the same
time, even if the intake specialist were a qualified interpreter). Effective
management strategies, including any appropriate adjustments in assignments and
protocols for using bilingual staff, can ensure that bilingual staff is fully and
appropriately utilized. When bilingual staff cannot meet all of the language service
obligations of the recipient, the recipient would turn to other options.

## 3. Hiring Staff Interpreters

Hiring interpreters may be most helpful where there is a frequent need for
interpreting services in one or more languages. Depending on the facts, sometimes it
may be necessary and reasonable to provide on-site interpreters to provide accurate
and meaningful communication with an LEP person.

## 4. Contracting for Interpreters .

Contract interpreters may be a cost-effective option when there is no regular need
for a particular language skill. In addition to commercial and other private
providers, many community-based organizations and mutual assistance associations
provide interpretation services for particular languages. Contracting with and
providing training regarding the recipient's programs and processes to these
organizations can be a cost-*2743 effective option for providing language services
to LEP persons from those language groups.

## 5. Using Telephone Interpreter Line

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 24
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

Telephone interpreter service lines often offer speedy interpreting assistance in many different languages. They may be particularly appropriate where the mode of communicating with an English-proficient person would also be over the phone. Although telephonic interpretation services are useful in many situations, it is important to ensure that, when using such services, the interpreters used are competent to interpret any technical or legal terms specific to a particular program that may be important parts of the conversation. Nuances in language and non-verbal communication can often assist an interpreter and cannot be recognized over the phone. Video teleconferencing may sometimes help to resolve this issue where necessary. In addition, where documents are being discussed, it is important to give telephonic interpreters adequate opportunity to review the document prior to the discussion, and any logistical problems should be addressed.

6. Using Community Volunteers

In addition to consideration of bilingual staff, staff interpreters, or contract interpreters (either in-person or by telephone) as options to ensure meaningful access by LEP persons, use of recipient-coordinated community volunteers, working with, for instance, community-based organizations, may be a cost-effective way of providing supplemental language assistance under appropriate circumstances. They may be particularly useful in providing language access for a recipient's less critical programs and activities. To the extent the recipient relies on community volunteers, it is often best to use volunteers who are trained in the information or services of the program and can communicate directly with LEP persons in their language. Just as with all interpreters, community volunteers used to interpret between English speakers and LEP persons, or to orally translate documents, should be competent in the skill of interpreting and knowledgeable about applicable confidentiality and impartiality rules. Recipients should consider formal arrangements with community-based organizations that provide volunteers to address these concerns and to help ensure that services are available more regularly.

7. Use of Family Members or Friends as Interpreters

Although recipients should not plan to rely on an LEP person's family members, friends, or other informal interpreters to provide meaningful access to important programs and activities, where LEP persons so desire, they should be permitted to use, at their own expense, an interpreter of their own choosing (whether a professional interpreter, family member, friend) in place of or as a supplement to the free language services expressly offered by the recipient. LEP persons may feel more comfortable when a trusted family member or friend acts as an interpreter. In addition, in exigent circumstances that are not reasonably foreseeable, temporary use of interpreters not provided by the recipient may be necessary. However, with proper planning and implementation, recipients should be able to avoid most such situations.

Recipients should take special care to ensure that family, legal guardians, caretakers, and other informal interpreters are appropriate in light of the circumstances and subject matter of the program, service, or activity, including protection of the recipient's own administrative or enforcement interest in accurate interpretation. In many circumstances, family members (especially children) or friends are not competent to provide quality and accurate interpretations. Confidentiality, privacy, or conflict-of-interest issues may also arise. LEP persons may feel uncomfortable revealing or describing sensitive, confidential, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 25
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

potentially embarrassing medical, law enforcement (e.g., sexual or violent
assaults), family, or financial information to a family member, friend, or member of
the local community. For example, special circumstances may raise additional serious
concerns regarding the voluntary nature, conflicts of interest, and privacy issues
surrounding the use of family members and friends as interpreters, particularly
where an important right, benefit, service, disciplinary concern, or access to
personal or law enforcement information is at stake. In addition to ensuring
competency and accuracy of the interpretation, recipients should take these special
circumstances into account when determining whether a beneficiary makes a knowing
and voluntary choice to use another family member or friend as an interpreter.
Furthermore, such informal interpreters may have a personal connection to the LEP
person or an undisclosed conflict of interest, such as the desire to protect
themselves or another perpetrator in a domestic violence or other criminal matter.
For these reasons, when oral language services are necessary, recipients would
generally offer competent interpreter services free of cost to the LEP person. For
HUD-recipient programs and activities, this is particularly true in a courtroom or
administrative hearing or in situations in which health, safety, or access to
important housing benefits and services are at stake; or when credibility and
accuracy are important to protect an individual's rights and access to important
services.

  An example of such a case is when a property manager/or PHA security personnel or
local police respond to a domestic disturbance. In such a case, use of family
members or neighbors to interpret for the alleged victim, perpetrator, or witnesses
may raise serious issues of competency, confidentiality, and conflict of interest
and is thus inappropriate. While issues of competency, confidentiality, and conflict
of interest in the use of family members (especially children) or friends, often
make their use inappropriate, the use of these individuals as interpreters may be an
appropriate option where proper application of the four factors would lead to a
conclusion that recipient-provided services are not necessary. An example of this is
a voluntary public tour of a community recreational facility built with CDBG funds.
There, the importance and nature of the activity may be relatively low and unlikely
to implicate issues of confidentiality, conflict of interest, or the need for
accuracy. In addition, the resources needed and costs of providing language services
may be high. In such a setting, an LEP person's use of family, friends, or others
may be appropriate.

  If the LEP person chooses to provide his or her own interpreter, a recipient should
consider whether a record of that choice and of the recipient's offer of assistance
is appropriate. Where precise, complete, and accurate interpretations or
translations of information and/or testimony are critical for legal reasons, or
where the competency of the LEP person's interpreter is not established, a recipient
might decide to provide its own, independent interpreter, even if an LEP person
wants to use his or her own interpreter as well. While the LEP person's decision
should be respected, there may be additional issues of competency, confidentiality,
or conflict of interest when the choice involves using children as interpreters.
Extra caution should be exercised when the LEP person chooses to use a minor. The
*2744 recipient should take care to ensure that the LEP person's choice is
voluntary, that the LEP person is aware of the possible problems if the preferred
interpreter is a minor child, and that the LEP person knows that the recipient could
provide a competent interpreter at no cost to the LEP person.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 26
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

*B. Written Language Services (Translation)*

  Translation is the replacement of a written text from one language (source
language) into an equivalent written text in the target language. It should be kept
in mind that because many LEP persons may not be able to read their native
languages, back-up availability of oral interpretation is always advantageous.

1. What Documents Should be Translated?

  After applying the four-factor analysis, a recipient may determine that an
effective LAP for its particular program or activity includes the translation of
vital, or generic widely used written materials into the language of each frequently
encountered LEP group eligible to be served and/or likely to be affected by the
recipient's program. Such written materials could include, for example:

  • Consent and complaint forms;

  • Intake forms with the potential for important consequences;

  • Written notices of rights, denial, loss, or decreases in benefits or services,
and other hearings;

  • Notices of eviction;

  • Notices advising LEP persons of free language assistance;

  • Notices of public hearings, especially those that meet Community Planning and
Development's citizen participation requirements;

  • Leases and tenant rules; and/or

  • Applications to participate in a recipient's program or activity or to receive
recipient benefits or services.

  Whether or not a document (or the information it solicits) is "vital" may depend
upon the importance of the program, information, encounter, or service involved, and
the consequence to the LEP person if the information in question is not provided
accurately or in a timely manner. For instance, applications for recreational
activities would not generally be considered vital documents, relative to
applications for housing. Where appropriate, recipients are encouraged to create a
plan for consistently determining, over time and across its various activities, what
documents are "vital" to the meaningful access of the LEP populations they serve.

  Classifying a document as vital or non-vital is sometimes difficult, especially in
the case of outreach materials such as brochures or other information on rights and
services. Awareness of rights or services is an important part of "meaningful
access." Lack of awareness that a particular program, right, or service exists may
effectively deny LEP persons meaningful access. Thus, where a recipient is engaged
in community outreach activities in furtherance of its activities, it would
regularly assess the needs of the populations frequently encountered or affected by
the program or activity to determine whether certain critical outreach materials
should be translated. Community organizations may be helpful in determining what
outreach materials may be most helpful to translate. In addition, the recipient

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                    Page 27
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

should consider whether translations of outreach material may be made more effective when done in tandem with other outreach methods, including utilizing the ethnic media, schools, grassroots and faith-based organizations, and community organizations to spread a message.

Sometimes a document includes both vital and non-vital information. This may be the case when the document is very large. It may also be the case when the title and a phone number for obtaining more information on the contents of the document in frequently encountered languages other than English is critical, but the document is sent out to the general public and cannot reasonably be translated into many languages. Thus, vital information may include, for instance, the provision of information in appropriate languages other than English regarding where a LEP person might obtain an interpretation or translation of the document.

## 2. Into What Languages Should Documents be Translated?

The languages spoken by the LEP persons with whom the recipient has contact determine the languages into which vital documents should be translated. A distinction should be made, however, between languages that are frequently encountered by a recipient and those less commonly encountered. Many recipients serve communities in large cities or across the country. They regularly serve LEP persons speaking dozens and sometimes more than 100 different languages. To translate all written materials into all those languages is unrealistic. Although recent technological advances have made it easier for recipients to store and share translated documents, such an undertaking would incur substantial costs and require substantial resources. Nevertheless, well-substantiated claims of lack of resources to translate all vital documents into dozens of languages do not necessarily relieve the recipient of the obligation to translate those documents into at least several of the more frequently encountered languages and to set benchmarks for continued translations into the remaining languages over time. As a result, the extent of the recipient's obligation to provide written translations of documents should be determined by the recipient on a case-by-case basis, looking at the totality of the circumstances in light of the four-factor analysis. Because translation is a one-time expense, consideration should be given to whether the upfront cost of translating a document (as opposed to oral interpretation) should be amortized over the likely lifespan of the document when applying this four-factor analysis.

## 3. Safe Harbor

Many recipients would like to ensure with greater certainty that they comply with their obligations to provide written translations in languages other than English. Paragraphs (a) and (b) below outline the circumstances that can provide a "safe harbor" for recipients regarding the requirements for translation of written materials. A "safe harbor" means that if a recipient provides written translations under these circumstances, such action will be considered strong evidence of compliance with the recipient's written-translation obligations. The failure to provide written translations under the circumstances outlined in paragraphs (a) and (b) does not mean there is noncompliance. Rather, the circumstances provide a common starting point for recipients to consider the importance of the service, benefit, or activity involved; the nature of the information sought; and whether the number or proportion of LEP persons served call for written translations of commonly used forms into frequently encountered languages other than English. Thus, these paragraphs merely provide a guide for recipients that would like greater certainty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 28
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

of compliance than can be provided by a fact-intensive, four-factor analysis.

For example, even if the safe harbors are not used, should written translation of a certain document(s) be so burdensome as to defeat the legitimate objectives of its program, translation of the written materials is not necessary. Other ways of providing meaningful access, such as effective oral interpretation of vital documents, might *2745 be acceptable under such circumstances.

The following actions will be considered strong evidence of compliance with the recipient's written-translation obligations:

(a) The HUD recipient provides written translations of vital documents for each eligible LEP language group that constitutes 5 percent or 1,000, whichever is less, of the population of persons eligible to be served or likely to be affected or encountered. Translation of other documents, if needed, can be provided orally; or

(b) If there are fewer than 50 persons in a language group that reaches the 5 percent trigger in (a), the recipient does not translate vital written materials but instead provides written notice in the primary language of the LEP language group of the right to receive competent oral interpretation of those written materials, free of cost.

These "safe harbor" provisions apply to the translation of written documents only. They do not affect the requirement to provide meaningful access to LEP persons through competent oral interpreters where oral language services are needed and are reasonable. For example, housing facilities should, where appropriate, ensure that leases have been explained to LEP residents, at intake meetings, for instance, prior to taking adverse action against such persons.

4. Competence of Translators

As with oral interpreters, all attempts should be made to ensure that translators of written documents are competent. Many of the same considerations apply. However, the skill of translating is very different from the skill of interpreting, and a person who is a competent interpreter may or may not be competent to translate.

Particularly where legal or other vital documents are being translated, competence can often be achieved by use of certified translators. Certification or accreditation may not always be possible or necessary. For those languages in which no formal accreditation currently exists, a particular level of membership in a professional translation association can provide some indicator of professionalism. Having a second, independent translator "check" the work of the primary translator can often ensure competence. Alternatively, one translator can translate the document, and a second, independent translator could translate it back into English to check that the appropriate meaning has been conveyed. This is called "back translation."

Translators should understand the expected reading level of the audience and, where appropriate, have fundamental knowledge about the target language group's vocabulary and phraseology. Sometimes, direct translation of materials results in a translation that is written at a much more difficult level than the English language version or has no relevant equivalent meaning. For instance, there may be languages that do not have an appropriate direct translation of some English language terms. In such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                        Page 29
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

cases, the translator should be able to provide an appropriate alternative. The translator should likely also make the recipient aware of this. Recipients can then work with translators to develop a consistent and appropriate set of descriptions of these terms in that language that can be used again, when appropriate. Recipients will find it more effective and less costly if they try to maintain consistency in the words and phrases used to translate terms of art, and legal or other technical concepts. Creating or using already created glossaries of commonly used terms may be useful for LEP persons and translators and cost-effective for the recipient. Providing translators with examples of previous translations of similar material by the recipient, other recipients, or federal agencies may be helpful. Community organizations may be able to help consider whether a document is written at an appropriate level for the audience. Likewise, consistency in the words and phrases used to translate terms of art, legal, or other technical concepts will help avoid confusion by LEP persons and may reduce costs.

While quality and accuracy of translation services is critical, they are part of the appropriate mix of LEP services. For instance, documents that are simple and have no legal or other consequence for LEP persons who rely on them may require translators that are less skilled than important documents with legal or other information upon which reliance has important consequences (including, for example, information or documents of HUD recipients regarding safety issues and certain legal rights or programmatic or other obligations). The permanent nature of written translations, however, imposes additional responsibility on the recipient to ensure that the quality and accuracy permit meaningful access by LEP persons.

VII. Elements of an Effective LAP

After completing the four-factor analysis and deciding what language assistance services are appropriate, a recipient would develop an implementation plan to address the identified needs of the LEP populations they serve. Recipients have flexibility in developing this plan. The development and maintenance of a periodically updated written plan on language assistance for LEP persons, or a LAP for use by recipient employees serving the public will likely be the most appropriate and cost-effective means of documenting compliance and providing a framework for the provision of timely and reasonable language assistance. Moreover, such written plans would likely provide additional benefits to a recipient's managers in the areas of training, administration, planning, and budgeting. These benefits should lead most recipients to document in a written LAP their language assistance services, and how staff and LEP persons can access those services. Despite these benefits, certain HUD recipients, such as recipients serving very few LEP persons and recipients with very limited resources, may choose not to develop a written LAP. However, the absence of a written LAP does not obviate the underlying obligation to ensure meaningful access by LEP persons to a recipient's program or activities. Accordingly, in the event that a recipient elects not to develop a written plan, it should consider alternative ways to articulate, in some other reasonable manner, a plan for providing meaningful access. Entities having significant contact with LEP persons, such as schools, grassroots and faith-based organizations, community groups, and groups working with new immigrants can be very helpful in providing important input into this planning process from the beginning.

The following five steps may be helpful in designing an LAP and are typically part of effective implementation plans.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                    Page 30
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

*A. Identifying LEP Individuals Who Need Language Assistance*

 The first two factors in the four-factor analysis require an assessment of the
number or proportion of LEP individuals eligible to be served or encountered and the
frequency of encounters. This requires recipients to identify LEP persons with whom
they have contact. One way to determine the language of communication is to use
language identification cards (or "I speak cards"), which invite LEP persons to
identify their language needs to staff. Such cards, for instance, might say, "I
speak Spanish" in both Spanish and English, and "I speak Vietnamese" in both English
and Vietnamese. To reduce costs of compliance, the federal *2746 government has made
a set of these cards available on the Internet. The Census Bureau "I speak card" can
be found and downloaded at http://www.usdoj.gov/crt/cor/13166.htm. When records are
normally kept of past interactions with members of the public, the language of the
LEP person can be included as part of the record. In addition to helping employees
identify the language of LEP persons they encounter, this process will help in
future applications of the first two factors of the four-factor analysis. In
addition, posting notices in commonly encountered languages notifying LEP persons of
language assistance will encourage them to self-identify.

*B. Language Assistance Measures*

 An effective Language Assistance Plan (LAP) would likely include information about
the ways in which language assistance will be provided. For instance, recipients may
want to include information on at least the following:

• Types of language services available;

• How staff can obtain those services;

• How to respond to LEP callers;

• How to respond to written communications from LEP persons;

• How to respond to LEP persons who have in-person contact with recipient staff;
and

• How to ensure competency of interpreters and translation services.

*C. Training Staff*

 Staff should know their obligations to provide meaningful access to information and
services for LEP persons. An effective LAP would likely include training to ensure
that:

• Staff knows about LEP policies and procedures; and

• Staff having contact with the public is trained to work effectively with
in-person and telephone interpreters.

 Recipients may want to include this training as part of the orientation for new
employees. It is important to ensure that all employees in public contact positions
(or having contact with those in a recipient's custody) are properly trained.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Recipients have flexibility in deciding the manner in which the training is provided. The more frequent the contact with LEP persons, the greater the need will be for in-depth training. Staff with little or no contact with LEP persons may only have to be aware of a Language Action Plan. However, management staff, even if they do not interact regularly with LEP persons, should be fully aware of and understand the plan so they can reinforce its importance and ensure its implementation.

*D. Providing Notice to LEP Persons*

Once an agency has decided, based on the four factors, that it will provide language services, it is important for the recipient to let LEP persons know that those services are available and that they are free of charge. Recipients should provide this notice in a language that LEP persons will understand. Examples of notification that recipients should consider include:

• Posting signs in common areas, offices, and anywhere applications are taken. When language assistance is needed to ensure meaningful access to information and services, it is important to provide notice in appropriate languages in initial points of contact so that LEP persons can learn how to access those language services. This is particularly true in geographic areas with high volumes of LEP persons seeking access to the recipient's major programs and activities. For instance, signs in offices where applications are taken could state that free language assistance is available. The signs should be translated into the most common languages encountered. They should explain how to get the language help. The Social Security Administration has made such signs available at http://www.ssa.gov/multilanguage/langlist1.htm. These signs could, for example, be modified for recipient use;

• Stating in outreach documents that language services are available from the recipient. Announcements could be in, for instance, brochures, booklets, and in outreach and recruitment information. These statements should be translated into the most common languages and could be "tagged" onto the front of common documents;

• Working with grassroots and faith-based community organizations and other stakeholders to inform LEP individuals of the recipients' services, including the availability of language assistance services;

• Using a telephone voice mail menu. The menu could be in the most common languages encountered. It should provide information about available language assistance services and how to get them;

• Including notices in local newspapers in languages other than English;

• Providing notices on non-English-language radio and television stations about the available language assistance services and how to get them; and

• Presentations and/or notices at schools and grassroots and faith-based organizations.

*E. Monitoring and Updating the LAP*

Recipients should, where appropriate, have a process for determining, on an ongoing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                              Page 32
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

basis, whether new documents, programs, services, and activities need to be made
accessible for LEP persons, and recipients may want to provide notice of any changes
in services to the LEP public and to employees. In addition, recipients should
consider whether changes in demographics, types of services, or other needs require
annual reevaluation of their LAP. Less frequent reevaluation may be more appropriate
where demographics, services, and needs are more static. One good way to evaluate
the LAP is to seek feedback from members of the community that the plan serves.

   In their reviews, recipients may want to consider assessing changes in:

 • Current LEP populations in the housing jurisdiction geographic area or population
affected or encountered;

 • Frequency of encounters with LEP language groups;

 • The nature and importance of activities to LEP persons;

 • The availability of resources, including technological advances and sources of
additional resources, and the costs imposed;

 • Whether existing assistance is meeting the needs of LEP persons;

 • Whether staff knows and understands the LAP and how to implement it; and

 • Whether identified sources for assistance are still available and viable.

   In addition to these elements, effective plans set clear goals, make management
accountable, and provide opportunities for community input and planning throughout
the process.

VIII. Voluntary Compliance Effort

   The goal for Title VI and Title VI regulatory enforcement is to achieve voluntary
compliance. The requirement to provide meaningful access to LEP persons is enforced
and implemented by HUD through the procedures identified in the Title VI
regulations. These procedures include complaint investigations, compliance reviews,
efforts to secure voluntary compliance, and technical assistance.

   The Title VI regulations provide that HUD will investigate whenever it receives a
complaint, report, or other information that alleges or indicates possible
noncompliance with Title VI or its regulations. The Office of Fair Housing and Equal
Opportunity (FHEO) is responsible for conducting the investigation to ensure that
federal program recipients are in compliance with civil rights-related program *2747
requirements. If the investigation results in a finding of compliance, HUD will
inform the recipient in writing of this determination, including the basis for the
determination. HUD uses voluntary methods to resolve most complaints. However, if a
case is fully investigated and results in a finding of noncompliance, HUD must
inform the recipient of the noncompliance through a Letter of Findings that sets out
the areas of noncompliance and the steps that should be taken to correct the
noncompliance. HUD must attempt to secure voluntary compliance through informal
means. If the matter cannot be resolved informally, HUD must secure compliance
through the termination of federal assistance after the HUD recipient has been given
an opportunity for an administrative hearing and/or by referring the matter to a DOJ

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

litigation section to seek injunctive relief or pursue other enforcement proceedings. At all stages of an investigation, HUD engages in voluntary compliance efforts and provides technical assistance to recipients. During such efforts, HUD proposes reasonable timetables for achieving compliance and consults with and assists recipients in exploring cost-effective ways of coming into compliance. In determining a recipient's compliance with the Title VI regulations, HUD's primary concern is to ensure that the recipient's policies and procedures provide meaningful access for LEP persons to the recipient's programs and activities.

While all recipients must work toward building systems that will ensure access for LEP persons, HUD acknowledges that the implementation of a comprehensive system to serve LEP persons is a process and that a system will evolve over time as it is implemented and periodically reevaluated. As recipients take reasonable steps to provide meaningful access to federally assisted programs and activities for LEP persons, HUD will look favorably on intermediate steps recipients take that are consistent with this Guidance, and that, as part of a broader implementation plan or schedule, move their service delivery system toward providing full access to LEP persons. This does not excuse noncompliance but instead recognizes that full compliance in all areas of a recipient's activities and for all potential language minority groups may reasonably require a series of implementing actions over a period of time. However, in developing any phased implementation schedule, HUD expects its recipients to ensure that the provision of appropriate assistance for significant LEP populations or with respect to activities having a significant impact on the housing, health, safety, legal rights, or livelihood of beneficiaries is addressed first. Recipients are encouraged to document their efforts to provide LEP persons with meaningful access to federally assisted programs and activities.

IX. Application to Specific Types of Recipients

Appendix A of this Guidance provides examples of how the meaningful access requirement of the Title VI regulations applies to HUD funded recipients. It further explains how recipients can apply the four factors to a range of situations, to determine their responsibility for providing language services in each of these situations. This Guidance helps recipients identify the population they should consider when determining the extent and types of services to provide. For instance, it gives examples on how to apply this guidance in situations like:

• Holding public meetings on Consolidated Plans for Community Planning and Development Programs [Community Development Block Grants (CDBG), HOME Investment Partnership Program (HOME), Housing Opportunities for Persons with AIDS (HOPWA), and Emergency Shelter Grants (ESG)];

• Interviewing victims of housing discrimination;

• Helping applicants to apply for public housing units;

• Explaining lease provisions; and

• Providing affirmative marketing housing counseling services.

X. Environmental Impact

This notice sets out nondiscrimination standards. Accordingly, under 24 CFR 50.19

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                    Page 34
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

(c) (3), this notice is categorically excluded from environmental review under the
National Environmental Policy Act (42 U.S.C. 4321).

Dated: August 16, 2006.

Kim Kendrick,

Assistant Secretary for Fair Housing, and Equal Opportunity.

Editorial Note: This document was received at the Office of the Federal Register on
January 16, 2007.

Appendix A:--Application of Limited English Proficiency (LEP) Guidance for JUH
Recipients

*Introduction*

A wide range of entities receives federal financial assistance through HUD. HUD
provides assistance to the following types of recipients, among others: Assisted
housing providers; public housing agencies (PHAs); Indian tribes, state and local
governments; nonprofit organizations, including housing counseling agencies,
grassroots community-based organizations, and faith-based organizations; state and
local fair housing agencies; and providers of a variety of services. Most
organizations can check their status as to whether or not they are covered by
reviewing the "List of Federally Assisted Programs," published in the Federal
Register on November 24, 2004 (69 FR 68700). This list may not be all-inclusive or
reflect newer programs. Subrecipients are also covered. All HUD-funded recipients,
except for Indian tribes, are required to certify to nondiscrimination and
affirmatively furthering fair housing, either through the Office of Community
Planning and Development's (CPD) Consolidated Plan [24 CFR 91.225 (a)(1) and (b)(6),
92.325(a)(1), and 91.425(a)(i)]; the public housing agency plans [24 CFR 903.7(o)]
or the certifications required in the competitive programs funded through the Super
Notice of Funding Availability (SuperNOFA). HUD publishes the SuperNOFA on an annual
basis. The nondiscrimination and the affirmatively furthering fair housing
requirements are found in the General Section of the SuperNOFA. The Web site link to
the SuperNOFA is: http://
www.hud.gov/library/bookshelf18/supernofa/nofa05/gensec.pdf. This appendix does not
change current civil rights-related program requirements contained in HUD
regulations.

Appendix A provides examples of how HUD recipients might apply the four-factor
analysis described in the general Guidance. The Guidance and examples in Appendix A
are not meant to be exhaustive and may not apply in some situations. CPD's citizen
participation plan requirement, in particular, specifically instructs jurisdictions
that receive funds through the Consolidated Plan process to take appropriate actions
to encourage the participation of "* * * non-English speaking persons * * *" [24 CFR
91.105(a)(2)(ii), 91.115(a)(2), 24 CFR 91.105(a)(2)(ii), and 91.115(a)(2)]. Such
recipients may therefore have processes in place to address the needs of their LEP
beneficiaries that already take into consideration the four-factor analysis and meet
the Title VI and Title VI regulatory requirements described in this Guidance.

This Guidance does not supplant any constitutional, statutory, and/or regulatory
provisions that may require LEP services. Rather, this Guidance clarifies the Title

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 35
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

VI and Title VI regulatory obligation to address, in appropriate circumstances and in a reasonable manner, the language assistance needs of LEP persons. The Guidance does not address those required by the Constitution or statutes and regulations other than Title VI and the Title VI regulations.

Tribes and tribally designated housing entities (TDHEs) are authorized to use federal housing assistance made available under the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4101-4212) (NAHASDA) for low-income housing programs or activities for the specific benefit of tribal members and/or other Native Americans. Programs or activities funded in *2748 whole or in part with federal assistance and in compliance with NAHASDA are exempt from Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968. Although Title VI may not apply to housing programs undertaken by these entities under NAHASDA, recipients of NAHASDA funds are encouraged to use this Guidance as a technical assistance tool in determining whether and to what degree language assistance may be appropriate to ensure meaningful access by otherwise eligible low-income Native Americans.

Members of the public are most likely to come into contact with recipients of HUD funds when they need housing and/or housing-related services or when the recipients conduct education and community outreach activities. The common thread running through contacts between the public and recipients of HUD funds is the exchange of information. Recipients of HUD assistance, depending on circumstances, have an obligation to provide appropriate types and levels of LEP services to LEP persons to ensure that they have meaningful access to, and choice of, housing and other HUD-funded programs. Language barriers can, for instance, prevent persons from learning of housing opportunities or applying for and receiving such opportunities; learning of environmental or safety problems in their communities and of the means available for dealing with such problems; and/or effectively reporting housing discrimination to the local fair housing agency or HUD, thus hindering investigations of these allegations.

Many recipients already provide language services in a wide variety of circumstances to obtain information effectively and help applicants obtain suitable housing and/or support services. For example, PHAs may have leases available in languages other than English and has interpreters available to inform LEP persons of their rights and responsibilities. In areas where significant LEP populations reside, PHAs may have forms and notices in languages other than English or they may employ bilingual intake personnel, housing counselors, and support staff. Such recipients may, therefore have processes in place to address the needs of their LEP beneficiaries that already take into consideration the four-factor analysis and meet the Title VI and regulatory Title VI requirements described in this Guidance. These experiences can form a strong basis for applying the four-factor analysis and complying with the Title VI regulations.

*General Principles*

The touchstone of the four-factor analysis is reasonableness based upon: (a) The specific needs and capabilities of the LEP population among the beneficiaries of HUD programs (tenants, applicants, community residents, complainants, etc.); (b) the program purposes and capabilities of the HUD-funded recipients providing the services to the LEP population; and (c) local housing, demographics, and other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 36
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

community conditions and needs. Accordingly, the analysis cannot provide a single
uniform answer on how service to LEP persons must be provided in all programs or
activities in all situations or whether such service need be provided at all. Each
HUD recipient's evaluation of the need for, and level of LEP services must be highly
individualized for each process in its services.

  Before giving specific program examples, several general points should assist the
wide variety of recipients of HUD funds in applying this analysis.

Factors (1) and (2): Target Audiences

  In evaluating the target audience, the recipient should take into account the
number and proportion of LEP persons served or eligible to be served in the target
population, as well as the frequency with which this target audience will or should
be served.

  Factor (1): For most recipients, the target audience is defined in geographic
rather than programmatic terms. In many cases, even if the overall number or
proportion of LEP persons in the local area is low, the number of contacts with LEP
persons may be high.

  Recipients of HUD funds are required by existing regulations to outreach, educate,
and affirmatively market the availability of housing and housing-related services to
eligible persons in the geographic area that are least likely to apply for and/or
receive the benefits of the program without such outreach and education activities
and/or affirmative marketing [(24 CFR 200.625; 24 CFR 92.351; and 24 CFR 903.2(d)(1)
and (2)]. In many cases, those least likely to apply for a benefit are LEP persons.
In addition, in some cases where there are few LEP persons in the immediate
geographic area, outreach, education, and affirmative marketing may require
marketing to residents of adjoining areas, communities, or neighborhoods [(24 CFR
200.625; 24 CFR 92.351; 903.2(d)(1) and (2)].

  The programs of many recipients require public meetings and input  (24 CFR 91,
subpart B; 24 CFR 903.13(a); 24 CFR part 964). Even within the large geographic area
covered by a city government, certain target areas may have concentrations of LEP
persons. These persons may be those who might be most affected by the issue being
discussed. In addition, some programs are specifically targeted to reach a
particular audience (e.g., persons with HIV/AIDS, elderly, residents of high crime
areas, persons with disabilities, and minority communities). In some communities,
these populations may disproportionately be LEP persons.

  Factor (2): Frequency of contact should be considered in light of the specific
program or the geographic area being served. Some education programs or complaint
processing may only require a single or limited interaction with each LEP individual
served. In contrast, housing, counseling, and housing supportive services programs
require ongoing communication. In the former case, the type and extent of LEP
services may be of shorter duration, even for a greater number of LEP persons, than
in the latter case. Therefore, decisions must be made accordingly.

Factor (3): Importance of Service/Information/Program/Activity

  Given the critical role housing plays in maintaining quality of life, housing and
complementary housing services rank high on the critical/non-critical continuum.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 37
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

However, this does not mean that all services and activities provided by recipients of HUD funds must be equally accessible in languages other than English. For instance, while clearly important to the quality of life in the community, certain recreational programs provided by a HUD-funded recipient may not require the same level of interpretive services as does the recipient's underlying housing service. Nevertheless, the need for language services with respect to these programs should be considered in applying the four-factor analysis. The recipient should always consider the basic activity for which it was funded as being of high importance.

Factor (4): Costs v. Resources and Benefits

The final factor that must be taken into account is the cost of providing various services balanced against the resources available to the HUD-funded recipient providing the service.

Type of Program: There are some programs for which translation and interpretation are such an integral part of the funded program that services would be provided in some way to any client that requires them. In important programs or activities (e.g., tenant selection and assignment, homeownership counseling, fair housing complaint intake, conflict resolution between tenants and landlords, etc.) that require one-on-one contact with clients, oral and written translations would be provided consistent with the four-factor analysis used earlier. Recipients could have competent bi-or multilingual employees, community translators, or interpreters to communicate with LEP persons in languages prevalent in the community. In some instances, a recipient may have to contract or negotiate with other agencies for language services for LEP persons.

Outreach: Affirmative marketing activities, as described above, require written materials in other languages, at a minimum [24 CFR 200.625; 24 CFR 92.351; and 24 CFR 903.2 (d)(1) and (2)]. As with counseling, affirmative marketing in large LEP communities could be fruitless without translations of outreach materials. Preferably, outreach workers would speak the language of the people to whom they are marketing.

Size of Program: A major issue for deciding on the extent of translation/interpretation/bilingual services is the size of the program. A large PHA may be expected to have multilingual employees representing the languages spoken by LEP persons who may reside in the communities. These employees may be involved in all activities, including affirmative marketing, taking and verifying applications, counseling, explaining leases, holding and/or interpreting at tenant meetings, and ongoing tenant contact, as well as translating documents into applicable languages. Similarly, a funded recipient receiving millions of dollars in CDBG Program funds may be expected to provide translation/interpretation services in major local languages and have bilingual staff in those languages. Recipients with limited resources (e.g., PHAs with a small number of units, or small nonprofit organizations) would not be expected to provide the same *2749 level and comprehensiveness of services to the LEP population, but should consider the reasonable steps, under the four-factor analysis, they should take in order to provide meaningful access.

Outreach v. Size of the Program: When the same recipient conducts a range of activities, even within the same community, translation needs for each activity may differ. The translation needs may also be mandated according to the number of LEP

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                                    Page 38
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

persons being served. For instance, a housing provider doing outreach and marketing
to an eligible population may have to provide written translations of materials
because the target population itself is large. Within that target population, there
could be an LEP population that exceeds 1,000 persons for one language, or a
specific language group that exceeds 5 percent of the population. Outreach materials
to that LEP population should be provided in translation to that language. Written
translations may not be necessary if, within a housing development, there is no LEP
population that meets the "safe harbor" threshold for written translation. In these
situations, housing providers need only arrange for oral interpretation.

 Relevance of Activity to the Program: A program with monthly information sessions
in a community with many LEP persons speaking the same language should consider
employing a bilingual employee who can hold these sessions in the LEP language.
Alternatively, if a community's major LEP language does not have many applicants to
the program, having an interpreter at sessions only when needed (by, for instance,
announcing in major languages in any public notice of the meeting that anyone in
need of an interpreter should call a certain number before the meeting to request
one, and ensuring that someone at that number can communicate with the person) may
be sufficient.

 Availability/Costs of Services: A HUD recipient with limited resources and located
in a community with very few LEP persons speaking any one language should target
interpretation and translation to the most important activities. The recipients may
decide, as appropriate, to provide those services through agreements with competent
translators and interpreters in the community-based organizations, or through
telephonic interpretation services. Costs may also be reduced if national
organizations pool resources to contract with oral interpretation/written
translation services.

 Services Provided: HUD recipients have a variety of options for providing language
services. Under certain circumstances, when interpreters are needed and recipients
should provide competent interpreter services free of cost to the LEP person, LEP
persons should be advised that they may choose either to use a competent interpreter
provided by the recipient or to secure the assistance of an interpreter of the LEP
person's own choosing, at his or her own expense. If the LEP person decides to
provide his/her own interpreter, the LEP person's election of this choice would be
documented. The Guidance doesn't preclude the use of family members or friends as
oral interpreters. However, HUD recommends that the recipient use caution when
family members or friends are used. While an LEP person may prefer bilingual family
members, friends, or other persons with whom they are comfortable, there are many
situations where recipient-supplied interpretative services may be better. Family
and friends may not be available when and where they are needed, or may not have the
ability to interpret program-specific technical information. Alternatively, an
individual may feel uncomfortable revealing or describing sensitive, confidential,
or potentially embarrassing medical, family, or financial information to a family
member, friend, or member of the local community.

 Similarly, there may be situations where a HUD-funded recipient's own interests
justify the provision of an interpreter regardless of whether the LEP individual
also provides his/her own interpreter. For example, where precise, complete, and
accurate translations of information are critical for lease enforcement, a recipient
might decide to provide its own, independent interpreter, even if several LEP
persons use their own interpreter(s) as well. In group meetings dealing with vital

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 39
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

issues, such as explanations of pending displacement, having the recipient provide interpretation services among multiple interpreters may be preferable, even if the LEP person brings his/her own interpreter as well.

In emergency situations that are not reasonably foreseeable, the recipient may have to temporarily rely on non-recipient-provided language services. Reliance on children is especially discouraged unless there is an extreme emergency and no competent interpreters are available.

While all language services need to be competent, the greater the potential consequences, the greater the need to monitor interpretation services for quality. For instance, it is important that interpreters of legal concepts be highly competent to translate legal and lease enforcement concepts, as well as be extremely accurate in their interpretation when discussing relocation and displacement issues. It may be sufficient, however, for a desk clerk who is fully bilingual but not skilled at interpreting to help an LEP person fill out an application in the language shared by the LEP person and bilingual person.

*Applying the Four-Factor Analysis*

While all aspects of a recipient's programs and activities are important, the four-factor analysis requires some prioritizing so that language services are targeted where most needed because of the nature and importance of the particular activity involved. In addition, because of the "reasonableness" standard, and frequency of contact and resources/costs factors, the obligation to provide language services increases where the importance of the programs and activities is greater.

HUD has translated generic documents into some of the most frequently encountered languages (i.e., Spanish, and depending on circumstances, Russian, Chinese, Korean, Vietnamese, and Arabic). Recipients should not interpret this to mean that these translations are the total universe of documents and languages requiring translations. HUD translations are intended to help recipients. However, the recipient-responsibility is determined by the four-factor analysis and the documents that are vital to their programs. Since most documents are not generic and there are so many languages spoken throughout the country, HUD cannot provide all applicable translations.

"Promising Practices." This section provides hypothetical examples of "promising practices" in which recipients may engage. Grantees or funded recipients are responsible for ensuring meaningful access to all portions of their program or activity, not just those portions to which HUD funds are targeted. So long as the language services are accurate, timely, and appropriate in the manner outlined in this guidance, the types of promising practices summarized below can assist recipients in meeting the meaningful access requirements of Title VI and the Title VI regulations.

Office of Fair Housing and Equal Opportunity

1. The Fair Housing Initiatives Program (FHIP): FHIP assists fair housing activities that promote compliance with the Fair Housing Act or with substantially equivalent fair housing laws administered by state and local government agencies under the Fair Housing Assistance Program. FHIP awards funds competitively and these funds enable recipients to carry out activities to educate and inform the public and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                Page 40
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

housing providers of their fair housing rights and responsibilities.

For example, a community organization in a large metropolitan area has received FHIP funds to develop an education curriculum to assist newly arrived immigrants. Data showed that non-English speaking persons were having difficulty in applying and securing housing in that geographic area. The organization has identified a large Hispanic clientele in the area who need this service, and has a well-developed program for this LEP population. However, the community's population was changing. The recipient found that there was also a large community of recent immigrants from Cambodia who are also in need of this service. To address this need, the FHIP partnered with Asian Action Network, a community-based social service agency, to translate materials and to present free seminars at the local public library. In addition, if needed, the Asian Action Network has on its staff a Cambodian-speaking counselor who is able to provide interpretation services.

2. The Fair Housing Assistance Program (FHAP): FHAP provides funds to state and local agencies that administer fair housing laws that are substantially equivalent to the federal Fair Housing Act.

A local FHAP is located in a small metropolitan area that has a population that is 3 percent Korean-speaking, 25 percent Spanish-speaking and 72 percent English-speaking. One of the FHAP agency's primary responsibilities is to process fair housing discrimination complaints. The FHAP Office has many Hispanic complainants who are LEP and Spanish-speaking; therefore, it has hired a Hispanic intake clerk who is *2750 proficient in Spanish and English. The Fair Housing Poster and the complaint form have been translated into Spanish. The FHAP Office has a contract with a nonprofit Hispanic organization for interpreters on an as-needed basis, for its education and outreach activities to the Hispanic community. Some of the FHAP's organizations are small and have limited resources. In competing for the available resources, the FHAP chooses not to translate the material into the language of the Korean population this year. However, it has plans to translate material into Korean in coming years to address the accessibility needs of the LEP population.

Office of Public and Indian Housing

1. HOPE VI: The HOPE VI Revitalization of Distressed Public Housing Program provides revitalization and demolition-only grants on a competitive basis for eligible PHAs that operate public housing units. During the HOPE VI lifecycle, PHAs are required to communicate with all tenants, including LEP tenants, through informational meetings that describe both the proposed project and the rights of the tenants during every stage of the application and implementation process. All residents need to be educated about both the HOPE VI project and their rights to be relocated into decent, safe, and sanitary housing and how they can return to the new project once it is completed.

A housing agency is planning to demolish a 400-unit public housing project and construct a 375-unit HOPE VI mixed-finance development and other amenities on the site. The 400-unit building is still occupied by a tenant population, of which 55 percent are Spanish-speaking LEP families. For a number of years, the PHA has had bilingual employees in its occupancy office, as well as copies of leases and other written documents translated into Spanish. The PHA would now need to translate public notices and other documents into Spanish.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. Public Housing (leases and other vital documents): There are approximately 3,400 PHAs in the United States that provide a majority of the housing to very low income and low-income families. A PHA in a large metropolitan area has a large number of Hispanic, Chinese, and Vietnamese LEP tenants such that they would translate vital documents into all three languages under the "safe harbor." All tenants must sign a lease before they can live in public housing. The lease clearly states the rules and requirements that the PHA and tenants must follow. Therefore, the PHA should have its lease and rental notices translated into Spanish, Chinese, and Vietnamese. The documents should be clearly labeled "for information purposes only." PHAs should have a procedure to access interpreters for these languages if oral discussions of the lease are necessary.

3. Public Housing (outreach for waiting list): The same PHA is preparing to re-open its waiting list for its Low-Income Public Housing (LIPH) after having it closed for over a year. The PHA must affirmatively market the availability of its units to all eligible families living in its jurisdiction. It should place a public service announcement in English, Spanish, Chinese, and Vietnamese in the local general circulation Spanish, Chinese, and Vietnamese newspapers and/or radio and TV stations.

Office of Community Planning and Development

1. Consolidated Plan: Consolidated planning means developing a Consolidated Plan based upon public participation and input. When planning the required public hearings, jurisdictions must identify how the needs of LEP residents will be met, if a significant number of LEP residents can be reasonably expected to participate (24 CFR 91, Subpart B, "Citizen Participation and Consultation"). In addition, there are activities surrounding citizen participation where the needs of the LEP population are expected to be met, such as: (1) Translation of the notification of the public hearings; and (2) translation of draft and final action, and consolidated plans, and dissemination of those documents to individuals and the appropriate organization(s) in the LEP community.

2. Housing Opportunities for Persons with AIDS (HOPWA): A major city has been providing permanent supportive housing to persons living with AIDS, and such assistance has been an integral part of its Consolidated Plan. However, it recently learned from a national study that 20 percent of its 2,000 HIV-infected persons are LEP persons. The city previously had not contacted these people about their needs. In formulating its Consolidated Plan, the city's Community Development Department contacted both the Department of Health and the city's leading AIDS-related housing provider for assistance in reaching out to this population. The city offered to provide funding for housing information services through its HOPWA formula grant to fund bilingual interpreters and health outreach workers who would contact the LEP persons living with HIV to assist eligible persons to locate, acquire, and maintain housing. In addition, as part of fulfilling the citizen participation requirements under the Consolidated Plan provisions, the city offered to conduct a multilingual meeting in which local government officials and local AIDS housing and service providers would participate and inform the public at large of the resources available to assist those living with HIV/AIDS.

3. HOME Investment Partnership Program (HOME): In general, under the HOME Program, HUD allocates funds by formula among eligible state and local governments to strengthen public-private partnerships and to expand the supply of decent, safe,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sanitary, and affordable housing. Families, including LEP families, may obtain homeownership and rental housing opportunities from participating jurisdictions (PJs). Under the program requirements, PJs are required to implement affirmative marketing strategies, under which they identify groups within the eligible population that are least likely to apply and to conduct special outreach efforts through advertising in local media, including media targeted at LEP citizens (24 CFR 92.351).

A small HOME participating jurisdiction is using its HOME formula-based funds to implement a tenant-based rental assistance (TBRA) program. Under TBRA, the assisted tenant may move from a dwelling unit, but retains the right to continued assistance. The rental assistance also includes the security deposit. The HOME PJ, as part of its affirmative marketing strategy, has submitted advertising to the local Spanish language newspapers and radio station that serve the community's small but growing Hispanic population. Since the costs of implementing the affirmative marketing strategy are eligible costs under the program regulations, the PJ is increasing its budget to train occupancy staff to address issues faced by LEP applicants and to hire a bilingual staff member.

Office of Housing

1. Single-Family Housing Counseling Program: HUD provides funds to housing counseling agencies that assist persons and families in specific geographic areas to enable them to buy homes and to keep homes already purchased. This requires one-on-one and group counseling on home-selection skills, understanding mortgages, understanding legal ramifications of various documents, establishing a budget, housekeeping and maintenance skills, understanding fair housing rights, etc.

In a majority-Hispanic community, La Casa has been the only HUD-funded counseling agency, and has been providing these services for many years. It has bilingual staff to serve the largely Hispanic population. Frequently, clients from a neighboring, low-income and primarily African-American community also use its services, since La Casa is well known in the area. However, over the past few years, many low-income LEP Iranian-Americans have been moving into the neighboring community, so that they now constitute almost 5 percent of the population. A housing counseling agency is required to provide one-on-one counseling services as the nature of its program. It is also required to outreach to those who are least likely to apply for its services. As a relatively small Agency, La Casa employs at least one person or has regular access to a person who can speak Farsi and interpret English to Farsi. This person should contact the Iranian communities and work through the local agencies to affirmatively market La Casa's program. La Casa should arrange to get key materials translated to Farsi and provide counseling and interpretation services, as needed.

2. Single-Family Property Disposition Program: When developers or organizations buy HUD-held housing to renovate and resell, they are required to affirmatively market the properties. Such developers or organizations are required to provide language assistance to attract eligible LEP persons who are least likely to apply as does any other housing provider.

3. Supportive Housing for the Elderly and Persons with Disabilities: The Section 202 Supportive Housing for the Elderly Program funds the construction of multifamily projects that serve elderly persons. Project sponsors are required to affirmatively market their services and housing opportunities to those segments of the elderly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 43
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

population that are identified as least likely to apply for the housing without
special outreach. Even more *2751 importantly, many LEP elderly may require care
from bilingual medical or support services staff, and recipients may devote
considerable financial and other resources to provide such assistance.

The sponsor of a Section 202 Supportive Housing for the Elderly Project identifies
in its Affirmative Fair Housing Marketing Plan the city's large numbers of East and
South Asian immigrants as least likely to apply for the new housing without special
outreach. After examining Census and other data and consulting with the city's
Office of Immigrant Affairs, the sponsor learns that more than 1,000 of the city's
5,000 South and East Asian families have at least one elderly relative that may be
eligible for the new units. The sponsor hires translators fluent in Hindi, Urdu,
Dari, Vietnamese, and Chinese to translate written materials and advertising for the
local press in those languages. The recipient also partners with community-based
organizations that serve the city's East and South Asian immigrants to arrange for
interpreters at meetings.

4. Assisted Housing: An assisted housing development is located in a city of 20,000
people, about 2,000 of whom are recent immigrants from Korea. Few of the 2,000 have
applied for assisted housing. Only eight of the development's 200 residents and no
applicants among the 20 on the waiting list are LEP speakers of Korean. Koreans
constitute about 10 percent of the eligible population of the community but only 4
percent of the development's residents.

In its Affirmative Fair Housing Marketing Plan for the development, the management
agent specified Asian (Korean) as the population least likely to apply for housing
and to whom it would outreach. Under the safe-harbor guidelines, the housing
provider should outreach to the Korean community using written Korean language
materials. However, even after extensive outreach, only one Korean family applied
for the waiting list, although during that time the total waiting list increased by
eight families to 38. Even after extensive outreach, the occupancy of the project is
4 percent, and its waiting list is less than 3 percent, LEP Korean.

Therefore, under safe-harbor guidelines, no translation of occupancy documents into
Korean is necessary. However, the housing provider should be prepared to provide for
oral interpretation, when needed. In addition, outreach to the eligible Korean
community should continue using written Korean language materials.

Appendix B--Questions and Answers

*I. Who are limited English proficient (LEP) persons?*

For persons who, as a result of national origin, do not speak English as their
primary language and who have a limited ability to speak, read, write, or
understand. For purposes of Title VI and the LEP Guidance, persons may be entitled
to language assistance with respect to a particular service, benefit, or encounter.

*II. What is Title VI and how does it relate to providing meaningful access to LEP
persons?*

Title VI of the Civil Rights Act of 1964 is the federal law that protects
individuals from discrimination on the basis of their race, color, or national

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 44
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

origin in programs that receive federal financial assistance. In certain situations, failure to ensure that persons who are LEP can effectively participate in, or benefit from, federally assisted programs may violate Title VI's prohibition against national origin discrimination.

### III. What do Executive Order (EO) 13166 and the Guidance require?

EO 13166, signed on August 11, 2000, directs all federal agencies, including the Department of Housing and Urban Development (HUD), to work to ensure that programs receiving federal financial assistance provide meaningful access to LEP persons. Pursuant to EO 13166, the meaningful access requirement of the Title VI regulations and the four-factor analysis set forth in the Department of Justice (DOJ) LEP Guidance apply to the programs and activities of federal agencies, including HUD. In addition, EO 13166 requires federal agencies to issue LEP Guidance to assist their federally assisted recipients in providing such meaningful access to their programs. This Guidance must be consistent with the DOJ Guidance. Each federal agency is required to specifically tailor the general standards established in DOJ's Guidance to its federally assisted recipients. On December 19, 2003, HUD published such proposed Guidance.

### IV. Who must comply with the Title VI LEP obligations?

All programs and operations of entities that receive financial assistance from the federal government, including but not limited to state agencies, local agencies and for-profit and non-profit entities, must comply with the Title VI requirements. A listing of most, but not necessarily all, HUD programs that are federally assisted may be found at the "List of Federally Assisted Programs" published in the Federal Register on November 24, 2004 (69 FR 68700). Sub-recipients must also comply (i.e., when federal funds are passed through a recipient to a sub-recipient). As an example, Federal Housing Administration (FHA) insurance is not considered federal financial assistance, and participants in that program are not required to comply with Title VI's LEP obligations, unless they receive federal financial assistance as well. [24 CFR 1.2 (e)].

### V. Does a person's citizenship and immigration status determine the applicability of the Title VI LEP obligations?

United States citizenship does not determine whether a person is LEP. It is possible for a person who is a United States citizen to be LEP. It is also possible for a person who is not a United States citizen to be fluent in the English language. Title VI is interpreted to apply to citizens, documented non-citizens, and undocumented non-citizens. Some HUD programs require recipients to document citizenship or eligible immigrant status of beneficiaries; other programs do not. Title VI LEP obligations apply to every beneficiary who meets the program requirements, regardless of the beneficiary's citizenship status.

### VI. What is expected of recipients under the Guidance?

Federally assisted recipients are required to make reasonable efforts to provide language assistance to ensure meaningful access for LEP persons to the recipient's programs and activities. To do this, the recipient should: (1) Conduct the four-factor analysis; (2) develop a Language Access Plan (LAP); and (3) provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appropriate language assistance.

The actions that the recipient may be expected to take to meet its LEP obligations depend upon the results of the four-factor analysis including the services the recipient offers, the community the recipient serves, the resources the recipient possesses, and the costs of various language service options. All organizations would ensure nondiscrimination by taking reasonable steps to ensure meaningful access for persons who are LEP. HUD recognizes that some projects' budgets and resources are constrained by contracts and agreements with HUD. These constraints may impose a material burden upon the projects. Where a HUD recipient can demonstrate such a material burden, HUD views this as a critical item in the consideration of costs in the four-factor analysis. However, refusing to serve LEP persons or not adequately serving or delaying services to LEP persons would violate Title VI. The agency may, for example, have a contract with another organization to supply an interpreter when needed; use a telephone service line interpreter; or, if it would not impose an undue burden, or delay or deny meaningful access to the client, the agency may seek the assistance of another agency in the same community with bilingual staff to help provide oral interpretation service.

*VII. What is the four-factor analysis?*

Recipients are required to take reasonable steps to ensure meaningful access to LEP persons. This "reasonableness" standard is intended to be flexible and fact-dependent. It is also intended to balance the need to ensure meaningful access by LEP persons to critical services while not imposing undue financial burdens on small businesses, small local governments, or small nonprofit organizations. As a starting point, a recipient may conduct an individualized assessment that balances the following four factors:

• The number or proportion of LEP persons served or encountered in the eligible service population ("served or encountered" includes those persons who would be served or encountered by the recipient if the persons received adequate education and outreach and the recipient provided sufficient language services);

• The frequency with which LEP persons come into contact with the program;

• The nature and importance of the program, activity, or service provided by the program; and

• The resources available and costs to the recipient.

Examples of applying the four-factor analysis to HUD-specific programs are located in Appendix A of this Guidance.

*2752 *VIII. What are examples of language assistance?*

Language assistance that a recipient might provide to LEP persons includes, but is not limited to:

• Oral interpretation services;

• Bilingual staff;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 46
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

- Telephone service lines interpreter;

- Written translation services;

- Notices to staff and recipients of the availability of LEP services; or

- Referrals to community liaisons proficient in the language of LEP persons.

*IX. What is a Language Access Plan (LAP) and what are the elements of an effective LAP?*

After completing the four-factor analysis and deciding what language assistance services are appropriate, a recipient may develop an implementation plan or LAP to address identified needs of the LEP populations it serves. Some elements that may be helpful in designing an LAP include:

- Identifying LEP persons who need language assistance and the specific language assistance that is needed;

- Identifying the points and types of contact the agency and staff may have with LEP persons;

- Identifying ways in which language assistance will be provided;

- Outreaching effectively to the LEP community;

- Training staff;

- Determining which documents and informational materials are vital;

- Translating informational materials in identified language(s) that detail services and activities provided to beneficiaries (e.g., model leases, tenants' rights and responsibilities brochures, fair housing materials, first-time homebuyer guide);

- Providing appropriately translated notices to LEP persons (e.g., eviction notices, security information, emergency plans);

- Providing interpreters for large, medium, small, and one-on-one meetings;

- Developing community resources, partnerships, and other relationships to help with the provision of language services; and

- Making provisions for monitoring and updating the LAP, including seeking input from beneficiaries and the community on how it is working and on what other actions should be taken.

*X. What is a vital document?*

A vital document is any document that is critical for ensuring meaningful access to the recipients' major activities and programs by beneficiaries generally and LEP persons specifically. Whether or not a document (or the information it solicits) is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 47
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

"vital" may depend upon the importance of the program, information, encounter, or service involved, and the consequence to the LEP person if the information in question is not provided accurately or in a timely manner. For instance, applications for auxiliary activities, such as certain recreational programs in public housing, would not generally be considered a vital document, whereas applications for housing would be considered vital. However, if the major purpose for funding the recipient were its recreational program, documents related to those programs would be considered vital. Where appropriate, recipients are encouraged to create a plan for consistently determining, over time and across its various activities, what documents are "vital" to the meaningful access of the LEP populations they serve.

*XI. How may a recipient determine the language service needs of a beneficiary?*

Recipients should elicit language service needs from all prospective beneficiaries (regardless of the prospective beneficiary's race or national origin). If the prospective beneficiary's response indicates a need for language assistance, the recipient may want to give applicants or prospective beneficiaries a language identification card (or "I speak" card). Language identification cards invite LEP persons to identify their own language needs. Such cards, for instance, might say "I speak Spanish" in both Spanish and English, "I speak Vietnamese" in both Vietnamese and English, etc. To reduce costs of compliance, the federal government has made a set of these cards available on the Internet. The Census Bureau "I speak" card can be found and downloaded at http://www.usdoj.gov/crt/cor/13166.htm. The State of Ohio Office of Criminal Justice Services, the National Association of Judiciary Interpreters and Translators, the Summit County Sheriff's Office, and the American Translators Association have made their language identification card available at http://www.lep.gov/ocjs--languagecard.pdf.

*XII. How may a recipient's limited resources be supplemented to provide the necessary LEP services?*

A recipient should be resourceful in providing language assistance as long as quality and accuracy of language services are not compromised. The recipient itself need not provide the assistance, but may decide to partner with other organizations to provide the services. In addition, local community resources may be used if they can ensure that language services are competently provided. In the case of oral interpretation, for example, demonstrating competency requires more than self-identification as bilingual. Some bilingual persons may be able to communicate effectively in a different language when communicating information directly in that language, but may not be competent to interpret between English and that language. In addition, the skill of translating is very different than the skill of interpreting and a person who is a competent interpreter may not be a competent translator. To ensure the quality of written translations and oral interpretations, HUD encourages recipients to use members of professional organizations. Examples of such organizations are: National organizations, including American Translators Association (written translations), National Association of Judicial Interpreters and Translators, and International Organization of Conference Interpreters (oral interpretation); state organizations, including Colorado Association of Professional Interpreters and Florida Chapter of the American Translators Association; and local legal organizations such as Bay Area Court Interpreters. While HUD recommends using the list posted on http://www.LEP.gov, its limitations must be recognized. Use of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                           Page 48
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

the list is encouraged, but not required or endorsed by HUD. It does not come with a presumption of compliance. There are many other qualified interpretation and translation providers, including in the private sector.

*XIII. May recipients rely upon family members or friends of the LEP person as interpreters?*

Generally, recipients should not rely on family members, friends of the LEP person, or other informal interpreters. In many circumstances, family members (especially children) or friends may not be competent to provide quality and accurate interpretations. Therefore, such language assistance may not result in an LEP person obtaining meaningful access to the recipients' programs and activities. However, when LEP persons choose not to utilize the free language assistance services expressly offered to them by the recipient but rather choose to rely upon an interpreter of their own choosing (whether a professional interpreter, family member, or friend), LEP persons should be permitted to do so, at their own expense. Recipients may consult HUD LEP Guidance for more specific information on the use of family members or friends as interpreters. While HUD guidance does not preclude use of friends or family as interpreters in every instance, HUD recommends that the recipient use caution when such services are provided.

*XIV. Are leases, rental agreements and other housing documents of a legal nature enforceable in U.S. courts when they are in languages other than English?*

Generally, the English language document prevails. The HUD translated documents may carry the disclaimer, "This document is a translation of a HUD-issued legal document. HUD provides this translation to you merely as a convenience to assist in your understanding of your rights and obligations. The English language version of this document is the official, legal, controlling document. This translated document is not an official document." Where both the landlord and tenant contracts are in languages other than English, state contract law governs the leases and rental agreements. HUD does not interpret state contract law. Therefore, questions regarding the enforceability of housing documents of a legal nature that are in languages other than English should be referred to a lawyer well-versed in contract law of the appropriate state or locality.

*XV. Are EO 13166 and HUD LEP Guidance enforceable by individuals in a court of law?*

Neither EO 13166 nor HUD LEP Guidance grants an individual the right to proceed to court alleging violations of EO 13166 or HUD LEP Guidance. In addition, current Title VI case law only permits a private right of action for intentional discrimination and not for action based on the discriminatory effects of a recipient's practices. However, individuals may file administrative complaints with HUD alleging violations of Title VI because the HUD recipient failed to take reasonable steps *2753 to provide meaningful access to LEP persons. The local HUD office will intake the complaint, in writing, by date and time, detailing the complainant's allegation as to how the HUD recipient failed to provide meaningful access to LEP persons. HUD will determine jurisdiction and follow up with an investigation of the complaint.

*XVI. Who enforces Title VI as it relates to discrimination against LEP persons?*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                              Page 49
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

Most federal agencies have an office that is responsible for enforcing Title VI of the Civil Rights Act of 1964. To the extent that a recipient's actions violate Title VI obligations, then such federal agencies will take the necessary corrective steps. The Secretary of HUD has designated the Office of Fair Housing and Equal Opportunity (FHEO) to take the lead in coordinating and implementing EO 13166 for HUD, but each program office is responsible for its recipients' compliance with the civil-rights related program requirements (CRRPRs) under Title VI.

*XVII. How does a person file a complaint if he/she believes a HUD recipient is not meeting its Title VI LEP obligations?*

If a person believes that a HUD federally assisted recipient is not taking reasonable steps to ensure meaningful access to LEP persons, that individual may file a complaint with HUD's local Office of FHEO. For contact information of the local HUD office, go to http://www.hud.gov or call the housing discrimination toll free hotline at 800-669-9777 (voice) or 800-927-9275 (TTY).

*XVIII. What will HUD do with a complaint alleging noncompliance with Title VI obligations?*

HUD's Office of FHEO will conduct an investigation or compliance review whenever it receives a complaint, report, or other information that alleges or indicates possible noncompliance with Title VI obligations by one of HUD's recipients. If HUD's investigation or review results in a finding of compliance, HUD will inform the recipient in writing of its determination. If an investigation or review results in a finding of noncompliance, HUD also will inform the recipient in writing of its finding and identify steps that the recipient must take to correct the noncompliance. In a case of noncompliance, HUD will first attempt to secure voluntary compliance through informal means. If the matter cannot be resolved informally, HUD may then secure compliance by: (1) Terminating the financial assistance of the recipient only after the recipient has been given an opportunity for an administrative hearing; and/or (2) referring the matter to DOJ for enforcement proceedings.

*XIX. How will HUD evaluate evidence in the investigation of a complaint alleging noncompliance with Title VI obligations?*

Title VI is the enforceable statute by which HUD investigates complaints alleging a recipient's failure to take reasonable steps to ensure meaningful access to LEP persons. In evaluating the evidence in such complaints, HUD will consider the extent to which the recipient followed the LEP Guidance or otherwise demonstrated its efforts to serve LEP persons. HUD's review of the evidence will include, but may not be limited to, application of the four-factor analysis identified in HUD LEP Guidance. The four-factor analysis provides HUD a framework by which it may look at all the programs and services that the recipient provides to persons who are LEP to ensure meaningful access while not imposing undue burdens on recipients.

*I. What is a "safe harbor?'*

A "safe harbor," in the context of this guidance, means that the recipient has undertaken efforts to comply with respect to the needed translation of vital written materials. If a recipient conducts the four-factor analysis, determines that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 50
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

translated documents are needed by LEP applicants or beneficiaries, adopts an LAP that specifies the translation of vital materials, and makes the necessary translations, then the recipient provides strong evidence, in its records or in reports to the agency providing federal financial assistance, that it has made reasonable efforts to provide written language assistance.

*XXI. What "safe harbors" may recipients follow to ensure they have no compliance finding with Title VI LEP obligations?*

HUD has adopted a "safe harbor" for translation of written materials. The Guidance identifies actions that will be considered strong evidence of compliance with Title VI obligations. Failure to provide written translations under these cited circumstances does not mean that the recipient is in noncompliance. Rather, the "safe harbors" provide a starting point for recipients to consider:

• Whether and at what point the importance of the service, benefit, or activity involved warrants written translations of commonly used forms into frequently encountered languages other than English;

• Whether the nature of the information sought warrants written translations of commonly used forms into frequently encountered languages other than English;

• Whether the number or proportion of LEP persons served warrants written translations of commonly used forms into frequently encountered languages other than English; and

• Whether the demographics of the eligible population are specific to the situations for which the need for language services is being evaluated. In many cases, use of the "safe harbor" would mean provision of written language services when marketing to the eligible LEP population within the market area. However, when the actual population served (e.g., occupants of, or applicants to, the housing project) is used to determine the need for written translation services, written translations may not be necessary.

The table below sets forth "safe harbors" for written translations.

| Size of language group | Recommended provision of written language assistance |
|---|---|
| 1,000 or more in the eligible population in the market area or among current beneficiaries ... | Translated vital documents. |
| More than 5% of the eligible population or beneficiaries and more than 50 in number ..... | Translated vital documents. |
| More than 5% of the eligible population or beneficiaries and 50 or less in number ....... | Translated written notice of right to receive free oral interpretation of documents. |
| 5% or less of the eligible population or beneficiaries and less than 1,000 in number .. | No written translation is required. |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                    Page 51
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)

--------------------------------------------------------------------------------

When HUD conducts a review or investigation, it will look at the total services the recipient provides, rather than a few isolated instances.

*XXII. Is the recipient expected to provide any language assistance to persons in a language group when fewer than 5 percent of the eligible population and fewer than 50 in number are members of the language group?*

HUD recommends that recipients use the four-factor analysis to determine whether to provide these persons with oral interpretation of vital documents if requested.

*XXIII. Are there "safe harbors" provided for oral interpretation services?*

There are no "safe harbors" for oral interpretation services. Recipients should use the four-factor analysis to determine whether they should provide reasonable, timely, oral language assistance free of charge to any beneficiary that is LEP (depending on the circumstances, reasonable oral language assistance might be an in-person interpreter or telephone interpreter line).

*XXIV. Is there a continued commitment by the Executive Branch to EO 13166?*

There has been no change to the EO 13166. The President and Secretary of HUD are fully committed to ensuring that LEP persons have meaningful access to federally conducted programs and activities.

**\*2754** *XXV. Did the Supreme Court address and reject the LEP obligation under Title VI in Alexander v. Sandoval [121 S. Ct. 1511 (2001)]?*

The Supreme Court did not reject the LEP obligations of Title VI in its Sandoval ruling. In Sandoval, 121 S. Ct. 1511 (2001), the Supreme Court held that there is no right of action for private parties to enforce the federal agencies' disparate impact regulations under Title VI. It ruled that, even if the Alabama Department of Public Safety's policy of administering driver's license examinations only in English violates Title VI regulations, a private party may not bring a lawsuit under those regulations to enjoin Alabama's policy. Sandoval did not invalidate Title VI or the Title VI disparate impact regulations, and federal agencies' (versus private parties) obligations to enforce Title VI. Therefore, Title VI regulations remain in effect. Because the legal basis for the Guidance required under EO 13166 is Title VI and, in HUD's case, the civil rights-related program requirements (CRRPR), dealing with differential treatment, and since Sandoval did not invalidate either, the EO remains in effect.

*XXVI. What are the obligations of HUD recipients if they operate in jurisdictions in which English has been declared the official language?*

In a jurisdiction where English has been declared the official language, a HUD recipient is still subject to federal nondiscrimination requirements, including Title VI requirements as they relate to LEP persons.

*XXVII. Where can I find more information on LEP?*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 2732-01                                                          Page 52
72 FR 2732-01, 2007 WL 130301 (F.R.)
(Cite as: 72 FR 2732)


  You should review HUD's LEP Guidance. Additional information may also be obtained
through the federal-wide LEP Web site at http://www.lep.gov and HUD's Web site,
http://www.hud.gov/offices/fheo/promotingfh/lep.cfm. HUD also intends to issue a
Guidebook to help HUD recipients develop an LAP. A HUD-funded recipient who has
questions regarding providing meaningful access to LEP persons may contact Pamela D.
Walsh, Director, Program Standards Division, HUD/FHEO, at (202) 708-2288 or
800-877-8339 (TTY). You may also email your question to
limitedenglishproficiency@hud.gov.

  [FR Doc. 07-217 Filed 1-16-07; 4:01 pm]

  BILLING CODE 4210-67-P

  72 FR 2732-01, 2007 WL 130301 (F.R.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.