**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATIONAL MULTI HOUSING COUNCIL,    :
in a representational capacity on behalf of    :
certain of its members,    :
1850 M Street, N.W., Suite 540    :
Washington, D.C. 20036, and    :
    :
NATIONAL APARTMENT ASSOCIATION,    :
in a representational capacity on behalf of    :     Civil Action No. 07-815
certain of its members,    :     Judge James Robertson
4300 Wilson Boulevard, Suite 400    :
Arlington, VA 22203    :     **ORAL ARGUMENT**
    :     **REQUESTED**
        Plaintiffs,    :
    :
        - against -    :
    :
ALPHONSO JACKSON, *et al.*    :
    :
        Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**



Andrew L. Sandler (D.C. Bar No. 387825)
Joseph L. Barloon (D.C. Bar No. 459626)
Austin K. Brown (D.C. Bar No. 499915)
SKADDEN, ARPS, SLATE,
        MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Counsel for Plaintiffs

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................... 4

ARGUMENT ........................................................................................................... 6

I.      THE NMHC AND THE NAA HAVE PLED FACTS SUFFICIENT TO SHOW STANDING. ....................................................................................................... 6

      A.      The Members Have Been And Continue To Be Injured By The Final Guidance. ............................................................................................... 6

      B.      The Members' Injuries Are Caused By The Final Guidance And Will Be Redressed By A Favorable Decision. ................................................. 9

II.     THE CHALLENGE IS RIPE FOR REVIEW. ............................................. 12

      A.      The Final Guidance Is Fit For Review. ............................................... 12

            1.      The Members' Legal Claims Are Presumptively Reviewable. ............... 12

            2.      The Final Guidance Is Fit For Review Because It Constitutes A Settled Agency Position That Has Direct And Immediate Impact On The Members. ................................................................................. 14

            3.      No Further Facts Are Needed To Review The Housing Groups' Challenge. ............................................................................................ 16

      B.      Withholding Review of the Final Guidance Would Work A Hardship On The Housing Groups' Members. ......................................................... 17

CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## **CASES**

*Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995) ................... 17-18

*Andrews v. U.S. Dep't of Health and Human Services*,
No. 04-0307, 2005 WL 4826342 (D.D.C., April 13, 2005) ................................. 6-7

*Barrick Goldstrike Mines, Inc. v. Browner*,
215 F.3d 45, 49 (D.C. Cir. 2000) ................................................................. 12

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) .............................................................. 14

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430, 436 (D.C. Cir. 1986) ............................................................. 17

*Commodity Trend Serv., Inc. v. CFTC*,
233 F.3d 981, 985 (7th Cir. 2000) ............................................................... 18

*Cont'l Air Lines v. Civil Aeronautics Bd.*,
522 F.2d 107, 124-26 (D.C. Cir. 1974) ................................................... 17-18

*CropLife America v. EPA*,
329 F.3d 876, 881, 884 (D.C. Cir. 2003) .................................................... 13

*Elec. Power Supply Ass'n v. FERC*,
391 F.3d 1255, 1262 (D.C. Cir. 2004) ........................................................ 13

\* *FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232, 239 (1980) ...................................................................... 14, 16

*Fox Television Stations, Inc. v. FCC*,
280 F.3d 1027, 1039 (D.C. Cir. 2002) ........................................................ 13

\* *Franklin v. D.C.*, 960 F. Supp. 394 (D.D.C. 1997)
(*vacated on other grounds*, 163 F.3d 625 (D.C. Cir. 1998)) .......................... 11-12

*General Electric Co. v. EPA*,
290 F.3d 377, 380 (D.C. Cir. 2002) ....................................................... 17-18

*Haase v. Sessions*,
835 F.2d 902, 906-07 (D.C. Cir. 1987) ......................................................... 7

\* *Lomont v. Summers*,
135 F. Supp. 2d 23, 25 (D.D.C. 2001) ........................................................ 5-6

\* *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560 (1992) .......................................................... 6, 8-9, 18-19

*Made In The USA Found. v. General Motors Corp.*,
No. Civ. A. 04-0553(JR), 2005 WL 3676030 (D.D.C. 2005) ............................. 7

*Midcoast Interstate Transmission, Inc. v. FERC*,
    198 F.3d 960, 970 (D.C. Cir. 2000) ................................................................. 18

*Nat'l Mining Ass'n v. Dep't of Labor*,
    145 F.3d 1339, 1408 (D.C. Cir. 1998) ........................................................... 17

\* *Nat'l Mining Ass'n v. Fowler*,
    324 F.3d 752, 756 (D.C. Cir. 2003) ........................................... 12, 13, 16-17

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803, 810 (2003) ................................................................................ 19

*Napreljac v. John Q. Hammons Hotels, Inc.*,
    461 F. Supp. 2d 981, 1029 (S.D. Iowa 2006) .............................................. 11

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726, 733-34 (1998) ......................................................................... 18

*Olagues v. Russoniello*,
    770 F.2d 791, 801 (9th Cir. 1985) ............................................................ 10-11

*Public Citizens v. Dep't of State*,
    276 F.3d 634, 641 (D.C. Cir. 2002) ............................................................... 12

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
    324 F.3d 726, 731-32 (D.C. Cir. 2003) .................................................... 14-15

*Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 (1993) ............................... 19

*Road Sprinkler Fitters Local Union v. Herman*,
    234 F.3d 1316, 1319 (D.C. Cir. 2000) ............................................................ 9

*Sabre Inc. v. Dep't. of Transp.*,
    429 F.3d 1113, 1119 (D.C. Cir. 2005) ............................................................ 7

*Soberal-Perez v. Heckler*,
    717 F.2d 36, 41 (2nd Cir. 1983) .................................................................... 11

\* *Spann v. Colonial Vill.*,
    899 F.2d 24, 27 (D.C. Cir. 1990) .................................................................... 8

*Sprint Corp. v. FCC*,
    331 F.3d 952, 956 (D.C. Cir. 2003) ......................................................... 13, 17

*Student Loan Mktg. Ass'n v. Riley*,
    104 F.3d 397, 406-07 (D.C. Cir. 1997) ......................................................... 18

*Time Warner Entm't Co. v. FCC*,
    93 F.3d 957, 974 (D.C. Cir. 1996) ................................................................. 13

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158, 164 (1967) ........................................................................... 18-19

*Venetian Casino Resort, LLC v. EEOC*,
    409 F.3d 359, 364-66 (D.C. Cir. 2004) ......................................................... 13

*Warth v. Seldin*, 422 U.S. 490, 501 (1975) ................................................... 7

## STATUTES AND OTHER AUTHORITIES

24 C.F.R. § 1.4 ........................................................................................................................ 4

65 Fed. Reg. 50121 (Aug. 11, 2000) ................................................................................. 3-5

72 Fed. Reg. 2732 (Jan. 22, 2007) ........................................................................... 2-3, 10, 15

5 U.S.C. § 706 ..................................................................................................................... 5

42 U.S.C. § 2000d ................................................................................................................ 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATIONAL MULTI HOUSING COUNCIL,    :
in a representational capacity on behalf of    :
certain of its members,    :
1850 M Street, N.W., Suite 540    :
Washington, D.C. 20036, and    :
    :
NATIONAL APARTMENT ASSOCIATION,    :
in a representational capacity on behalf of    :
certain of its members,    :
4300 Wilson Boulevard, Suite 400    :    Civil Action No. 07-815
Arlington, VA 22203    :    Judge James Robertson
    :
                    Plaintiffs,    :
    :
           - against -    :
    :
ALPHONSO JACKSON, *et al.*    :
    :
                    Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs National Multi Housing Council ("NMHC") and National Apartment

Association ("NAA") (collectively, the "Housing Groups") respectfully submit this

memorandum in opposition to the motion to dismiss, filed by defendants Department of Housing

and Urban Development and the Department's Secretary, Alphonso Jackson (collectively,

"HUD").

**PRELIMINARY STATEMENT**

Congress has enacted no law requiring businesses to provide services to their

customers in languages other than English, or equating English fluency or lack thereof with

national origin for purposes of our nation's laws prohibiting discrimination.  Yet, by publication

of the directive at issue here, HUD has imposed on owners and managers of federally-subsidized

housing just such a requirement.  HUD now requires apartment owners to subject themselves to a

"four-part test" to determine all of the languages likely to be spoken by tenants or potential

tenants at all of their federally-funded properties, to develop a "Language Assistance Plan," and

then maintain fleets of translators to translate all information – both written and oral – into each

tenant's language of choice.  These new requirements are unlawful and must be enjoined.

        The specific requirements challenged by the Complaint were effectuated by HUD

on March 7, 2007 through the promulgation of a document published in the Federal Register

after notice and comment entitled "Final Guidance to Federal Financial Assistance Recipients

Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited

English Proficient Persons" (the "Final Guidance"). 72 Fed. Reg. 2732 (Jan. 22, 2007).  The

Final Guidance requires recipients of federal funds, including certain of the NMHC's and the

NAA's Members (the "Members"), to provide two primary translation services:  professional

interpreters and written translations.  With respect to the provision of professional interpreters,

the Final Guidance requires that they be "timely" provided for *each* language spoken by the

Members' tenants and potential tenants.  *Id.* at 2742.  With respect to the provision of written

translations, the Final Guidance requires Members to subject themselves to a vague and

ambiguous four-part test to determine the number of languages in which they must communicate

and the specific information to be translated.  Members are instructed to determine the number or

proportion of Limited English Proficiency ("LEP") persons eligible to be served by them by

studying census data for the area served, data from school systems and community organizations,

and data from state and local governments.  *Id.* at 2740.  These requirements are infeasible and

include no standards for compliance.  For example, the Final Guidance states unequivocally that oral interpreters should be provided to LEP persons "no matter how few LEP persons the recipient is serving."  *Id*. at 2742.  While the Final Guidance concedes that translating information into 100 different languages is "unrealistic," it does not state what number of foreign languages is realistic for the Members to translate.  *Id.*

        According to HUD, the Final Guidance is intended to assist recipients of federal assistance with fulfilling their previously existing obligation under Title VI to provide meaningful access by LEP persons to important programs and services.  *Id.* at 2738.  In reality, however, the requirements are new and unlawful.  *First*, the plain language of Title VI prohibits discrimination based on only race, color, or national origin.  The statute does not permit HUD to equate a person's fluency in English with his or her national origin.  Accordingly, the Members had no previously existing obligation to communicate with tenants or potential tenants in languages other than English.  *Second*, prior to the issuance of Executive Order 13166, which requires every federal agency to publish guidance similar to the Final Guidance at issue here, HUD had made no reference in any regulation nor in any other official document to any responsibility by recipients to provide meaningful access to LEP persons under Title VI or its Title VI implementing regulations.  Exec. Order No. 13166, 65 Fed. Reg. 50121 (Aug. 11, 2000).  *Third*, Title VI prohibits only intentional discrimination.  The Final Guidance, however, unlawfully imposes a "disparate impact" standard of liability on recipients' actions.  Because these requirements are in excess of and contrary to HUD's statutory authority, arbitrary and capricious, and threaten Plaintiffs with irreparable harm, this Court should declare the requirements invalid and enjoin their enforcement.

Seeking to evade a merits review, HUD moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and ripeness. HUD's motion to dismiss should be denied because:  (1) Plaintiffs have standing to bring this suit because the Members have suffered injury as a result of HUD's actions, and a favorable decision by this Court will redress their injuries; and (2) this case is ripe for review because the claims are purely legal and thus presumptively reviewable, no further facts are needed to review their challenge, and withholding review would further harm the Members.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

As recipients of federal funds, the apartment owners and managers represented by the NAA and the NMHC are subject to formal regulations and guidance promulgated by HUD, pursuant to Title VI of the Civil Rights Act of 1964 ("Title VI").  42 U.S.C. § 2000d; 24 C.F.R. § 1.4.  Title VI prohibits recipients of federal financial assistance from discriminating against customers or potential customers based on their race, color, or national origin.  *Id.*  The statute does not mention English fluency or proficiency.  On August 11, 2000, President William Jefferson Clinton issued Executive Order 13166, entitled "Improving Access to Services for Persons with Limited English Proficiency" (the "Executive Order").  65 Fed. Reg. 50121.  The Executive Order, which purports to assist federal agencies in enforcing Title VI, requires every federal agency that provides financial assistance to non-federal entities to publish guidance outlining recipients' obligations to provide meaningful access to LEP persons.  *Id.*  In addition,

---

[1]    While HUD challenges generally the Housing Groups' standing to bring suit in this case, it does not dispute that the interests the suit seeks to vindicate are germane to the Housing Groups' purpose.  Nor does it argue that the claims asserted or the relief requested require the participation of individual members in the lawsuit.  (MTD at 8).  HUD thus concedes that if one of the Members possesses standing to sue in its own right, then the Housing Groups have standing in a representational capacity.

4

the Executive Order directs affected agencies to make the required guidance consistent with model guidance issued by the Department of Justice and describes the model guidance as outlining the standards that recipients of federal funds "must follow." *Id.*

Plaintiffs' Complaint alleges that HUD violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(a)-(c), by promulgating Final Guidance requiring the Members to implement costly written and oral translation services for LEP persons. Specifically, the Complaint alleges violations of the APA as follows:

**Count One**: Because Congress never prohibited discrimination on the basis of English fluency *vel non*, HUD's Final Guidance is in excess of its statutory authority, in violation of the APA.

**Count Two**: By requiring recipients of federal funds to communicate with tenants and potential tenants in languages other than English so as to avoid effecting a potential disparate impact on individuals based on their fluency in English, the agency effectively read a disparate impact prong of liability into Title VI, whereas Congress prohibited only intentional discrimination. Accordingly, HUD is acting contrary to law and in violation of the APA.

**Count Three**: By making it infeasible for the Members to comply with or prove compliance with the Final Guidance and failing to sufficiently justify its requirements, HUD has abused its discretion and acted in an arbitrary and capricious fashion, in violation of the APA.

HUD seeks to avoid review of its actions by assuming as true one of the central issues in dispute – whether Title VI prohibits communicating only in English. HUD's attempt to assume as true the merits of the case to avoid Court review of the merits is circular and should

5

not be permitted. *See Lomont v. Summers*, 135 F.Supp. 2d 23, 25 (D.D.C. 2001) (holding that "[i]n evaluating plaintiffs' standing…we do not recast merits arguments as jurisdictional ones."). Plaintiff Housing Groups have sufficiently alleged that this Court has jurisdiction to hear their claims by alleging that the Final Guidance has caused their Members injury, and that this injury can be redressed by a favorable decision by this Court.

## ARGUMENT

### I.    THE NMHC AND THE NAA HAVE PLED FACTS SUFFICIENT TO SHOW STANDING.

The Housing Groups have sufficiently alleged that their Members have suffered injury that is traceable to HUD's conduct and is redressable by a favorable decision by this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (outlining the three-part test for standing). Indeed, Plaintiffs have pled specific facts outlining the scope and severity of the injuries caused by HUD's Final Guidance and the relief that this Court can provide by declaring the Final Guidance unlawful.

### A.    The Members Have Been And Continue To Be Injured By The Final Guidance.

HUD argues that the Housing Groups fail to allege actual or imminent injury. (MTD at 8-9). In particular, HUD maintains that the Housing Groups lack standing because they have not alleged that HUD has initiated any type of Title VI LEP enforcement proceeding against any of their Members or that any of their Members has lost any federal funding. (MTD at 9). Contrary to HUD's assertion, the initiation or threat of an enforcement proceeding or the loss of funding are not necessary to confer standing. As this Court has recognized, "[e]conomic injury may amount to injury-in-fact for standing purposes." *Andrews v. U.S. Dep't of Health and*

6

*Human Services*, No. 04-0307, 2005 WL 4826342, at *2 (D.D.C., April 13, 2005); *see also*

*Sabre, Inc. v. Dep't. of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (holding that the plaintiff

demonstrated a "sufficient likelihood of economic injury to establish standing" where it pled that

altering certain of its business practices, which were deemed illegal by the Department of

Transportation, would cause it economic injury). Here, Plaintiffs have sufficiently alleged that

the Final Guidance has caused their Members severe financial and reputational injury.

        Plaintiffs have described in detail the economic and reputational injuries incurred

by their Members as a result of the Final Guidance. In paragraph 38 of the Complaint, for

example, the Housing Groups state that the

> Members have spent a substantial amount of money subjecting
> themselves to the required four-part test. In particular, Members
> have studied, at great expense, census data for all locations
> currently under management to attempt to determine the number of
> languages spoken by their tenants and potential tenants and the
> frequency with which their employees come in contact with LEP
> tenants and potential tenants. Members have also developed
> Language Assistance Plans for serving their LEP tenants and
> potential tenants and complying with the new requirements.

(Compl. at ¶ 38). Indeed, the severity of the economic injury caused by the Final Guidance is

demonstrated in the two Declarations from Plaintiffs' Members that are attached to this

memorandum.[2] Simply complying with the four-part test set forth in the Final Guidance has

already cost individual Members thousands of dollars each. (Scurfield Decl. at ¶ 9-10;

Churgovich Decl. at ¶ 7). In addition, undertaking the translation efforts purportedly required by

HUD would cost the Members millions of dollars. (Scurfield Decl. at ¶ 10).

---

[2]    It is well established that plaintiffs can augment their pleadings with Declarations for purposes of establishing
their standing at the Rule 12(b)(1) motion to dismiss stage. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975);
*Haase v. Sessions*, 835 F.2d 902, 906-07 (D.C. Cir. 1987); *Made In The USA Found. v. General Motors Corp.*,
No. Civ. A. 04-0553, 2005 WL 3676030 (D.D.C. 2005) ("When considering its jurisdiction to hear a claim, a
court may consider materials outside the pleadings.").

HUD cites *Spann v. Colonial Vill.*, 899 F.2d 24 (D.C. Cir. 1990) for the proposition that spending money to understand legal or regulatory requirements is insufficient to confer standing. (MTD at 10). Plaintiffs do not dispute this inapposite assertion. Paragraph 38 of the Complaint alleges injury not in the form of costs to understand the Final Guidance, but in the form of costs incurred complying with the Final Guidance. Indeed, in *Spann*, the court held that the plaintiffs had standing to pursue their claims where they alleged that the defendants' discriminatory conduct required them to devote more time, effort and money to responding to the discriminatory conduct. *Id.* at 29. Like the plaintiffs in *Spann*, the Housing Groups have sufficiently alleged that their Members have spent money, time, and effort responding to and complying with the Final Guidance. Accordingly, the Housing Groups have standing to bring their claims.

HUD also asserts that the Members' injuries are "conjectural or hypothetical" and are not sufficiently concrete and particularized. (MTD at 10). In fact, Plaintiffs *do* plead concrete injuries incurred by their Members. They allege in paragraph 38 of the Complaint that the Members have spent a substantial amount of money complying with the four-part test and further describe the precise measures the Members have taken to comply with the test. Indeed, the Complaint, along with the attached Declarations, demonstrate that the Members have expended significant funds to comply with the Final Guidance by studying census data, developing Language Assistance Plans, surveying employees at their buildings, and interviewing translators. (Scurfield Decl. at ¶ 9; Churgovich Decl. at ¶ 7). Such injury is hardly "hypothetical."

Finally, HUD's claims that the Members' injuries are not sufficiently "particularized" are based on a misreading of standing cases. (MTD at 10). Contrary to HUD's

implication in its motion to dismiss, the requirement that Plaintiffs' allegations be
"particularized," as that term is used by the Supreme Court in *Lujan*, has no relevance to the
volume or types of facts alleged. The term "particularized" requires only that the Plaintiffs plead
that agency action affects them in a personal and individual way. *Lujan*, 504 U.S. at 560 n. 1.
Plaintiffs have sufficiently pled, and the attached Declarations from two of Plaintiffs' Members
setting forth the funds they have spent and will need to spend sufficiently show, that the Final
Guidance affects the Members in a personal way. Accordingly, the Members' injuries are hardly
conjectural or hypothetical and support this Court's jurisdiction to hear their claims.

> **B.  The Members' Injuries Are Caused By The Final Guidance And Will Be
> Redressed By A Favorable Decision.**

HUD argues that the Members' injuries are caused not by the Final Guidance but
by Title VI, and that enjoining HUD from enforcing the Final Guidance will not redress the
Members' injuries. (MTD at 11-12). HUD specifically argues that "any obligation to which any
of plaintiffs' members…may be subject regarding the provision of services to LEP persons
comes, not from the Guidance, but from Title VI and its implementing regulations." (MTD at
11). HUD thereby seeks to evade review of its conduct by asking this Court to assume for
jurisdictional purposes the answer to one of the very questions Plaintiffs have asked this Court to
decide – whether the Final Guidance creates new law independent of Title VI and in excess of
HUD's statutory authority. *See Road Sprinkler Fitters Local Union v. Herman*, 234 F.3d 1316,
1319 (D.C. Cir. 2000) (ruling that merits questions should not be recast as jurisdictional issues to
deny standing).

Plaintiffs have sufficiently alleged that their Members' injuries are caused by the
Final Guidance and will be redressed by a favorable decision. *First*, the allegations in the
Complaint and in the attached Declarations support Plaintiffs' contention that their Members'

injuries are caused by the Final Guidance and not by Title VI.  As described above, the

Complaint clearly identifies the Final Guidance as causing Members to spend significant

amounts of money subjecting themselves to the required four-part test, studying census data for

all locations currently under management, and developing Language Assistance Plans for serving

their LEP tenants and potential tenants.  Furthermore, the attached Declarations confirm that

compliance with the Final Guidance has already cost certain of the Members upwards of $10,000

each.  (Scurfield Decl. at ¶ 9; Churgovich Decl. at ¶ 7.).

       The language in the Final Guidance itself also affirms that the Final Guidance sets

forth new obligations.  Indeed, HUD itself acknowledges that the Final Guidance establishes new

legal obligations by carefully outlining a "safe harbor" in the Final Guidance for complying with

its requirements.  72 Fed. Reg. at 2744.  This "safe harbor" protects the Members from HUD

action pursuant to the Final Guidance itself.  In fact, the safe harbor provision makes no

reference whatsoever to Title VI or HUD's Title VI implementing regulations.  In addition, until

President Clinton issued Executive Order 13166, HUD never gave any indication that lack of

proficiency with English could be used as a proxy for national origin discrimination or that Title

VI prohibited discrimination on the basis of English fluency.

       HUD's argument that Title VI itself imposes the obligation to communicate in

languages other than English has been rejected by several courts.  These courts have found that

Title VI's prohibition against discrimination based on race, color, or national origin does not

imply an affirmative duty to provide translation services.  *See, e.g., Olagues v. Russoniello*, 770

F.2d 791, 801 (9th Cir. 1985) ("No court has yet held that a language-based classification is the

equivalent of one based on race or national origin requiring heightened scrutiny as a 'suspect

class.'  Indeed, those courts which have faced this issue have held that language-based

classifications are not the equivalent of national origin classifications.")  (citations omitted);

*Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2nd Cir. 1983) (rejecting a claim that the failure of

the Secretary of Health and Human Services to provide forms and services in Spanish constituted

discrimination based on national origin in violation of the Equal Protection Clause of the United

States Constitution); *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F.Supp. 2d 981, 1029 (S.D.

Iowa 2006) ("Evidence that [defendant] could have discriminated against [Plaintiff] because he

was not able to speak English is not evidence of national origin-based discrimination.  Language

and national origin are not interchangeable.").

   In *Franklin v. D.C.*, 960 F.Supp. 394 (D.D.C. 1997) (*vacated on other grounds*,

163 F.3d 625 (D.C. Cir. 1998)), for example, Judge Green considered whether a class of LEP

Hispanic prisoners was entitled to relief under Title VI on the ground that the prison provided the

vast majority of its vocational, educational and rehabilitative programs in English only.  Judge

Green held that the plaintiffs did not have a claim under Title VI, reasoning that "the LEP

Hispanic inmates are not being barred from participation in prison programs because of their race,

color or national origin."  *Id.* at 432.  Judge Green continued, stating:

> [w]hile it may be penologically sound and even highly
> desirable for the defendant to offer identical programs to
> every language group confined within the walls of its prisons,
> neither Title VI nor the Constitution require it to do so.  The
> defendant simply cannot discriminate for an illegal reason
> and, here, the plaintiffs have not shown that it has.

*Id.*  The court's holding in *Franklin* thus makes clear that Title VI does not obligate the Members

to provide translations for all of the languages spoken by their tenants.  Accordingly, any such

obligation is created exclusively by the Final Guidance.

   This case law, the plain language of Title VI, and the Final Guidance itself make

clear that the language requirements in the Final Guidance are new and are not found in Title

VI's prohibition against national origin discrimination.  Furthermore, the Members have

expended considerable resources complying with the Final Guidance.  For all of these reasons,

the NMHC and the NAA have standing to pursue this cause of action on their Members' behalf.

## II.    THE CHALLENGE IS RIPE FOR REVIEW.

HUD argues that the complaint should be dismissed because the Housing Groups'

challenge is not ripe for review.  (MTD at 12-18).  This facial pre-enforcement challenge to the

Final Guidance is ripe for review because it involves a concrete legal dispute, no further factual

development is necessary to clarify the issues, and the Final Guidance constitutes a settled

agency position.  *See Public Citizens v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002);

*Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) ("case is ripe for

judicial review" where "questions presented are purely legal" and "[n]othing … would bring the

issues into greater focus or assist in determining them").  Further, withholding review of the

Final Guidance would work a hardship on the Members because they have suffered and will

continue to suffer economic injury in undertaking the actions necessary to comply with the Final

Guidance.

The essential framework for determining the ripeness of pre-enforcement agency

action is well established and requires an evaluation of (1) the fitness of the issues for judicial

decision and (2) the hardship to the parties due to the withholding of court consideration.  *Nat'l

Mining Ass'n v. Fowler*, 324 F.3d 752, 756 (D.C. Cir. 2003).

### A.    The Final Guidance Is Fit For Review.

#### 1.    The Members' Legal Claims Are Presumptively Reviewable.

In assessing fitness for review, this Court "ask[s] first whether the issue ...

presents a purely legal question, in which case it is presumptively reviewable."  *Fowler*, 324

F.3d at 757. A claim that an agency action exceeds its statutory authority presents a "purely legal" issue. *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir. 2002) (challenge to rule as contrary to statute presented pure question of law); *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004) ("straightforward legal question" whether FERC orders violate law "on its face" is purely legal); *Fowler*, 324 F.3d at 757 (resolving the relationship between underlying statute and challenged regulation is a purely legal issue). In addition, the question of whether an agency decision is arbitrary and capricious is a purely legal question. *Sprint Corp. v. FCC,* 331 F.3d 952, 956 (D.C. Cir. 2003).

Determining whether HUD acted (i) in excess of its statutory authority (First Cause of Action), (ii) contrary to law (Second Cause of Action) or (iii) arbitrarily and capriciously (Third Cause of Action), in effectuating the Final Guidance involves pure questions of law. How HUD will act to interpret or enforce the Final Guidance is irrelevant; the Final Guidance itself imposes obligations on the Members. Thus, contrary to HUD's assertions, the Complaint does not "seek to involve this Court in an abstract dispute concerning policy guidance." (MTD at 14). These challenges are "presumptively reviewable" without further factual development. *Fowler*, 324 F.3d at 757 (quoting *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739 (D.C. Cir. 1990)).[3]

---

[3]  *See also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 364-66 (D.C. Cir. 2005) (case was ripe because it presented clear-cut legal question that could be resolved based on analysis of relevant statutes and case law); *CropLife America v. EPA.*, 329 F.3d 876, 881, 884 (D.C. Cir. 2003) (holding that "binding regulation" promulgated by the EPA was ripe for review because it presents a "purely legal question" and unambiguously precludes agency action of a certain type, even though plaintiffs did not challenge its application on specific facts); *Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 974 (D.C. Cir. 1996) (claim that raises purely legal question is presumptively fit for judicial review so long as challenged policy is "sufficiently fleshed out to allow the court to see the concrete effects and implication of its decision.").

2.    **The Final Guidance Is Fit For Review Because It Constitutes A Settled Agency Position That Has Direct And Immediate Impact On The Members.**

HUD argues that the Final Guidance is not a final agency action because it is only a guide that does not impose an obligation or fix a legal relationship. (MTD at 15-16). Administrative agencies cannot evade review of final agency action simply by terming the action "guidance." The Final Guidance reflects a settled agency position and has legal consequences and a direct and immediate effect on the day-to-day business of the Members. Accordingly, it is subject to challenge.

An agency action is deemed final if it is "'definitive' and has a 'direct and immediate ... effect on the day-to-day business' of plaintiffs' members." *FTC. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (quoting *Abbott Laboratories*, 387 U.S. at 136). A final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

Review of the only case HUD relies on in arguing that the Final Guidance is not final agency action demonstrates the weakness of HUD's argument here. In *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731-32 (D.C. Cir. 2003), a product manufacturer attempted to challenge a letter from the Consumer Product Safety Commission stating that the Commission intended to make a preliminary determination that the manufacturer's product presented a substantial hazard and requesting that the manufacturer take voluntary actions to eliminate the hazard. *Id.* at 731-32. The Court of Appeals concluded that the actions taken by the agency—"an investigation of appellant's sprinkler heads, a statement of the agency's intention to make a preliminary determination that the sprinkler heads present a

14

substantial product hazard, and a request for voluntary corrective action"—did not constitute

final agency action and that the manufacturer could not challenge the agency's jurisdiction

unless and until the agency took an action that imposed an obligation, denied a right, or fixed a

legal relationship. *Id.*

        This case is nothing like *Reliable*. Here, Plaintiffs mount a facial pre-enforcement

challenge to an agency regulation published in the Federal Register after notice and comment.

The Final Guidance is not a tentative or preliminary position on the part of HUD.  Indeed, HUD

worked on the Final Guidance for more than six years.  It cannot credibly assert that the Final

Guidance does not "mark the consummation of the agency's decision making process."  In

addition, the Final Guidance imposes an obligation and fixes a legal relationship.  While the

Final Guidance states that it "is not a regulation, but rather a guide," 72 Fed. Reg. at 2738, the

Members are compelled to comply with the Final Guidance or risk an enforcement action.  *Id.*

("These are the same criteria HUD will use in evaluating whether recipients are in compliance

with Title VI and Title VI regulations."); *id.* at 2747 ("HUD must secure compliance through the

termination of federal assistance after the HUD recipient has been given an opportunity for an

administrative hearing and/or by referring the matter to a DOJ litigation section to seek

injunctive relief or pursue other enforcement proceedings.").

        HUD further argues that "Plaintiffs' claim rests upon a speculative and

unsupported assumption that the challenged policy may some day have an effect on their

members if HUD determines that their future acts or omissions deny meaningful access to

federally assisted programs on the basis of national origin."  (MTD at 15).  HUD misunderstands

the Members' claims.  The Final Guidance, which is not a policy statement, has had and will

continue to have a "direct and immediate … effect on [the Members'] day-to-day business."

*Standard Oil Co.*, 449 U.S. at 239.  As stated above, the Final Guidance has caused the Members

to spend significant amounts of money subjecting themselves to the required four-part test,

studying census data for all locations currently under management, and developing Language

Assistance Plans for serving their LEP tenants and potential tenants.  (Scurfield Decl. at ¶ 9;

Churgovich Decl. at ¶ 7).  Further, providing the translation services required by the Final

Guidance will cost millions of dollars.  (Scurfield Decl. at ¶ 10) (estimating $3.4 million).

      Because the Final Guidance reflects a settled agency position and has a direct and

immediate effect on the Members' day-to-day business, it is final agency action.

      **3.**      **No Further Facts Are Needed To Review The Housing Groups'
Challenge.**

      HUD contends that factual development is necessary to review the Housing

Groups' claims.  (MTD at 14-15) ("the court would be issuing an advisory opinion as there is no

certainty or even likelihood that the facts will develop as plaintiffs hypothesize at this time.").

HUD is wrong.  The resolution of the Complaint does not depend on any particular pattern of

facts.  The question is a simple one:  Do Title VI and HUD's Title VI regulations require

apartment owners to communicate with their tenants and potential tenants in the tenants' foreign

language of choice?  This is a pure legal question – and no amount of factfinding, application of

expertise, or exercise of discretion by HUD is needed to answer the question.  If the answer is

"no," then the Final Guidance must be enjoined as in excess of the agency's authority.

      The final part of the fitness test considers "whether the agency or court will

benefit from deferring review until the agency's policies have crystallized through the

application of the policy to particular facts."  *Fowler*, 324 F.3d at 757.  "Putting the point

somewhat differently, we must decide 'whether consideration of the issue would benefit from a

more concrete setting, and whether the agency's action is sufficiently final.'" *Id.* (quoting *Her Majesty the Queen ex rel. Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990)).

      The legality of the challenged agency action will not change from case to case or become clearer in a concrete setting. The Members' objection is to the "faithful application" of the Final Guidance, *National Mining Ass'n v. Department of Labor,* 145 F.3d 1339, 1408 (D.C. Cir. 1998), and is not "intertwined with how [HUD] might exercise its discretion in the future", *Sprint Corp.*, 331 F.3d at 954. The ripeness doctrine is inapplicable here because the Housing Groups' claims rest not "on the assumption that the agency will exercise its discretion unlawfully" in applying the regulation but on whether "its faithful application would carry the agency beyond its statutory mandate." *National Mining Ass'n,* 145 F.3d at 1408 (internal citation omitted).

      HUD does not, and cannot, explain how this dispute would look any different, or be any more ripe, were this Court to defer review until another day. Accordingly, further factual development will not aid in adjudicating these claims, and HUD has no legitimate interest in postponing review. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) (agency's interest in postponing review highest when position is tentative; once position is publicly articulated, agency interest in postponing is gone); *Cont'l Air Lines v. Civil Aeronautics Bd.*, 522 F.2d 107, 124-26 (D.C. Cir. 1974) (same).

    **B.**    **Withholding Review of the Final Guidance Would Work A Hardship On The Housing Groups' Members.**

      According to the law of this circuit, once a court determines that an issue is clearly fit for review, there is no need to consider "the hardship to the parties of withholding court consideration," because there would be no advantage to be had from delaying review. *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995); *General Electric*

*Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002).  Because the three counts in the complaint are

fit for review, the Court need not consider the hardship to the parties resulting from withholding

review.

In any event, it is clear that withholding review of the Final Guidance imposes

hardship upon the Members because it requires them to modify their behavior by spending

money to comply in order to avoid adverse future consequences.  *See Lujan*, 497 U.S. at 891.

Economic impact satisfies the "hardship" aspect of the ripeness test.  *See, e.g., Midcoast*

*Interstate Transmission, Inc. c. FERC*, 198 F.3d 960, 970 (D.C. Cir. 2000), ("imminent loss" of

business was a sufficient hardship); *Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 406-07

(D.C. Cir. 1997) (Sallie Mae's continued exposure to risk altered its conduct in a costly way);

*Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 985 (7th Cir. 2000) (holding that financial

loss and operating constraints suffered constituted hardship).  The Members' declarations

demonstrate the significant economic injury caused by the Final Guidance.  (Scurfield Decl. at ¶

9; Churgovich Decl. at ¶ 7).

All of the cases HUD relies on in support of its argument that the Members will

not be significantly harmed if judicial determination is withheld at this time are distinguishable.

Specifically, none of these cases involve a situation where the administrative action could be said

to be felt immediately by those subject to it in conducting their day-to-day affairs.  *Nat'l Park*

*Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003) ("the regulation here leaves a

concessioner free to conduct its business as it sees fit"); *Ohio Forestry Ass'n, Inc. v. Sierra Club*,

523 U.S. 726, 733-34 (1998) ("Nor have we found that the Plan now inflicts significant practical

harm upon the interests…advance[d]…."); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158,

164 (1967) (the situation of the petition was "not a situation in which primary conduct is

affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled"). (MTD at 16-18). Here, by contrast, as set forth in the Complaint, the Final Guidance *does* affect the Members' conduct of their day-to-day affairs. The Final Guidance requires the Members to modify their behavior immediately by spending money to comply with the Final Guidance in order to avoid adverse future consequences. Thus, the Final Guidance is reviewable as "a substantive rule which as a practical matter requires the [the Members] to adjust [their] conduct immediately.'" *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Lujan*, 497 U.S. at 891).[4]

## CONCLUSION

For the foregoing reasons, HUD's motion to dismiss the Complaint pursuant to F.R.C.P. 12(b)(1) and F.R.C.P. 12(b)(6) should be denied.

Respectfully submitted,


/s/ Andrew L. Sandler
_____
Andrew L. Sandler (D.C. Bar No. 387825)
Joseph L. Barloon (D.C. Bar No. 459626)
Austin K. Brown (D.C. Bar No. 499915)
SKADDEN, ARPS, SLATE,
        MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Counsel for Plaintiffs

Dated: August 16, 2007

---

[4] Defendants also cite *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 (1993) to support their argument that the instant case does not involve a situation where a "challenged regulation[ ] [or other agency action] presented plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." (MTD at 17-18). To the contrary, as stated above, the Members are compelled to comply with the Final Guidance or risk an enforcement action.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2007, copies of the foregoing Opposition to Defendants' Motion to Dismiss and the attached Declarations were filed electronically. Notice of these filings will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access these filings through the Court's CM/ECF system.

/s/ Austin K. Brown
_____
Austin K. Brown (D.C. Bar No. 499915)
SKADDEN, ARPS, SLATE,
     MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

NATIONAL MULTI HOUSING COUNCIL,  :
in a representational capacity on behalf of    :
certain of its members,                                  :
1850 M Street, N.W., Suite 540                  :
Washington, D.C. 20036                            :
                                                                   :
NATIONAL APARTMENT ASSOCIATION,  :
in a representational capacity on behalf of    :        Civil Action No. 07-815 (JR)
certain of its members,                                  :        Judge James Robertson
4300 Wilson Boulevard, Suite 400              :
Arlington, VA 22203                                  :
                                                                   :
                  Plaintiffs,             :
                                                                   :
       - against -                                      :
                                                                   :
ALPHONSO JACKSON, et al.,                   :
                                                                   :
                  Defendants.          :
                                                                   :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DECLARATION OF SHERRY SCURFIELD

Sherry Scurfield hereby declares:

1.     I am the Senior Vice President at Related Management Company

("Related"), a position I have held since 2001 and was a Vice President since 1990.

2.     Related is a limited partnership that manages over 143 multi-family

housing properties in 12 states throughout the country. Related has been in business since 1973.

3.     Related has been a member of the National Multi Housing Council since

1993 and of the National Apartment Association since 1991.

4.    Among the states serviced by Related are New York, California, Connecticut, Georgia, New Jersey, North Carolina, and Texas. Seventy-six of Related's properties receive Federal money in the form of Section 8 and other project-based grants. This money is used to subsidize rental rates for low-income families. Nearly all of the units within these 76 buildings are subsidized. In all, more than 13,000 of Related's units are subsidized by the Federal government and thus subject to Housing and Urban Development ("HUD") regulations.

5.    Last year alone, Related received more than $110 million in federal project-based grants, benefiting over 12,000 families.

6.    Related employs 1,197 people. On average, however, each of Related's buildings maintains a full-time staff of only 4 to 5 employees.

7.    At least 24 languages are spoken in those buildings that receive project based grants, including such languages as French Creole, Tagalog, three dialects of Chinese, Hindi, Myanmar, Serbo-Croatian, Cambodian, Amharic, Swahili, and Kenyan.

8.    HUD's Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons (the "Final Guidance") requires Related to follow a "four-part" test for determining the languages information should be translated into and to provide written and oral translations into those languages. Related's compliance with these requirements has resulted and continues to result in significant economic harm to Related.

9.    To date, Related has spent approximately $10,000 complying with the Final Guidance. In particular, Related has surveyed all of its properties that receive project-based grants to determine the number of languages required to be translated in each community

2

pursuant to the four-part test outlined in the Final Guidance. In addition, Related has reviewed on-line census data provided by the United States Census bureau to confirm the results of its surveys. Next, Related has identified at least 90 documents that are required to be translated under the Final Guidance's "vital document" rule and has contacted translators to determine the translation costs for each language and document.

10.    Based on this research, Related has developed a Language Assistance Plan for providing translation services to its LEP tenants. In addition, Related has concluded that it will cost approximately $2 million to provide written translations and at least $1,400,000 annually to provide oral translations. The projected cost for oral translations is based on an estimate of 20 hours of translation per 100 apartments, per year, per language. This estimate does not include the cost of translating "one-time" notices, which HUD also requires recipients to translate. Finally, to comply with the Final Guidance, Related will periodically re-review census data and re-interview employees to determine the languages necessary to be translated.

11.    The efforts by Related's staff to identify, arrange for, and provide translation services pursuant to the Final Guidance is also likely to lead to significant delays in various administrative and operational procedures, including application processing and waiting list management.

12.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on 7/26/07

Sherry Scurfield

KRISTIN G. HAID
NOTARY PUBLIC, State of New York
No. 01HA6168185
Qualified in Queens County
Commission Expires June 11, 20 11

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```
NATIONAL MULTI HOUSING COUNCIL, :
in a representational capacity on behalf of   :
certain of its members,                        :
1850 M Street, N.W., Suite 540                 :
Washington, D.C. 20036,                        :
                                           :
NATIONAL APARTMENT                             :
ASSOCIATION,                                   :    Civil Action No. 07-815 (JR)
in a representational capacity on behalf of    :    Judge James Robertson
certain of its members,                        :
4300 Wilson Boulevard, Suite 400               :
Arlington, VA 22203,                           :
                                           :
           Plaintiffs,  :
                                           :
      - against -                 :
                                           :
ALPHONSO JACKSON, et al.,                      :
                                           :
           Defendants.  :
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DECLARATION OF PATRICIA CHURGOVICH

Patricia Churgovich hereby declares:

1.      I am the Senior Manager for Federally Assisted Housing ("FAH") Operations and Administration at Forest City Residential Management, Inc. ("Forest City"). I have been employed with Forest City since 1985.

2.      Forest City, a subsidiary of Forest City Enterprises, manages over 120 apartment communities. Forest City has been managing apartment communities for over 40 years.

3.      Forest City has been a member of the National Multi Housing Council since 1989.

4.      Among the states served by Forest City are New York, West Virginia, Kentucky, California, Connecticut, New Jersey, Michigan, Ohio and Pennsylvania. Forty-two of Forest City's properties receive HUD housing assistance in the form of Section 8 and Section 236 housing assistance programs. This money is used to subsidize rental housing for lower income families. Nearly all of the apartments within these 42 apartment communities are subsidized. In all, more than 7,200 of Forest City's apartments are subsidized by HUD and thus subject to Housing and Urban Development ("HUD") regulations.

5.      Tenants in several of Forest City's apartment communities speak languages other than English. Until now, employees at these buildings either interpreted information into these languages themselves, or relied on family members or third parties to provide translation services.

6.      HUD's Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons (the "Final Guidance") declares Forest City's practices for providing translation services illegal and requires Forest City to hire professional translators for all languages other than English spoken by its tenants. Prior to doing so, the Final Guidance requires Forest City to subject itself to a four-part test which evaluates (1) the number or proportion of LEP persons eligible to be served; (2) the frequency with which LEP persons come in contact with the

2

program; (3) the nature and importance of the program, activity, or service provided by the program; and (4) the resources available to Forest City. In order to satisfy this test, Forest City is required to conduct an extensive survey of data regarding the demographics of the communities it serves.

       7.     To date, Forest City has spent approximately $6,000 complying with the Final Guidance. In particular, Forest City has surveyed all of its apartment communities that receive project-based HUD housing assistance to determine the number of languages required to be translated in each apartment community pursuant to the four-part test outlined in the Final Guidance. Based on this research, Forest City has determined that several of its apartment communities serve tenants who speak several languages, including Arabic, Chinese, Korean, Russian, Italian, Polish, and Persian. In addition, Forest City has contacted translators to determine the cost for translating each of these languages. Finally, Forest City has developed a Language Assistance Plan for providing translation services to its LEP tenants.

8.    Forest City's compliance with the requirements in the Final Guidance has resulted and continues to result in significant economic harm to Forest City.

9.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on _July 31, 2007_.


_Patricia Churgovich_
Patricia Churgovich