IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL MULTIFAMILY HOUSING COUNCIL )
and NATIONAL APARTMENT ASSOCIATION, )
)
                        Plaintiffs, )
)
              v. )
)
ALPHONSO JACKSON, in his official capacity as )   Civil Action No. 07-815 (JR)
Secretary of Housing and Urban Development, and )   Judge James Robertson
UNITED STATES DEPARTMENT OF HOUSING )
& URBAN DEVELOPMENT, )
451 Seventh St., S.W. )
Washington, DC 20410, )
)
                        Defendants. )

**REPLY MEMORANDUM IN SUPPORT OF MOTION
TO DISMISS ON THE PLEADINGS**

Pending before this Court is Defendants' Motion to Dismiss the Complaint (Docket Entry #10). Plaintiffs responded on August 16, 2007 (Docket Entry #14). Plaintiffs challenge and seek to overturn guidance issued earlier this year by the United States Department of Housing and Urban Development ("HUD") to help ensure that persons with limited English proficiency ("LEP") receive fair and meaningful access to federally funded services, programs, and activities. See Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 72 Fed. Reg. 2732 (Jan. 22, 2007) ("Policy Guidance").[1]  As explained in our opening brief, this Court

---

[1] We attached the Policy Guidance to our opening brief as Attachment A.

should dismiss the complaint because (1) Plaintiffs lack standing to challenge the Policy Guidance; and (2) Plaintiffs' claims are not ripe for review.

While Plaintiffs' response contains two new declarations in an attempt to bolster the allegations in their complaint, Plaintiffs still fail to raise their allegations of injury or right to relief beyond the level of speculation. The obligation Plaintiffs' members have to provide meaningful access to LEP persons stems from Title VI and its implementing regulations, which Plaintiffs do not challenge. The federal government has long interpreted the Title VI regulations to require recipients of federal funds to take reasonable steps to provide meaningful access to LEP persons who participate in the federally funded program. See 28 C.F.R. 42.405(d)(1). The Policy Guidance does not create new obligations, but simply assists recipients in complying with their existing obligations. Invalidating the Policy Guidance, therefore, will not relieve Plaintiffs' members of their legal obligations to provide meaningful access to LEP persons and it will not redress their alleged injury. Accordingly, Plaintiffs lack standing to bring this action. See National Wrestling Coaches Ass'n v. Department of Educ., 366 F.3d 930, 939-40 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005).

Furthermore, Plaintiffs' claims are not ripe for review because Plaintiffs do not allege that any of their members have been threatened with an enforcement action or a termination of federal funds. Whether a recipient has failed to provide meaningful access to LEP persons is a case-by-case determination. In the absence of any developed administrative record, Plaintiffs' claims are not justiciable, and this Court should dismiss their complaint.

# ARGUMENT

A. **Plaintiffs Have Not Shown That Any Of Their Members Have Standing To Challenge the Policy Guidance**

1. Plaintiffs Have Not Alleged Actual Or Imminent Injury

In our opening brief, we argued that Plaintiffs had not demonstrated that they have standing to challenge the Policy Guidance because they had not alleged that any of their members had been subject to or threatened with an enforcement proceeding or a loss of funding. See Def. Br. 9-10 (citing Rizzo v. Goode, 423 U.S. 362, 372 (1976)). In response, Plaintiffs suggest (Pl. Br. 6-7) that an alleged "economic injury," without more, is sufficient to establish standing, even in the absence of any allegation of an imminent threat of enforcement action or termination of funds. Plaintiffs are incorrect.

Plaintiffs rely on two cases that are clearly distinguishable from the case at bar. First, Plaintiffs cite Andrews v. U.S. Dept. Of H. & H.S., 2005 WL 4826342 (D.D.C., Apr. 13, 2005), which challenged a statutory ban on the re-importation of prescription drugs. This Court found that the plaintiffs had standing because they alleged that they wanted to purchase such banned prescription drugs from Canada, and that the United States Customs Service had a practice of seizing such drugs at the postal service before they reached the prospective purchaser. See 2005 WL 4826342 at *2. Plaintiffs also cite Sabre Inc. v. U.S. Dept. Of Transp., 429 F.3d 1113 (D.C. Cir. 2005). In that case, the D.C. Circuit concluded there was standing because of "a combination of three circumstances": (1) the plaintiffs challenged a final regulation in which the Department claimed jurisdiction over computerized reservations services, like Sabre; (2) the Department had already issued guidance condemning as unlawful business practices like those

that Sabre engaged in and stated it planned to continue to carry out; and (3) the Department claimed authority to commence an enforcement action and seek daily fines against Sabre for violations of the applicable statute, without prior notice. See id. at 1117-18.

The situation here is a far cry from the scenarios in Andrews and Sabre. Plaintiffs do not challenge a regulation or a statute but rather challenge guidance about how to comply with a regulation. Moreover, Plaintiffs fail to allege that they are engaged in or intend to engage in practices that HUD has stated are unlawful.[2] Finally, no termination of funds or enforcement action can occur until after the filing of a complaint and a lengthy administrative process for investigating and exploring a consensual resolution of that complaint. See Def. Br. 18. Plaintiffs do not cite a single case in which a court has held a plaintiff has standing to challenge agency guidance and circumvent the statutory administrative process before there has been even a threat that the agency may take enforcement action against the plaintiff. This Court should decline Plaintiffs' invitation to break such new legal ground.

---

[2] In one of the Declarations Plaintiffs submit with their Response, discussed in more detail infra at 5-6, a manager at Forest City Management states that some of their LEP tenants have used bilingual friends or family members to assist them in communicating with Forest City employees and that in other cases they have bilingual employees who are able to speak with LEP tenants. See Churgovich Decl. ¶ 5. The manager goes on to say that the Policy Guidance "declares Forest City's practices for providing translation services illegal and requires Forest City to hire professional translators for all languages other than English". Id. ¶ 6. This latter assertion is not correct. As explained in more detail below, infra at 6, the obligations of recipients are determined on a case by case basis after considering a variety of factors, and the mere fact that a tenant speaks a language other than English does not necessarily trigger an a obligation to provide language assistance. Furthermore, the Guidance states that "formal certification as an interpreter is not necessary" see 72 Fed. Reg. at 2742, notes that hiring bilingual staff who speak a frequently encountered staff "offers one of the best, and often one of the most economical, options", id., and states that recipients should allow LEP persons to use family or friends to assist them if they so desire. Id. at 2743. There is, therefore, no reason other than speculation to believe that Forest City or any other of Plaintiffs' members are likely to engage in conduct that violates Title VI or its regulations.

Even assuming that a plaintiff might under some circumstances have standing to challenge agency guidance before the administrative complaint process has run its course, Plaintiffs have failed to show that any of their members have suffered any legally cognizable injury. As we noted in our opening brief (Def. Br. 8-9), Plaintiffs' complaint alleges only that unspecified members have spent "a substantial amount of money" attempting to comply with their obligation to provide meaningful access to LEP persons. In an apparent attempt to remedy the deficient allegations of injury in their complaint, Plaintiffs have filed with their response declarations by representatives of two of their corporate members. In deciding a Rule 12(b)(6) motion, district courts may typically consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F.Supp.2d 191, 196 (D.D.C. 2002) (citation omitted). Even if the deficiencies in their complaint could be cured by filings outside the complaint's corners, these declarations are inadequate to demonstrate standing.

In these declarations, representatives from two residential management companies assert that they have followed the suggestions made in Part V.A of the Policy Guidance, see 72 Fed. Reg. 2740-42, by consulting publicly available sources and surveying the properties they operate to determine the potential need for services to LEP persons at those properties. They allege that the cost of doing so was $6000, in the case of Forest City Residential Management, Inc., and $10,000, in the case of Related Management Company. They do not provide any details about how this cost was calculated, such as whether it represents out-of-pocket expenses or is based on the estimated hours spent by paid employees. As set forth in our opening brief (Def. Br. 9), a party does not have standing to challenge a law simply because it spends money to determine the

potential cost of compliance. Therefore, assertions that two member companies have spent modest sums, relative to the size of their operations,[2] to determine how they can comply with the law are not sufficient to establish a distinct and palpable injury.

Related Property Management also claims that it has identified 24 languages that are spoken in its subsidized properties, and that it has contacted translators and determined that it will cost approximately $2 million to translate 90 unspecified documents into these languages.[3] See Scurfield Decl. ¶ 10. However, it is entirely speculative that Related will ultimately spend such sums to provide meaningful access to LEP persons. The mere fact that one or more residents speak a language other than English does not necessarily trigger an obligation to translate any rental documents (much less 90 different documents) into that language. Non-native English speakers may be proficient in English, see 72 Fed. Reg. at 2740, and only those documents that are "critical or vital" to ensure meaningful access by LEP persons are potentially required to be translated, and only into the language(s) most frequently encountered in the program. See 72 Fed. Reg. at 2736. Furthermore, the Guidance states that HUD will assess the obligations of a particular recipient by applying a balancing test that, among other things, considers the number of LEP residents or prospective residents, the nature of their contacts with

---

[2] Related Management, for example, manages over 1300 federally subsidized apartments in 76 properties and received more than $110 million in federal project-based grants in 2006. See Scurfield Decl. ¶ 2. Forest City manages over 7,200 federally subsidized apartments in 42 apartment communities. Churgovich Decl. ¶ 4.

[3] Related also claims that it has determined that it will cost $1.4 annually "to provide oral translations." Scurfield Decl. ¶ 3. Related provides no specifics, however, as to the nature of the oral translation that would be provided or how the estimate was calculated. It is impossible, therefore, to evaluate what potential injuries might flow from the alleged costs of oral translations.

the provider, and the resources of the funding recipient. See 72 Fed. Reg. 2734; see also 72 Fed. Reg. at 2735 ("[C]osts are a material consideration in identifying the reasonableness of particular language assistance measures.").

Related Property Management's declaration contains no facts from which it can reasonably be inferred that it will be legally required to incur the translation expenditures it claims to face. Nor does Related allege that any LEP resident or prospective resident has even requested or needed language assistance that Related was unable or unwilling to provide. Plaintiffs have thus failed to allege injury "beyond the speculative level," Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1959 (2007), and their complaint must therefore be dismissed.

    2.     <u>Plaintiffs Have Failed to Satisfy the Causation and Redressability Elements of Standing</u>

        a.    *The Policy Guidance Imposes No New Obligations on Funding Recipients*

Even if Plaintiffs could satisfy the injury requirement, dismissal would still be required because Plaintiffs cannot establish that their alleged injury is caused by the Policy Guidance or that it would be remedied if the Guidance were invalidated. In responding to our Motion to Dismiss, Plaintiffs characterize the Policy Guidance as a "directive" that imposes "requirements" on Plaintiffs' members. Pl. Br. 2. Yet the plain language of the Policy Guidance refutes this assertion:

> This policy guidance clarifies <u>existing</u> legal requirements for LEP persons by describing the factors recipients should consider in fulfilling their responsibilities to LEP persons. The policy guidance is not a regulation, but rather a guide * * * it provides an analytic framework that recipients may use to determine how best to comply with statutory and regulatory obligations to provide meaningful access to benefits, services, information, and other important portions of their programs and activities for individuals who are limited English proficient.

72 Fed. Reg. at 2738 (emphasis added).

Accordingly, the Policy Guidance does not, as Plaintiffs contend, obligate recipients of federal financial assistance to do anything beyond what is already required under Title VI and its implementing regulations. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d. Title VI further requires each federal grant agency to implement this principle of non-discrimination "by issuing rules, regulations, or orders of general applicability." 42 U.S.C. 2000d-1.

In 1976, the Department of Justice (DOJ) promulgated regulations governing "the respective obligations of federal agencies regarding enforcement of Title VI," including HUD. 28 C.F.R. 42.401. The DOJ regulations, which have been in effect since January 3, 1977, include the following provision, currently codified at 28 C.F.R. 42.405(d)(1):

> Where a significant number or proportion of the population eligible to be served or likely to be directly affected by a federally assisted program (*e.g.*, affected by relocation) needs service or information in a language other than English in order effectively to be informed of or to participate in the program, <u>the recipient shall take reasonable steps, considering the scope of the program and the size and concentration of such population, to provide information in appropriate languages to such persons.</u> This requirement applies with regard to written material of the type which is ordinarily distributed to the public.

41 Fed. Reg. 52,669, 52,670-71 (1976) (emphasis added).[4] Pursuant to Title VI, HUD has

---

[4] Since 1965, the Attorney General has been responsible for coordinating federal agencies' activities under Title VI. See Exec. Order No. 11,247, 30 Fed. Reg. 12327 (1965); Exec. Order No. 12250, 45 Fed. Reg. 72,995 (1980). When Congress charges multiple agencies with enforcing a statute, the Supreme Court generally gives special deference to the regulations promulgated by the agency charged by Executive Order with coordinating government-wide compliance. See <u>Consolidated Rail Corp. v. Darrone</u>, 465 U.S. 624, 634 (1984); <u>Andrus v.</u>

promulgated regulations virtually identical to those promulgated by every other federal agency stating that recipients of federal financial assistance may not "utilize criteria or methods of administration which have the <u>effect</u> of subjecting individuals to discrimination because of their race, color, or national origin, or have the <u>effect</u> of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin."[5] 24 C.F.R. 1.4(b)(2)(i) (emphasis added). Plaintiffs have not challenged those regulations in this case.

Plaintiffs do not dispute that in some circumstances, a funding recipient's refusal to provide language assistance to LEP participants could have "the effect of subjecting individuals to discrimination because of their * * * national origin or have the effect of subjecting individuals to discrimination because of their race, color or national origin." See 24 C.F.R. 1.4(b)(2)(i). Indeed, the Supreme Court upheld this principle more than 30 years ago, in <u>Lau v. Nichols</u>, 414 U.S. 563 (1974), when it concluded that a public school system's failure to provide

---

<u>Sierra Club</u>, 442 U.S. 347, 357-358 (1979).

[5] At least 25 other federal agencies have adopted regulations that contain similar language. See 5 C.F.R. 900.404 (Office of Personnel Management); 6 C.F.R. 21.5 (Department of Homeland Security); 7 C.F.R. 15.3 (Department of Agriculture); 10 C.F.R. 4.12 (Nuclear Regulatory Commission); 10 C.F.R. 1040.13 (Department of Energy); 14 C.F.R. 1250.103-2 (National Aeronautics & Space Administration); 15 C.F.R. 8.4 (Department of Commerce); 18 C.F.R. 705.4 (Water Resources Council); 18 C.F.R. 1302.4 (Tennessee Valley Authority); 22 C.F.R. 15.3 (Agency for International Development); 28 C.F.R. 36.204 (Department of Justice); 29 C.F.R. 31.3 (Department of Labor); 32 C.F.R. 195.4 (Department of Defense); 34.F.R. 15.3 (Department of Education); 38 C.F.R. 18.3 (Department of Veterans Affairs); 41 C.F.R. 101.6.204.2 (Federal Property Management Regulations); 43 C.F.R. 27.3 (Department of Interior); 44 C.F.R. 7.5 (Department of Interior); 44 C.F.R. 7.5 (Federal Emergency Management Agency); 45 C.F.R. 80.3 (Department of Health and Human Services); 45 C.F.R. 15.3 (National Science Foundation); 45 C.F.R. 1110.3 (National Foundation on the Arts & Humanities); 45 C.F.R. 1203.4 (Corporation for National and Community Service); 49 C.F.R. 21.5 (Department of Transportation); 49 C.F.R. 265.7 (Federal Railroad Administration).

English language instruction to students of Chinese ancestry who did not speak English denied the students a meaningful opportunity to participate in a public educational program in violation of Title VI and a regulation promulgated by the former Department of Health, Education, and Welfare, which is identical to the HUD regulation.[6]

Plaintiffs, however, ignore the regulation and simply assert that "the plain language of Title VI prohibits discrimination based on only race, color, or national origin. The statute does not permit HUD to equate a person's fluency in English with his or her national origin." Pl. Br. 3. Plaintiffs' argument is a red herring. The Policy Guidance does not equate language with national origin; nor does it suggest that funding recipients violate Title VI whenever they fail to communicate with LEP persons in their native language. Rather, it explains how, in certain circumstances, the failure to provide meaningful access to federally funded programs and services to LEP persons can result in national origin discrimination as prohibited by Title VI and its implementing regulations. 72 Fed. Reg. at 2738.

Although the Policy Guidance encourages recipients to conduct individualized

---

[6] None of the cases Plaintiffs cite (Pl. Br. 10-11) refutes the proposition that in some circumstances, a funding recipient's failure to provide language assistance to an LEP participant may have the effect of subjecting individuals to discrimination on the basis of national origin, in violation of Title VII and its implementing regulations. Plaintiffs cite Olagues v. Russoniello, 770 F.2d 791 (9th Cir. 1985), and Soberal-Perez v. Heckler, 717 F.2d 36 (2d Cir. 1983), which hold that lack of English fluency is not a suspect class requiring strict scrutiny under the Equal Protection Clause. Plaintiffs also cite Napreljac v. John Q. Hammons Hotels, Inc., 461 F.Supp.2d 981 (S.D. Iowa 2006), a Title VII case holding that evidence that plaintiff was fired because of his limited English ability was insufficient to support a claim of national origin discrimination. Finally, Plaintiffs cite Franklin v. District of Columbia, 960 F.Supp. 394 (D.D.C. 1997), which involved a private Title VI action, not governmental enforcement of Title VI regulations, and is thus distinguishable. See Alexander v. Sandoval, 532 U.S. 275 (2001) (holding that Title VI does not create a private right of action to enforce the statute's implementing regulations).

assessments of their obligation, if any, to provide meaningful program access to LEP persons by considering certain factors, such assessments are not required. The Policy Guidance states that "[t]he recipient may conduct an individualized assessment that balances the following four factors * * *." 72 Fed. Reg. at 2734 (emphasis added); see also 72 Fed. Reg. At 2738 ("This guidance provides an analytical framework that recipients may use to determine how best to comply with statutory and regulatory obligations to provide meaningful access [to LEP persons]"). A recipient's failure to conduct such an assessment cannot constitute grounds for an enforcement action. See 24 C.F.R. 1.8(d). Only Title VI and its implementing regulations are legally enforceable. See 42 U.S.C. 2000d-1; 24 C.F.R. 1.7-1.9 (setting forth HUD's administrative enforcement procedures for noncompliance with the regulation's nondiscrimination mandate). Accordingly, the Policy Guidance imposes no new obligations on funding recipients.

        b.    *Plaintiffs' Alleged Injuries Were Not Caused by the Policy Guidance and Will Not Be Redressed by a Decision in Their Favor*

Because the legal obligations of Plaintiffs' members toward LEP persons arise from Title VI and its implementing regulations, not from the Policy Guidance, invalidating the Policy Guidance will not redress their alleged injuries. Even if the Guidance were invalidated, Plaintiffs would still be subject to the regulation prohibiting them from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin." 24 C.F.R. 1.4(b)(2)(i) (emphasis added). Plaintiffs' members would

still be subject to a Title VI complaint alleging that they had violated these regulations by failing to provide meaningful access to an LEP person. Consistent with the binding DOJ coordination regulation, 28 C.F.R. 42.405(d)(1), in assessing the merits of such a complaint HUD would still have to consider whether the recipient had taken "reasonable steps, considering the scope of the program and the size and concentration of such population to provide information in [the] appropriate language(s)" to provide meaningful access to the person. It is entirely speculative whether the outcome of any such complaint would be any different if the Policy Guidance were not in effect.

This case, therefore, is similar to National Wrestling Coaches Ass'n v. Department of Educ., 366 F.3d 930, 939-40 (D.C. Cir. 2004), cert. denied, 545 U.S. 1104 (2005). There, associations of college wrestling coaches and athletes challenged Title IX policy guidance issued by the Department of Education alleging that their schools had terminated wrestling programs in response to the guidance. The Court of Appeals held that because plaintiffs had not challenged the underlying Title IX regulation, it was speculative whether invalidating the guidance would redress the alleged injury:

> Appellants do not contest the constitutionality of Title IX, nor do they challenge the 1975 regulations. Therefore, that legal regime, which requires schools to take gender equity concerns into account when structuring their athletic programs, would remain in place even if the disputed 1996 Clarification and the 1979 Policy Interpretation were revoked. And under that legal regime, schools would still have the discretion to eliminate men's wrestling programs, as necessary, to comply with the gender equity mandate of Title IX. A judicial decision striking down the 1996 Clarification and the 1979 Policy Interpretation would not afford appellants redress sufficient to support standing.

366 F.3d at 933. Similarly, here, the "legal regime" of the HUD Title VI regulations and the

DOJ coordinating regulations would remain in effect even if the Guidance were invalidated, and Plaintiffs' members could still face Title VI complaints by LEP program participants.

    B.    **Plaintiffs' Claims Are Not Ripe for Judicial Review and this Court Should Not Undertake Judicial Review of the Policy Guidance Prior to its Application to a Specific Set of Facts**

Finally, Plaintiffs' claims are not ripe because they have not alleged that any member has been subjected to an actual or threatened enforcement action for failing to provide adequate assistance to LEP persons. Plaintiffs' complaint does not a present a pure issue of law, as they contend (Pl. Br. 12-13), because there are a virtually infinite number of possible facts to which the law may be applied. Whether and to what extent a funding recipient's failure to provide assistance to LEP persons may violate Title VI and its implementing regulations requires application of a "flexible and fact dependent standard" to achieve "a balance that ensures meaningful access by LEP persons to critical services while not imposing undue burdens on small business, small local governments, or small non nonprofit entities." See 72 Fed. Reg. at 2740. Furthermore, the agency has emphasized that it will be similarly flexible as it conducts its investigation:

> At all stages of an investigation, HUD engages in voluntary compliance efforts and provides technical assistance to recipients. During such efforts, HUD proposes reasonable timetables for achieving compliance and consults with and assists recipients in exploring cost-effective ways of coming into compliance. In determining a recipient's compliance with the Title VI regulations, HUD's primary concern is to ensure that the recipient's policies and procedures provide meaningful access for LEP persons to the recipient's programs and activities.

72 Fed. Reg. 7247; see also 24 C.F.R. 1.8.

As set forth above, the failure to provide language assistance to an LEP program participant could have "the effect of subjecting individuals to discrimination because of their

\* \* \* national origin or have the effect of subjecting individuals to discrimination because of their race, color or national origin." 24 C.F.R. 1.4(b)(2)(i); see also Lau v. Nichols, 414 U.S. 563 (1974); 28 C.F.R. 42.405(d)(1). There are undoubtedly also many instances where language assistance to LEP persons, while beneficial to such persons, is not legally required. In the absence of a developed factual record, there is simply no concrete issue for this Court to decide. As noted in our opening brief (Def. Br. 18), and described in the Policy Guidance itself, 72 Fed. Reg. 2746-47, there is a lengthy administrative process that must be exhausted before one of Plaintiffs' members would be threatened with an enforcement action or a termination of funds. At this point we do not know when or if one of Plaintiffs' members would face that administrative process, much less suffer an adverse outcome. Accordingly, this Court should dismiss Plaintiffs' complaint because their claims are not ripe for review.[7] See, e.g., New York v. E.P.A., 413 F.3d 3, 43-44 (D.C. Cir. 2005).

---

[7] Plaintiffs cite two cases (Pl. Br. 17-18) that are clearly distinguishable from the instant case. In Ciba-Geigy Corp. v. U.S.E.P.A., 801 F.2d 430 (D.C. Cir. 1985), the D.C. Circuit found that the agency imposed new labeling requirements on the plaintiff's pesticide by administrative fiat, without allowing plaintiff recourse to statutorily mandated review procedures. In so doing, the agency bypassed its established process to make a determination that a specific pesticide manufactured by Ciba-Geigy was misbranded. Plaintiffs here have not alleged that any of their members have been subjected to or threatened with enforcement action. If and when such actions take place, there is no reason to question that the recipients affected will be afforded the review process set out in 24 C.F.R. 1.7 - 1.9. Similarly, in Continental Air Lines, Inc. v. C. A. B., 522 F.2d 107 (D.C. Cir. 1975), the Civil Aeronautics Board invoked the ripeness doctrine to postpone judicial review of the Board's response to new seating configurations adopted by some airlines. The D.C. Circuit rejected the Board's argument, pointing out that the policy was having its intended effect of forcing the airlines to abandon the new configurations. In this case, by contrast, HUD's Policy Guidance does not in and of itself require any funding recipient to do anything.

CONCLUSION

Plaintiffs have failed to demonstrate that this Court has subject matter jurisdiction over their claims. Accordingly, this Court should dismiss Plaintiffs' complaint.

This 14th day of September, 2007

Respectfully submitted,

| | |
|---|---|
| JEFFREY A. TAYLOR<br>United States Attorney | RENA J. COMISAC<br>Acting Assistant Attorney General<br>Civil Rights Division |
| BEVERLY RUSSELL<br>Assistant United States Attorney<br>555 4th Street, NW<br>Washington, DC 20530 | STEVEN H. ROSENBAUM<br>Chief<br>TIMOTHY J. MORAN<br>Deputy Chief |

_____/s_____
HARVEY L. HANDLEY
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - G St.
Washington, D.C. 20530
Phone: (202) 514-4756
Fax: (202) 514-1116

Attorneys for Defendants

## CERTIFICATE OF SERVICE

      I hereby certify that on September 14, 2007, I filed the foregoing Reply Brief in Support of Motion to Dismiss electronically, using the court's Electronic Case Filing System, which automatically served the document on Andrew L. Sandler, Joseph L. Barloon, and Austin K. Brown.

                                                 /s/
                                      Harvey L. Handley