## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
NATIONAL MULTI HOUSING COUNCIL,  :
et al.,                          :
                                 :
        Plaintiffs,              :
                                 :
    v.                           :  Civil Action No. 07-0815 (JR)
                                 :
ALPHONSO JACKSON, Secretary,     :
Department of Housing and Urban  :
Development, et al.,             :
                                 :
        Defendants.              :
```

### MEMORANDUM

The plaintiffs here – two landlord groups – complain that the Department of Housing and Urban Development exceeded its statutory authority under Title VI of the Civil Rights Act by adopting a recent "policy guidance." That guidance "clarifies" a long-standing requirement that recipients of funding for Federal programs communicate with program beneficiaries in languages other than English if those beneficiaries have limited English proficiency (LEP). Plaintiffs assert that Title VI prohibits only discrimination on the basis of national origin, not on the basis of language, and that it does not support this kind of "disparate impact" provision. They also complain that the vagueness of the guidance makes compliance overly burdensome, rendering it substantively arbitrary and capricious in violation of the Administrative Procedure Act.

HUD's response is to deny the existence of a case or controversy. On its view, the case is not yet ripe because no

enforcement proceedings have been undertaken, and plaintiffs lack standing to challenge a guidance document that only details an existing obligation – neither creating rights or obligations for private parties nor binding the agency's enforcement authority. The agency has thus moved for judgment on the pleadings.

I conclude that, together, the doctrines of standing and ripeness do present an impassable barrier to plaintiffs' claims. The claim that the policy guidance is substantively arbitrary or capricious is unripe because its adjudication would require speculation on the nature of hypothetical enforcement proceedings. Plaintiffs' other two claims – that the statute allows regulation of national origin discrimination, not language discrimination, and that the statute does not allow disparate impact regulations – present purely legal issues under a settled agency policy, and so they are ripe, but plaintiffs lack standing to bring them. The injury of which they complain would not be redressed by the remedy they seek: the obligation of HUD's funding recipients to communicate with their tenants in languages other than English did not arise from the challenged policy guidance and so would survive its invalidation.

## I. Ripeness

Ripeness is a justiciability doctrine designed both to prevent courts from short-circuiting policymaking activity that is not yet complete and to prevent premature adjudication of

issues whose just resolution would benefit from further factual development.  See, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732-733 (1998) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148-149 (1967)).  The Supreme Court has distilled the necessary inquiry into a three factor test: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  Ohio Forestry, 523 U.S. at 733.  Ultimately, the dispositive question is "whether the issues tendered are appropriate for judicial resolution," Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 156, 162 (1967), balancing the benefits of patience for the administrative process against the harms of withholding review.

Concerns about ripeness abate most quickly when the issues presented are "purely legal question[s]."  See Toilet Goods, 367 U.S. at 163.  An example would be a claim that "the regulation is totally beyond the agency's power under the statute," which is "the type of legal issue that courts have occasionally dealt with without requiring a specific attempt at enforcement."  See id. (citing Columbia Broadcasting System v. United States, 316 U.S. 407 (1942); Pierce v. Society of Sisters, 268 U.S. 510 (1925)); see also Nat'l Mining Ass'n v. Fowler, 324

F.3d 752, 757 (D.C. Cir. 2003) (if a petition for review raises a purely legal question, "it is presumptively reviewable").  Such purely legal challenges will be deemed unfit for present judicial resolution only if there is a showing that "the agency or court will benefit from deferring review until the agency's policies have crystallized through the application of the policy to particular facts."  Am. Petroleum Inst. v. EPA, 906 F.2d 729, 739 (D.C. Cir. 1990) (quoting Eagle-Picher Indus. v. EPA, 759 F.2d 905, 915 (D.C. Cir. 1985) (internal quotations omitted).

On these precedents, plaintiffs' two main complaints, regarding the distinction between national origin and language discrimination and the availability of a disparate impact theory under Title VI, are already ripe for review.  The allegation is essentially that regulation of English-only communication as a form of national origin discrimination exceeds the statutory authority granted under Title VI, even as a form of disparate impact regulation, and this raises a purely legal question.  It involves the application of no facts, and the agency's position on the issue is settled by long-standing regulation in addition to the current policy guidance.  The agency's position on this matter is fully crystallized – or, perhaps, set in concrete – and neither accuracy in adjudication nor flexibility in policy-making will be affected by delaying the issue any longer.

Plaintiffs' complaint of substantive arbitrariness and capriciousness in violation of 5 U.S.C. § 706(2)(A) is different. The theory is that the guidance's requirement to communicate in languages other than English is overly burdensome, or vague, or both, and that it imposes prohibitive costs upon landlords.  See Complaint [1] at ¶¶ 54-55.  That argument runs smack into the ripeness doctrine.  Perhaps anticipating the argument, HUD explained in the guidance that "the intent of this Guidance is to suggest a balance that ensures meaningful access by LEP persons . . . while not imposing undue burdens on small business."  72 Fed. Reg. 2740.  HUD further explained that the guidance was "designed to be a flexible and fact-dependent standard," giving various factors that funding recipients should consider in assessing their own compliance.  Id. (emphasis added).  Application of the ripeness doctrine in this context gives the agency the opportunity to show that what it calls "flexibility" is not what the plaintiffs call "vagueness" by allowing the court to abstain from review until a crystallized factual record exists.  For their part, the plaintiffs have made no showing that, in their real-world interactions with HUD, the guidance – with its "vague" requirements – is being dangled over their heads like the sword of Damocles.  The benefits of abstention for the administrative and adjudicative processes thus

far outweigh the harms to the plaintiff, and this cause of action
will accordingly be dismissed as unripe.

## II. Standing

Although the first two claims are ripe, these
plaintiffs lack standing to pursue them because the relief they
seek – invalidation of HUD's policy guidance – would not redress
their claimed injury.  Lujan v. Defenders of Wildlife, 504 U.S.
555 (1992), rendered Article III standing into a three-part
inquiry:

> First, the plaintiff must have
> suffered an injury in fact - an
> invasion of a legally protected
> interest which is (a) concrete and
> particularized, and (b) actual or
> imminent, not conjectural or
> hypothetical.  Second, there must
> be a causal connection between the
> injury and the conduct complained
> of - the injury has to be fairly
> traceable to the challenged action
> of the defendant, and not the
> result of the independent action of
> some third party not before the
> court.  Third, it must be likely,
> as opposed to merely speculative,
> that the injury will be redressed
> by a favorable decision."

Id. at 560-61 (internal quotations omitted).  This inquiry is not
satisfied where a plaintiff challenges an agency publication
which is "neither a rule nor a precedent but is merely an
announcement to the public of the policy which the agency hopes
to implement in future rulemakings or adjudications."  Utility
Air Regulatory Group v. EPA, 320 F.3d 272, 278 (D.C. Cir. 2003)

(quoting Pac. Gas & Elec. Co. v. Fed. Power Comm'n, 506 F.2d 33, 38 (D.C. Cir. 1974); see also Panhandle E. Pipeline Co. v. FERC, 198 F.3d 266, 269 (D.C. Cir. 1999). Plaintiffs' standing in this case thus turns upon the proper characterization of HUD's policy guidance and its relation to other regulations in causing the particular injury of which they complain.

Because the plaintiffs challenge the substance of the guidance, and not the procedures by which it was promulgated, it is not necessary to inquire broadly into whether HUD's guidance is a substantive regulation or an "interpretive rule." See 5 U.S.C. § 553(b). I am sensitive to the concerns that Judge Randolph enunciated in Appalachian Power Co. v. EPA, 208 F.3d 1015, 1020 (D.C. Cir. 2000) – namely, that an agency might use "policy guidance" when actually regulating as a way of making law without public comment or as a means of evading judicial review. I also do not doubt that the intent of HUD's guidance was regulatory in the sense that it was meant to menace landlords into compliance by raising the specter of funding termination under certain circumstances. Yet where plaintiffs challenge a particular aspect of a guidance document as exceeding an agency's authority under its authorizing statute, the standing question is not only whether the guidance document was actually a substantive regulation, but whether the substance complained of actually causes – or, whether its invalidation would redress – the

- 7 -

particular injury alleged.  Answering that question requires an analysis of HUD's guidance in the context of the existing regulatory structure.

The statute in question is Title VI of the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from . . . any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Every federal agency that extends financial assistance is authorized by the statute to effectuate this goal "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute."  42 U.S.C. § 2000d-1.  The statute also requires an agency to advise recipients of their non-compliance and to "determine[] that compliance cannot be secured by voluntary means" before terminating funding.  Id. Thus, non-compliance with the statute or with its expressly authorized regulations does not ever result in "surprise" fund cut-offs: third parties are always given the opportunity to comply with the regulations as the agency is currently interpreting them before losing their funding.

Only two years into the life of Title VI, the Department of Justice promulgated an implementing regulation endorsing the "disparate impact" theory that these plaintiffs

claim to be a violation of the statute.  That regulations states
that a federally funded program

> may not . . . utilize criteria or
> methods of administration which
> have the _effect_ of subjecting
> individuals to discrimination
> because of their race, color, or
> national origin, or have the _effect_
> of defeating or substantially
> impairing accomplishment of the
> objectives of the program as
> respects individuals of a
> particular race, color, or national
> origin.

28 C.F.R. § 42.104(b)(2) (published at 31 Fed. Reg. 10265
(July 29, 1966)) (emphasis added).  In 1973, HUD adopted the same
operative language to govern recipients of funding for "housing,
accommodations, facilities, services, financial aid, or other
benefits which will be provided under any [funded] program or
activity."  24 C.F.R. § 1.4(b)(2)(I) (published at 38 Fed. Reg.
17949 (July 5, 1973)).  Thus, a disparate impact theory of
discrimination is and has been available under the duly
promulgated Title VI regulations of both the Justice Department
and HUD for 35 years.

Longstanding Justice Department regulations also
expressly require communication between funding recipients and
program beneficiaries in languages other than English to ensure
Title VI compliance.  Regulations provide that

> [w]here a significant number or
> proportion of the population
> eligible to be served or likely to

- 9 -

> be directly affected by a federally
> assisted program (e.g., affected by
> relocation) needs service or
> information in a language other
> than English in order effectively
> to be informed of or to participate
> in the program, the recipient shall
> take reasonable steps, considering
> the scope of the program and the
> size and concentration of such
> population, to provide information
> in appropriate languages to such
> persons.

28 C.F.R. § 42.405(d)(1) (originally published at 41 Fed. Reg.
52669 (Dec. 1, 1976)).  Other than the policy guidance now at
issue, HUD has not itself enacted a parallel regulation or any
other provision explicitly requiring communication with LEP
populations in their native languages.

There were no relevant changes to this regulatory
structure until 2000, when President Clinton issued Executive
Order 13166 directing all Federal agencies to "work to ensure
that recipients of Federal financial assistance (recipients)
provide meaningful access to their LEP applicants and
beneficiaries."  65 Fed. Reg. 50121 (Aug. 11, 2000).  That order
directed the agencies to a Justice Department guidance document,
published the same day, "which sets forth the compliance
standards that recipients must follow to ensure that the programs
and activities they normally provide in English are accessible to
LEP persons and thus do not discriminate on the basis of national
origin in violation of title VI . . . and its implementing

regulations." Id.  The Justice Department made clear that the

standards in that guidance were an articulation of an existing

requirement for funding recipients, not the creation of a new

one.  The DOJ guidance notes that the "Department of Justice has

consistently adhered to the view that the significant

discriminatory effects that the failure to provide language

assistance has on the basis of national origin, places the

treatment of LEP individuals comfortably within the ambit of

Title VI and agencies' implementing regulations."  65 Fed. Reg.

50123, 50124 (Aug. 11, 2000) (citing regulations described

above).  Following the direction in Executive Order 13166, HUD

made extensive use of the Justice Department guidance in creating

the guidance at issue in this case.

        The HUD guidance takes similar pains to identify its

function as fleshing out existing responsibilities, rather than

creating new ones.  It states:

                The purpose of this policy guidance
                is to assist recipients in
                fulfilling their responsibilities
                to provide meaningful access to LEP
                persons under existing law.  This
                policy guidance clarifies existing
                legal requirements for LEP persons
                by describing the factors
                recipients should consider in
                fulfilling their responsibilities
                to LEP persons.  The policy
                guidance is not a regulation, but
                rather a guide.  Title VI and its
                implementing regulations require
                that recipients take responsible
                steps to ensure meaningful access

- 11 -

by LEP persons.  This guidance
provides an analytical framework
that recipients may use to
determine how best to comply with
statutory and regulatory
obligations to provide meaningful
access to the benefits, services,
information, and other important
portions of their programs and
activities for individuals who are
limited English proficient.  These
are the same criteria HUD will use
in evaluating whether recipients
are in compliance with Title VI and
Title VI regulations.

72 Fed. Reg. 2732, 2738 (Jan. 22, 2007).  This self-description

is accurate.  The HUD guidance offers a "flexible and fact-

dependent standard" which balances four factors: (1) the

proportion of LEP persons served by the program; (2) the

frequency with which they come in contact with the program;

(3) the importance of the program for those beneficiaries; and

(4) the resources available to the recipient.  Id. at 2740.  This

is a malleable standard that the recipient "should" use in

assessing their own compliance, but it does not bind or expand

HUD's enforcement or de-funding authority.  Ultimately, it is

only an expression of the "criteria HUD will use in evaluating

whether recipients are in compliance with Title VI and Title VI

regulations."  Id.

        The guidance is thus not susceptible to a challenge by

these plaintiffs.  A plaintiff generally lacks standing to

challenge a document that, like this policy guidance, is "merely

an announcement to the public of the policy which the agency
hopes to implement in future rulemakings or adjudications."
Utility Air Regulatory Group v. EPA, 320 F.3d 272, 278 (D.C. Cir.
2003).  Yet these plaintiffs have an even clearer standing
problem because of the nature of their challenge.  The legal
injuries they assert regarding the availability of language
discrimination and disparate impact theories under Title VI do
not arise from this guidance at all: it is clear from the
foregoing discussion that HUD and Justice have adhered to a
disparate impact theory of discrimination under Title VI and its
implementing regulations for over 35 years, and that the Justice
Department has required funding recipients to communicate with
LEP populations in languages other than English for nearly that
long.  HUD's existing disparate impact regulation provides ample
authority for initiating the fund cut-off procedure against
recipients who fail to provide translations for LEP beneficiaries
because that practice would likely "have the effect of defeating
or substantially impairing accomplishment of the objectives of
the program as respects individuals of a particular . . .
national origin."  24 C.F.R. § 1.4(b)(2)(I).  If such an effect
were not proven, HUD could not terminate funding, with or without
the guidance, because the guidance by its own terms does not
create any new obligations.

HUD's intent in promulgating this guidance may indeed have been regulatory – it may have been done to make the requirement more palpable and to encourage greater "voluntary" compliance.  Because the relevant behavior would put the plaintiffs at risk of funding termination for Title VI non-compliance with or without the guidance, however, the relief plaintiffs seek would not redress their claimed injury.

An appropriate order accompanies this memorandum.


JAMES ROBERTSON
United States District Judge